MCDONALD HOPKINS LLC

SHAWN M. RILEY (0037235)
PAUL W. LINEHAN (0070116)
JOHN A. POLINKO (0073967)
600 Superior Avenue, East, Suite 2100
Cleveland, OH  44114-2653
Telephone:  (216) 348-5400
Facsimile:  (216) 348-5474
Email:   **sriley@mcdonaldhopkins.com**
         **plinehan@mcdonaldhopkins.com**
         **jpolinko@mcdonaldhopkins.com**

MOSELEY BIEHL TSUGAWA LAU & MUZZI
A HAWAII LIMITED LIABILITY LAW COMPANY

CHRISTOPHER J. MUZZI (6939)
Alakea Corporate Tower
1100 Alakea Street, 23rd Floor
Honolulu, HI  96813
Telephone:  (808) 531-0490, Facsimile (808) 534-0202
Email:  **cmuzzi@hilaw.us**

Proposed Co-Counsel to the Debtors and
Debtors in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>Hawaii Medical Center, et al.,[1]<br><br>Debtors. | Case No. 11-01746<br>(Chapter 11 Case)<br>(Honorable Robert J. Faris)<br>(Joint Administration Requested) |
| This document relates to:<br>All Cases | |

---

[1]  The Debtors are as follows:  Hawaii Medical Center, a Hawaii non-profit corporation (Tax No. 20-3409838); Hawaii Medical Center East, a Hawaii non-profit corporation (Tax No. 51-0598670); and Hawaii Medical Center West, a Hawaii non-profit corporation (Tax No. 51-0598672).

## DECLARATION OF KENNETH J. SILVA IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

1.     I am a Member of the Board of Directors for each of Hawaii Medical Center, a Hawaii non-profit corporation ("HMC"), Hawaii Medical Center East, a Hawaii non-profit corporation ("HMC East"), and Hawaii Medical Center West, a Hawaii non-profit corporation ("HMC West"). I am generally familiar with the day-to-day operations, business affairs, and books and records of HMC, HMC East and HMC West, each of which are debtors and debtors in possession in these proceedings (collectively, the "Debtors").

2.     On June 21, 2011 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Hawaii (the "Bankruptcy Court"). Hereinafter, I refer to the proceeding cases arising from the filing of the chapter 11 petitions as these "Chapter 11 Cases."

3.     To enable the Debtors to minimize the adverse effects of these Chapter 11 Cases, the Debtors have requested assorted types of relief in various "first-day" applications and motions (collectively, the "First Day Motions"). The First Day Motions seek relief aimed at, among other things, continuing hospital operations with minimal disruption to patients and staff, retaining employees, promoting an efficient and economical restructuring, and

maintaining the Debtors' going-concern value as they attempt to reorganize. I believe the relief sought in the First Day Motions is crucial to achieving these goals.

4.      Furthermore, the Debtors have, on the Petition Date, filed a proposed plan of reorganization (the "Plan") and disclosure statement (the "Disclosure Statement"), which is supported by the Debtors' prepetition secured lenders. I believe the structure and implementation of the Plan is proper to allow the Debtors to successfully reorganize in these Chapter 11 Cases.

5.      I submit this Declaration in support of the First Day Motions. Any capitalized term not expressly defined herein has the meaning ascribed to that term in the relevant First Day Motions. All facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by others at the Debtors, upon my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration in support of the filing of these Chapter 11 Cases.

6.      This Declaration is divided into two parts: Part I describes the Debtors' businesses and the circumstances surrounding the commencement of these Chapter 11 Cases, and Part II sets forth the relevant facts in support

of each of the First Day Motions, in addition to previewing certain aspects of the Plan.

## I.    BACKGROUND

### *Debtors' Businesses*

7.    Following their emergence from chapter 11 bankruptcy in 2010 (In re: CHA Hawaii, LLC; Case No. 08-01369, Jointly Administered) (the "Prior Cases"), the Debtors, then Hawaii limited liability companies, converted to Hawaii non-profit corporations.  The Debtors maintain two hospital campuses – HMC East and HMC West – located in North Honolulu and in Ewa Beach, respectively.  HMC East has 240 licensed beds (52 skilled nursing facility beds), and HMC West has 102 licensed beds – for a combined total of 342 beds for HMC East and HMC West.

8.    As of the Petition Date, the Debtors employed approximately 1,002 individuals, including full-time, part-time, temporary, union and non-union employees.  The Debtors' consolidated net revenues for the fiscal year ending June 30, 2010, were approximately $144,018,000.

### *Debtors' History and Previous Chapter 11 Bankruptcy Filings*

9.    The hospital system currently operated by HMC was originally established in 1927 under the sponsorship of the sisters of the Third Franciscan Order of Syracuse, New York.  The hospitals came to be known as St. Francis Medical Center.  Among the programs for which St. Francis

Medical Center had become well known were transplant services (operating Hawaii's first and only program), End Stage Renal Disease care, cardiac care and the Institute of Cancer. After a period of sustained success, however, St. Francis Medical Center (along with many other hospitals throughout the country) fell victim to the ever-changing healthcare industry. Such changes, including the steady increase in the cost of patient care coupled with static Medicare and Medicaid reimbursement, contributed to the deferral of certain maintenance and capital expenditures, adversely affecting the long-term viability of the hospitals.

10. Shortly after the passage of the Balanced Budget Act of 1997, St. Francis Medical Center began to experience financial difficulties, partially due to its role as the primary health care provider for the uninsured or government-insured in the Honolulu market. St. Francis Medical Center faced a 9-week nursing strike in 2002 and the subsequent loss of physician and community support. By 2005, 74% of patients visiting St. Francis Medical Center were either on Medicare or Medicaid. Although the costs of caring for these patients continued to increase, Medicare and Medicaid reimbursements remained flat. The deterioration of St. Francis Medical Center's financial performance contributed to its deferral of maintenance and capital expenditures, further compromising the long-term viability of the hospital system.

11.    In January, 2007, Hawaii Medical Center, LLC, a Hawaii limited liability company,[2] purchased the two hospital campuses in North Honolulu (Hawaii Medical Center East, commonly referred to as "HMC East") and Ewa Beach (Hawaii Medical Center West, commonly referred to as "HMC West") from St. Francis Medical Center.[3]

12.    To fund the purchase of the hospitals and provide adequate working capital, HMC, HMC East and HMC West, as borrowers, entered into certain loan agreements with St. Francis Healthcare System of Hawaii, as Agent, St. Francis Medical Center, and St. Francis Medical Center – West (collectively, "St. Francis") and Siemens Financial Services, Inc. ("Siemens"). Initially, the aggregate amount due and owing under the loan agreements was in excess of $69 million.

13.    Following the acquisition of the hospitals in January of 2007 through August of 2008, HMC and its affiliates suffered significant operating losses.  Contributing to such losses were several factors, including, but not limited to, the cost of patient care exceeding actual reimbursement and overstaffing.  HMC and it affiliates instituted several initiatives to reduce losses and increase revenues while, at the same time, working to address various defaults under the loan agreement with Siemens.

---

[2]   Hawaii Medical Center, LLC ("HMC") is the predecessor to Debtor Hawaii Medical Center.

[3]   CHA Hawaii, LLC ("CHA Hawaii"), a subsidiary of Cardiovascular Hospitals of America, LLC ("CHA"), provided management services to the Debtors subsequent to the purchase from St. Francis.

U.S. Bankruptcy Court - Hawaii  #11-01746  Dkt # 10  Filed 06/21/11  Page 6 of 39

14.     HMC, its affiliates, and Siemens expended significant time discussing and negotiating the various defaults under the loan agreement, entering into a forbearance agreement, thereafter amended and revised on several occasions.   Ultimately, HMC and its affiliates were left with little choice but to seek bankruptcy protection and, on August 29, 2008, HMC and its affiliates filed the Prior Cases, seeking relief under chapter 11 of the Bankruptcy Code.[4]

15.     During the period commencing on the filing date of the Prior Cases and ending in April 2010, HMC, its affiliated debtors, St. Francis, Siemens, and the Committee of Unsecured Creditors worked towards the creation of a confirmable plan of reorganization.   On April 10, 2010, HMC, its affiliated debtors, and the Official Committee of Unsecured Creditors filed their *First Amended Disclosure Statement for First Amended Joint Plan of Reorganization for Hawaii Medical Center, LLC, Hawaii Medical Center East, LLC, and Hawaii Medical Center West, LLC Proposed by the Official Committee of Unsecured Creditors, Hawaii Medical Center, LLC, Hawaii Medical Center East, LLC, and Hawaii Medical Center West, LLC, and Hawaii Physicians Group, LLC,* and, on that same day, their *First Amended Joint Plan of Reorganization.*

---

[4]   The debtors in the 2008 Chapter 11 Bankruptcy Filing included: CHA Hawaii, LLC, a Delaware limited liability company (Tax No. xx-xxx7186); Hawaii Medical Center LLC, a Hawaii limited liability company (Tax No. xx-xxx9838); Hawaii Medical Center East, LLC, a Hawaii limited liability company (Tax No. xx-xxx8670); and Hawaii Medical Center West, LLC, a Hawaii limited liability company (Tax No. xxx-xxx8672).

U.S. Bankruptcy Court - Hawaii   #11-01746   Dkt # 10   Filed 06/21/11   Page 7 of 39

16. On May 28, 2010, the Court entered its Findings of Fact, Conclusions of Law, and Order Under U.S.C. §§ 1126 and 1129(A) and (B) and Fed. R. Bankr. P. 3020 Confirming the First Amended Joint Plan of Reorganization for Hawaii Medical Center, LLC, Hawaii Medical Center East, LLC, and Hawaii Medical Center West, LLC Proposed by the Official Committee of Unsecured Creditors, Hawaii Medical Center, LLC, Hawaii Medical Center East, LLC, and Hawaii Medical Center West, LLC, and Hawaii Physicians Group, LLC.

17. Pursuant to the terms of the confirmed First Amended Joint Plan of Reorganization (the "2010 Plan"), HMC and its affiliated debtors, then each Hawaii limited liability companies, converted to new, Hawaii non-profit corporations – the Debtors herein. Furthermore, CHA Hawaii, one of HMC's affiliated debtors and a subsidiary of Cardiovascular Hospitals of America, LLC, was, upon emergence, to discontinue any involvement in the management of HMC, HMC East and HMC West. CHA Hawaii did, in fact, cease involvement in the management of HMC, HMC East and HMC West and its chapter 11 case has since been dismissed. The remaining chapter 11 cases remain open.

### Debtors' Prepetition Debt Structure

18. The Debtors' prepetition debt structure is comprised of (i) the Prepetition MidCap Revolving Loan (defined below) by and between the

Debtors, as borrowers, and MidCap Financial, LLC, a Delaware limited liability company ("MidCap"), as lender; and (ii) the Prepetition St. Francis Term Loan (defined below) by and between the Debtors, as borrowers, and St. Francis Healthcare System of Hawaii, a Hawaii nonprofit corporation, among others, as lender. As of the Petition Date, the aggregate outstanding principal on the Prepetition MidCap Revolving Loan and the Prepetition St. Francis Term Loan is approximately $46,851,772.

### (A) Prepetition MidCap Revolving Loan

19. MidCap served as the Debtors "exit lender" under the 2010 Plan.

20. On August 17, 2010, the Debtors and MidCap executed that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Prepetition MidCap Revolving Loan Agreement"), along with all agreements, documents, notes and instruments in respect thereof, pursuant to which MidCap made loans and extended other financial accommodations to the Debtors prior to the Petition Date (the "Prepetition MidCap Revolving Loan"). As of the Petition Date, the principal balance of the Prepetition MidCap Revolving Loan is approximately $7,676,495.

21. The Debtors' obligations with respect to the Prepetition MidCap Revolving Loan are secured by MidCap's first priority lien on, among other

things: (i) all Accounts[5], and payment intangibles, instruments and other rights to receive payment of the Debtors related to the Accounts; (ii) all general intangibles (including, without limitation, contract rights and intellectual property), chattel paper, documents, letter-of-credit rights and commercial tort claims; (iii) all Lockbox Accounts (as defined in the Prepetition MidCap Revolving Loan Agreement), and all deposit accounts of the Debtors (other than the St. Francis Collateral Account (as defined in the Prepetition MidCap Revolving Loan Agreement)); and (iv) all books and records of the Debtors evidencing or relating to or associated with any of the foregoing (collectively, the "First Lien Collateral").

22.     Furthermore, MidCap holds a second priority lien on, among other things, all right, title and interest of the Debtors in and to all property (other that the First Lien Collateral), including, without limitation all accounts (as defined in the UCC) (other than Accounts), subject to a prior security interest of St. Francis (collectively, the "Second Lien Collateral").

---

[5] "Accounts," as described in the Prepetition MidCap Revolving Loan, Annex I, include, but are not limited to: (i) all Debtors' present and future accounts, payment intangibles, instruments, chattel paper (including electronic chattel paper) (all as defined in the UCC) and all other rights of each Debtor to receive payments generated directly and exclusively from the delivery by such Debtor of medical, surgical, diagnostic, treatment or other professional or medical or healthcare related services and/or the supply of goods related to any such services, including, without limitation all health-care-insurance-receivables (as defined in the UCC) and all other rights of reimbursement under any agreements with an Obligor.

U.S. Bankruptcy Court - Hawaii  #11-01746  Dkt # 10  Filed  06/21/11  Page 10 of 39

### (B) Prepetition St. Francis Term Loan

23.     On August 17, 2010, the Debtors and St. Francis Healthcare System of Hawaii, a Hawaii nonprofit corporation, as Lender and Agent for the Lenders, St. Francis Medical Center, as Lender, and St. Francis Medical Center – West, as Lender, entered into that certain Term Loan A Loan Agreement (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Prepetition St. Francis Term Loan"), along with all agreements, documents, notes and instruments in respect thereof, in which St. Francis made loans and extended other financial accommodations to the Debtors prior to the Petition Date. As of the Petition Date, the principal balance owed on the Prepetition St. Francis Term Loan was approximately $39,175,277.

24.     The Debtors' obligations with respect to the Prepetition St. Francis Term Loan are secured by St. Francis's first priority lien on, among other things, all real property in which the Debtors are fee simple owners, the St. Francis Collateral Account, and all collateral described in the Collateral Documents made part of, and associated with, the Prepetition St. Francis Term Loan other than the First Lien Collateral, on which St. Francis holds a second priority lien subject to MidCap's prior lien.

25.     The Debtors have not remitted a debt service payment to St. Francis with respect to the Prepetition St. Francis Term Loan.

**(C)   Other Indebtedness**

26.   Under the 2010 Plan, the Debtors agreed to pay unsecured creditors in full according to a schedule.  The Debtors estimate that the total amount of unsecured claims under the 2010 Plan is approximately $19 million.   Under the 2010 Plan, the Debtors would have been obligated to make the first payment to unsecured creditors on June 30, 2011 in a total amount of $1.5 million.  Over the next four years, the Debtors were obligated to make semi-annual payments of $750,000; the next four years semi-annual payments of $1,000,000; and then the next four years semi-annual payments of $1,250,000 until paid in full.

### Causes for Filing these Chapter 11 Cases

27.   Since their emergence from bankruptcy in August of 2010 after confirmation of the 2010 Plan, the Debtors suffered numerous set backs which did not allow them to reach the projected goals set forth in the 2010 Plan, nor meet their financial obligations going forward.  Specifically, the 2010 Plan called for the Debtors, after conversion to Hawaii non-profit corporations, to reach certain milestones in the several months following the effective date of the 2010 Plan.  Although the Debtors were able to achieve some of the tax savings projected through their conversion to Hawaii non-profit corporations, and, further, although the Debtors made certain operational adjustments and

took steps to reduce overhead, the projected revenue goals included in the 2010 Plan were, in retrospect, too high.

28.     Furthermore, the 2010 Plan stripped the HMC doctors of their ownership interests in the hospitals.    Additionally, the tightened budget projections did not allow for proper capital equipment upgrades.   These two factors contributed to a loss of physicians, of referrals, and a corresponding loss of revenue.  While revenue continued to decrease, the costs of operating the hospitals remained steady and, in some cases, increased.

29.     The foregoing factors exacerbated the Debtors' then-existing financial condition.  In fact, immediately prior to the confirmation of the 2010 Plan, an audit conducted by the Centers for Medicare & Medicaid Services ("CMS") revealed that, following the 2007 sale of the hospitals by St. Francis to HMC, 2008 cost reports filed by HMC East and HMC West with CMS incorrectly claimed certain "bad debt" expenses that were attributable to the period during which St. Francis operated the hospitals.    Following the submission of the 2008 cost report, but prior to the final audit conducted in 2010, CMS remitted approximately $3.8 million for such "bad debt" expenses to HMC East and HMC West, of which HMC forwarded a portion to St. Francis as reimbursement for the period during which St. Francis operated the hospital.  CMS subsequently advised HMC East and HMC West that approximately $3.2 million of the funds previously advanced (the "2008 Cost

Report Liability") would be deemed an overpayment and recouped from future Medicare payments for services rendered. Although other prospective exit lenders advised the Debtors that the 2008 Cost Report Liability made it impossible to fund the exit financing contemplated in the 2010 Plan, MidCap agreed to move forward on the basis that a reserve would be imposed against the Debtors' borrowing availability from the opening date of the Prepetition Revolving Loan until such 2008 Cost Report Liability no longer existed to account for the fact that a portion of the accounts receivable owing from Medicare would be offset to repay the 2008 Cost Report Liability. This reserve, together with other reserves imposed by MidCap since the date on which the Debtors emerged from the 2010 Plan, also impacted the Debtors' ability to meet their financial obligations under the 2010 Plan.

30. The Debtors have been in default under the Prepetition MidCap Revolving Loan Agreement since December 31, 2010, when the Debtors first failed to satisfy certain financial performance covenants set forth therein. The financial performance covenants, which are tested quarterly beginning with the quarter-ending December 31, 2010, have never been satisfied, meaning the Debtors continuously have failed to achieve the revenue performance goals anticipated by the 2010 Plan.

31. At or about December 31, 2010, the Debtors also defaulted on their debt service obligations under the 2010 Plan, which caused additional

defaults under the Prepetition MidCap Revolving Loan Agreement and the Prepetition St. Francis Term Loan. Faced with such defaults, and considering the continued decrease in revenue, the Debtors approached St. Francis and MidCap to discuss a strategy to relieve the stresses on the hospitals, while also allowing the Debtors to address their liquidity issues, including their debt service obligations, with the hope of reaching the 2010 Plan milestones. Such strategies included, but were not limited to, extending payment terms as a means to avert financial crisis.

32.     On February 3, 2011, MidCap advised the Debtors by letter of the existence of certain events of default under the Prepetition MidCap Revolving Loan Agreement notified Debtors that it was reserving all rights available to it, including the right to cease making further advances under the Prepetition Revolving Loan Agreement. Notwithstanding that reservation of rights, MidCap continued to fund the Debtors' borrowing requests. On March 31, 2011, MidCap again advised the Debtors in writing of the continued existence of such events of default and further notified the Debtors of an additional default based upon the Debtors failure to satisfy its financial performance covenants for the testing period ending March 31, 2011. In the letter, MidCap notified the Debtors that it would cease making advances under the Prepetition Revolving Loan until the Debtors were further notified in writing.

Shortly thereafter, MidCap advised the Debtors that it would continue to fund ordinary operating expenses as the Debtors worked toward a restructuring.

33.     Recognizing that the hospitals were not reaching their stated goals, the Debtors made a change in management on April 28, 2011, replacing then Chief Executive Officer Salim Hasham with Maria Costylo.

34.     Additionally, the Debtors discovered, and subsequently self-reported, certain technical violations of the Stark Act.  The Debtors self-reported these technical, unintentional violations to CMS using the CMS voluntary Self-Referral Disclosure Protocol.  While none of the violations were related to fraud, CMS may have certain recoupment rights available to it as a result of payments made while the Debtors were not in compliance with the Stark Act.  Accordingly, MidCap notified the Debtors in writing on May 13, 2011 that it would immediately implement additional reserves against the Debtors' borrowing availability to protect against future recoupment actions, further reducing the Debtors' abilities to meet their financial obligations under the 2010 Plan.  By separate motion, the Debtors have moved to employ Robert A. Wade as special counsel to the Debtors to assist in achieving a global resolution of the violations with CMS.

35.     Unfortunately, the Debtors were not able, and have not been able, to adequately solve their liquidity issues.  As a result of declining revenues,

coupled with steady and/or increasing operational costs, the Debtors have been unable to reach the 2010 Plan milestones.

36.     After significant negotiations, it was determined that the best solution for the hospitals, all of their creditors, and the citizens of Honolulu was for the Debtors to work with St. Francis and MidCap to form a plan of reorganization.  As part of the proposed reorganization mutually agreed upon by the Debtor, St. Francis and MidCap, the Debtors believe it is in the best interests of all parties involved, including the thousands of patients that present at the hospitals each year, to return the hospitals to the control of St. Francis through a new chapter 11 bankruptcy filing.  In light of this decision, the Debtors have found it necessary, with the support of St. Francis and MidCap, to commence these Chapter 11 Cases.

37.     On the Petition Date, the Debtors each filed a voluntary petition for relief under the Bankruptcy Code, in an effort to preserve and maximize the value of their chapter 11 estates, as authorized and directed by the Board of Directors of each of the Debtors.

38.     In order to minimize any loss of value to the Debtors' business, the Debtors' immediate objective is threefold:  (a) to engage in business as usual following the commencement of these Chapter 11 Cases, with as little interruption to the Debtors' operations as possible, (b) to consummate the DIP Facility (defined below), and (c) to pursue approval of the Disclosure

U.S. Bankruptcy Court - Hawaii  #11-01746   Dkt # 10   Filed  06/21/11   Page 17 of 39

Statement and confirmation of the Plan. I believe that if this Court grants the relief requested in each First Day Motion, the prospect for achieving these objectives, to the maximum benefit of Debtors, their estates, their creditors, their patients, and other parties in interest, is achievable.

## II.    FIRST DAY MOTIONS AND PLAN

### A.    First Day Motions

39.    Concurrently with the filing of these Chapter 11 Cases, the Debtors have filed a number of First Day Motions, each of which is described briefly below. I have reviewed each of the First Day Motions (including the exhibits thereto) and I believe that the relief sought in each of the First Day Motions: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption; and (b) constitutes a critical element in maintaining the value of the Debtors' assets during the sale process.

### DEBTORS' MOTION FOR AN ORDER DIRECTING JOINT ADMINISTRATION OF THE DEBTORS' CASES PURSUANT TO FED. R. BANKR. P. 1015(B)

40.    The Debtors seek the joint administration of these Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

41.    I am informed by counsel that the joint administration of these Chapter 11 Cases will permit the Court to utilize a single general docket for these cases and combine notices to creditors of the Debtors' respective estates and other parties in interest, which will result in savings to the estates.

Accordingly, I believe that the relief requested in the joint administration motion is in the best interests of the Debtors' estates, their creditors and other parties in interest.

**MOTION FOR ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363(c), 345(b) AND 364 (I) AUTHORIZING CONTINUED USE OF EXISTING (A) BANK ACCOUNTS, (B) CASH MANAGEMENT SYSTEM AND (C) BUSINESS FORMS, (II) GRANTING AN EXTENSION OF TIME TO COMPLY WITH THE DEPOSIT REQUIREMENTS OF SECTION 345(b) OF BANKRUPTCY CODE AND (III) AUTHORIZING CONTINUATION OF INTERCOMPANY TRANSACTIONS AND ACCORDING ADMINISTRATIVE EXPENSE STATUS TO CLAIMS FOR SUCH TRANSACTIONS**

42.    The Debtors seek authority to continue the use of their prepetition: (a) cash management system (the "Cash Management System"); (b) bank accounts (the "Bank Accounts"); and (c) business forms (which includes checks used with all of the Debtors' bank accounts) (the "Business Forms"). The Cash Management System is designed to permit the efficient collection, investment and application of funds.  A chart depicting the Debtors' Cash Management System as of the Petition Date is attached as an exhibit to the cash management motion.

43.    Prepetition, the Debtors' Cash Management System provided for daily and monthly sweeps from certain of the Debtors' Depository Accounts into an account maintained by MidCap (the "MidCap Sweep Account"). Postpetition, the Debtors, by separate motion, are seeking authority to obtain postpetition financing from MidCap and grant certain security interests with

respect thereto. As a result, the daily and monthly sweeps into the MidCap Sweep Account will continue to occur; however, the daily and monthly sweeps would be applied, as applicable, to the Debtors' debt obligations under the proposed postpetition financing arrangement.

44. The Debtors utilize a series of Bank Accounts designated as Depository Accounts provided by both First Hawaiian Bank ("FHB") and Bank of Hawaii ("BOH"). The monies that are funded into the Depository Accounts come from three separate sources: (i) patient and self-pay deposits; (ii) government deposits; and (iii) non-government deposits.

### (A) Patient and Self-Pay Deposits

45. The hospitals deposit funds collected from patient and self-pay accounts into one of two Depository Accounts operated by BOH – one for HMC East (the "East BOH Depository Account") and one for HMC West (the "West BOH Depository Account"). Prepetition, deposits to the West BOH Depository Account were transferred to the East BOH Depository Account twice per month; on the 1st and 15th. Thereafter, the combined deposits of the West BOH Depository Account and the East BOH Depository Account were swept on the 2nd calendar day of the subsequent month to the MidCap Sweep Account. Postpetition, the sweeps to the MidCap Sweep Account will continue.

### (B) Governmental Deposits

46.    Governmental deposits (from the collection of insured healthcare accounts receivable) are collected into two separate Depository Accounts maintained by FHB, one for each facility – HMC East and HMC West.  The government collections are received from either the Medicare or Medicaid Managed Care Plans, State of Hawaii (Medicaid) or through a third-party intermediary (Medicare).  Deposits posting to the HMC East and HMC West government Depository Accounts are swept daily into the non-governmental Depository Accounts maintained by FHB as outlined below.

### (C)    Non-Governmental Deposits

47.    In addition to the daily sweeps from the governmental Depository Accounts, all funds received from non-governmental entities are deposited into two separate Depository Accounts maintained by FHB, and separated by facility — HMC East or HMC West.  Prepetition, the funds held in the non-governmental Depository Accounts were swept daily into the MidCap Sweep Account.  Postpetition, the sweeps to the MidCap Sweep Account will continue.

48.    Additionally, the Bank Account designated as the Concentration Account maintained by the Debtors is funded through weekly deposits from MidCap and is utilized as the funding source for disbursements to fulfill the Debtors' financial obligations.  The funding structure consists of one payables account, three payroll accounts and one management sweep account.

Specifically, HMC East utilizes a payables account, a payroll account and a management account. HMC West and HMC each utilize one payroll account.

49. Furthermore, in the ordinary course of their businesses, the Debtors use Business Forms, including a multitude of checks and other forms, for, among other things, purchase requests and purchase orders. By virtue of the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with which the Debtors deal with on a regular basis, it is important that the Debtors be permitted to continue to use the Business Forms without alteration or change. To avoid disruption and unnecessary expense, moreover, the Debtors have requested that they not be required to include the legend "Debtor in Possession" or a "debtor in possession number" on the Business Forms.

50. I have been advised that permitting the Debtors to maintain the use of the Cash Management System, Bank Accounts, and Business Forms will prevent disruption of the Debtors' operations and will not prejudice any party in interest. The Debtors will maintain complete and accurate records of all transfers of funds in and out of the Bank Accounts. The Debtors' existing Cash Management System functions smoothly and permits the efficient collection of cash, for the benefit of the Debtors and all parties in interest. Any requirement that the Debtors open new bank accounts would potentially result in confusion and delay, thereby hindering the efficient use of the

Debtors' resources. Thus, the continued use of their Cash Management System, Bank Account and Business Forms is necessary and in the best interest of their estates.

**DEBTORS' MOTION ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363(b) AND 507(a) AUTHORIZING (I) PAYMENT OF WAGES, SALARIES AND OTHER COMPENSATION, (II) PAYMENT OF EMPLOYEE, MEDICAL, DENTAL AND SIMILAR BENEFITS, (III) WITHHOLDING FROM EMPLOYEE PAYCHECKS AND RELATED DEDUCTIONS AND PAYMENTS, (IV) PAYMENT OF ALL OBLIGATIONS IN RESPECT THEREOF, AND (V) GRANTING RELATED RELIEF**

51. The Debtors seek authority to pay or otherwise honor various prepetition and postpetition obligations for the benefit of the Debtors' employees.

52. In the ordinary course of their business operations, the Debtors employ approximately 990 individuals (collectively, the "Employees"), who work in different capacities for the Debtors, including, but not limited to, corporate management, administrators, directors of nursing, medical and therapeutic professionals, and patient care and facility staff.

53. The Employees consist of approximately: (a) 440 full-time employees, including 136 exempt employees and 304 hourly employees; (b) 342 part-time employees, including 13 exempt employees and 329 hourly employees; and (c) 208 "call-in" non-union employees. Approximately 58 Employees work at HMC; 485 work at HMC – West; and 447 work at HMC – East.

54.     The Employees continue to perform a variety of critical functions, and their knowledge and understanding of the Debtors' corporate infrastructure, facility management and patient care services are essential to the Debtors' reorganization efforts. Therefore, the relief requested in the Motion referenced herein, which will enable the Debtors to retain and compensate their Employees with minimal disruption to operations, is necessary and in the best interests of the Debtors, their estates, and their creditors.

55.     The Debtors' average monthly payroll expense, including benefits, except for PTO benefits (as defined below), is approximately $5,461,000, with payroll funded and paid on a bi-weekly basis, one week in arrears, in the approximate amount of $2,520,000. As of the Petition Date, the following prepetition Employee Obligations (defined below) remain unpaid: (a) non-Union wages of approximately $528,000; (b) Union wages of approximately $1,940,000; (c) Employee Benefits (defined below) of approximately $592,000; and (d) reimbursable business expenses of less than $5,000.

56.     The Debtors submit that it is in the best interest of their estates for the Court to authorize certain payments for obligations to or for the benefit of the Employees. These certain obligations (collectively, the "Employee Obligations") include, among other things: (a) unpaid prepetition wages, salaries, bonuses, commissions, car and parking allowances, holiday and

vacation leave, relocation assistance pay, sick leave pay, and other excused leave pay earned prior to the Petition Date; (b) reimbursable business expenses incurred prior to the Petition Date; and (c) certain employee benefits arising before the Petition Date. The Debtors also offer the Employees certain benefits including, but not limited to: (i) medical, dental and health benefits, (ii) life and disability insurance, (iii) employee 401(k) savings plans, (iv) paid time off ("PTO"), and (v) other miscellaneous benefits including, but not limited to programs such as educational assistance and other benefits (collectively, the "Employee Benefits"). Payment of such Employee Obligations and Employee Benefits shall not exceed $11,725 for any individual employee.

57. I have been advised that in order to minimize the personal hardship to Employees, and in order to maintain morale during this critical time, it is in the best interest of the Debtors and their estates to seek entry of an order authorizing the Debtors, in their sole and absolute discretion, to pay and honor all Employee Obligations and to continue all Employee Benefits.

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105(a) AND 366, (I) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING OR DISCONTINUING SERVICES, (II) DETERMINING THAT UTILITY COMPANIES ARE ADEQUATELY ASSURED OF PAYMENT, (III) APPROVING PROPOSED PROCEDURE FOR REQUESTING ADDITIONAL OR DIFFERENT ADEQUATE ASSURANCE, AND (IV) SCHEDULING FINAL HEARING**

58.     The Debtors seek an order that prohibits certain providers of utility services to the Debtors from altering, refusing or discontinuing services on account of prepetition amounts outstanding, while also finding that the utility companies (the "Utility Companies") have "adequate assurance of payment" within the meaning of section 366(b) of the Bankruptcy Code, therefore negating the need for the Debtors to provide any additional adequate assurance beyond what is proposed in the utilities motion.  Furthermore, the Debtors seek approval of certain procedures whereby Utility Companies may request additional or different adequate assurance.   Lastly, the Debtors request that the Court schedule a final hearing on the Debtors' proposed adequate assurance.

59.     The Debtors possess a consistent payment history with the Utility Companies.  There are few, if any, defaults or arrearages of any significance with respect to the Debtors' undisputed invoices for utility services, other than payment interruptions that may be caused by the commencement of these Chapter 11 Cases.

60.     The Utility Companies provide the Debtors with an aggregate total of approximately $181,073 in utility services each month.   The Debtors believe that their postpetition use of the Utility Companies' services will remain at approximately the same levels, although seasonal effects and

variations in the prices of such services will, of course, result in variations in the Debtors' average monthly utility expenses.

61.    The Debtors propose to provide as adequate assurance of payment (the "Adequate Assurance Deposit") to each of the Utility Companies a two week cash deposit based on the average monthly bill of each Utility Company.  A Utility Company's request for, and acceptance of, an Adequate Assurance Deposit will be deemed an acknowledgment and admission from the Utility Company that the Adequate Assurance Deposit is the form of adequate assurance acceptable to it.   Similarly, any Utility Company that does not timely request an Adequate Assurance Deposit will be deemed to have adequate assurance that is satisfactory to it.

62.    I believe that this process will provide the Debtors with certainty that the proposed adequate assurance of payment is "satisfactory" to the Utility Companies, therefore alleviating the concern that thirty days after the Petition Date, the Debtors will be informed that the proposed adequate assurance is not satisfactory, coupled with the imminent threat to discontinue service.  I also believe that granting the relief requested will not prejudice the rights of the Utility Companies under section 366 of the Bankruptcy Code.

**DEBTORS' MOTION FOR AN ORDER AUTHORIZING RETENTION OF PROFESSIONALS UTILIZED BY THE DEBTORS IN THE ORDINARY COURSE OF BUSINESS *NUNC PRO TUNC* TO THE PETITION DATE**

63.    The Debtors seek authority to retain and employ certain professionals used by the Debtors in the ordinary course of their businesses *nunc pro tunc* to the Petition Date.

64.    The Debtors customarily retain the services of various attorneys, accountants and other professionals to represent them in matters arising in the ordinary course of their business (the "Ordinary Course Professionals"). The Debtors request authority to retain and employ certain Ordinary Course Professionals without the necessity of a separate, formal retention application approved by this Court for each Ordinary Course Professional.  Additionally the Debtors would like to compensate the Ordinary Course Professionals for postpetition services rendered, subject to certain limits set forth in the ordinary course professionals motion, without the necessity of additional Court approval.

65.    I believe that the retention and employment of the Ordinary Course Professionals is necessary to allow the Debtors to successfully conduct and operate their businesses following the Petition Date.

**DEBTORS' MOTION FOR INTERIM ORDER (I) AUTHORIZING POSTPETITION SECURED FINANCING PURSUANT TO SECTIONS 105, 361, 362, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) AND 503(B) OF THE BANKRUPTCY CODE; (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE; (III) PROVIDING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES PURSUANT TO SECTIONS 361, 362, AND 363 OF THE BANKRUPTCY CODE; (IV) MODIFYING THE AUTOMATIC STAY PURSUANT TO SECTION 362(D) OF THE BANKRUPTCY CODE; (V) AUTHORIZING EXECUTION OF POSTPETITION AMENDMENT TO PREPETITION REVOLVING CREDIT AGREEMENT; (VI) PROVIDING RELATED RELIEF; AND (VII) SCHEDULING A FINAL HEARING**

66.     The Debtors seek authority to secure postpetition secured financing, including the ability to execute all related documents thereto, while also being authorized to use cash collateral.   Further, the Debtors seek authority to extend to the prepetition secured parties' adequate protection in several forms pursuant to sections 361, 362 and 363 of the Bankruptcy Code. Lastly, the Debtors request that the Court schedule a final hearing with respect to the relief sought in the financing motion.

67.     As I have further described elsewhere in this Declaration, the Debtors are parties to certain prepetition loan and security documents with St. Francis and MidCap.  To secure the obligations under these prepetition loan and security agreements, the Debtors granted certain security interests to St. Francis and MidCap.

68.     The Debtors are seeking authority from the Court to allow the Debtors to use cash collateral in which both MidCap and St. Francis assert an

interest, while also allowing the Debtors to enter into a postpetition financing facility (the "DIP Facility") with MidCap, as described, in greater detail, in the financing motion. The Debtors, given their financial condition which precipitated the filing of these Chapter 11 Cases, require approval of the DIP Facility as they are unable to survive on cash collateral pending confirmation of the Plan.

69. Other parties, exclusive of MidCap, were approached in an attempt to procure postpetition financing. No party, exclusive of MidCap, stepped forward with a proposal of postpetition financing. This was not unexpected for the following reasons, among others:

a. The difficulties experienced by the Debtors in trying to attract "exit financing" during the Prior Cases; in particular, the 2008 Cost Report Liability, which continues today;

b. The perceptions caused by two Chapter 11 filings in a three year period;

c. The Debtors' default under the 2010 Plan less than six (6) months after emerging from the Prior Cases;

d. The ongoing deterioration of the Debtors' financial condition, including decreased revenues and steady or increasing operating costs;

e. The Debtors' disclosure of certain technical violations of the Stark Act, which may give rise to recoupment action by CMS thereby reducing the amount the Debtors (and, thus, the Debtors' secured lender) may receive from their single largest payor — Medicare; and

f.   The existence of two layers of prepetition liens on substantially all of the Debtors' assets, without any "equity cushion."

70.   Based upon its role as a prepetition lender to the Debtors, coupled with its familiarity with the Debtors, their operations, and the issues with which they are faced, MidCap is uniquely positioned to provide the Debtors with the postpetition financing necessary to enable them to operate their businesses as debtors in possession.   Notwithstanding the foregoing, MidCap, the Debtors and St. Francis expended considerable time and resources making certain that the financial and operational issues confronting the Debtors would be appropriately managed and contained during these Chapter 11 Cases.   During the negotiations, it became apparent that, absent the proposal provided by MidCap, the Debtors had few, if any, alternatives to reorganize.   Only after lengthy negotiations among the Debtors, MidCap and St. Francis, during which the parties ultimately agreed upon, among other things, a Support Agreement (as defined below), the DIP Facility, the Plan and an Exit Facility Proposal (as defined below), did MidCap agree to proceed with the transactions contemplated in these Chapter 11 Cases.   I understand that agreement on all aspects set forth in the Support Agreement, the DIP Facility, the Plan and the Exit Facility Proposal was paramount to MidCap's agreement to provide the DIP Facility as each piece works together to form a comprehensive plan for reorganization.

71.    I am advised, however, in light of the circumstances that led to the filing of these Chapter 11 Cases and the Debtors' financial situation, MidCap will not extend postpetition financing (or consent to the use of its cash collateral) absent the protections set forth in the proposed interim order and the DIP Facility, which protections the Debtors agree are necessary in light of the unique circumstances surrounding the Debtors, their recent operational history and these Chapter 11 Cases.

72.    For the use of cash collateral and placement of the DIP Facility, the Debtors have proposed significant adequate protection for MidCap, all of which is warranted given the Debtors' dire financial condition.

73.    I submit that the use of cash collateral and the approval of the DIP Facility is the lynchpin in these Chapter 11 Cases. Should it be decided that the relief sought in the financing motion is not appropriate, the ramifications to the Debtors, their estates, their creditors, their patients and other parties in interest would be devastating. Without the ability to utilize cash collateral and enter into the DIP Facility, the Debtors' prospects of continuing their businesses and operations, including providing high quality medical care to patients, would become nonexistent. Conversely, should it be decided that the use of cash collateral and the DIP Facility is appropriate, the Debtors can begin the process of reorganizing and continuing to provide their patients with

the vital professional medical services they have come to expect from the Debtors.

### DEBTORS' APPLICATION PURSUANT TO SECTION 327(A) OF THE BANKRUPTCY CODE, RULE 2014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND LOCAL RULE 2014-1 FOR AUTHORITY TO RETAIN AND EMPLOY McDONALD HOPKINS LLC AS COUNSEL FOR THE DEBTORS, *NUNC PRO TUNC,* TO THE PETITION DATE

74. The Debtors seek to retain McDonald Hopkins LLC ("McDonald Hopkins") as their bankruptcy counsel, effective as of the Petition Date. The Debtors contemplate that McDonald Hopkins will render general legal services to the Debtors as needed throughout the course of these Chapter 11 Cases, including, but not limited to: (a) filing and monitoring of these Chapter 11 Cases and advising the Debtors on the legal ramifications of certain actions; (b) providing the Debtors with advice regarding their obligations and duties as debtors in possession; (c) filing with the Court motions, objections, and other relevant documents; (d) appearing before the Court on all matters in these Chapter 11 Cases; (e) assisting the Debtors in the administration of these Chapter 11 Cases; and (f) taking such other actions as are necessary to protect the rights of the Debtors' estates.

75. McDonald Hopkins is uniquely familiar with the Debtors' businesses and a highly qualified full service law firm with an excellent restructuring practice. Accordingly, I believe that McDonald Hopkins is both

well qualified and uniquely able to represent the Debtors in these Chapter 11 Cases in an efficient and timely manner.

## DEBTORS' APPLICATION PURSUANT TO SECTION 327(A) OF THE BANKRUPTCY CODE, RULE 2014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND LOCAL RULE 2014-1 FOR AUTHORITY TO RETAIN AND EMPLOY MOSELEY BIEHL TSUGAWA LAU & MUZZI AS COUNSEL FOR THE DEBTORS, *NUNC PRO TUNC,* TO THE PETITION DATE

76.     The Debtors seek to retain Moseley Biehl Tsugawa Lau & Muzzi, a Hawaii Limited Liability Law Company ("Moseley Biehl") as their Hawaii bankruptcy co-counsel, effective as of the Petition Date, because of the firm's: (a) extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code; (b) expertise, experience and knowledge of practicing before this Court; and (c) ability to quickly respond to all issues that may arise in thee Chapter 11 Cases.  I believe that Moseley Biehl's appearance before this Court as co-counsel in these Chapter 11 Cases will be efficient and cost effective for the Debtors' estates.

77.     Accordingly, I believe that Moseley Biehl is both qualified and able to represent the Debtors in an efficient and timely manner.

## APPLICATION FOR AUTHORITY TO RETAIN AND EMPLOY ROBERT A. WADE AS SPECIAL COMPLIANCE COUNSEL FOR THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE

78. The Debtors seek to retain and employ Robert A. Wade of the law firm of Krieg DeVault, LLP as special compliance counsel for the Debtors, effective as of the Petition Date, because of Mr. Wade's extensive experience representing, among others, health care facilities and hospitals with respect to, among other things, compliance issues concerning the Stark Act and the Emergency Medical Treatment and Active Labor Act. The Debtors believe that Mr. Wade's expertise, for which he has been nationally recognized, in representing parties similarly situated to the Debtors with respect to such compliance issues will be invaluable during these Chapter 11 Cases.

79. Accordingly, I believe that Mr. Wade is both well qualified and uniquely able to provide the compliance services that are required by the Debtors in these Chapter 11 Cases

### APPLICATION FOR AUTHORITY TO RETAIN AND EMPLOY SCOULER & COMPANY, LLC, AS FINANCIAL ADVISOR FOR THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE

80. The Debtors seek to retain and employ Scouler & Company, LLC ("Scouler") as the Debtors' financial advisor, effective as of the Petition Date, because of Scouler's expertise and experience in financial advisory and business stabilization strategies. Furthermore, Scouler possesses significant experience in advising chapter 11 debtors and in chapter 11 cases. The Debtors believe that Scouler will be able to provide vital services to the Debtors, including, but not limited to, reviewing the Debtors' financial

U.S. Bankruptcy Court - Hawaii  #11-01746  Dkt # 10  Filed  06/21/11  Page 35 of 39

forecasts, assessing the Debtors' ability to operate postpetition pursuant to the proposed DIP Facility, and evaluating the Plan proposed by the Debtors and their secured lenders.

81.    Accordingly, I believe that Scouler is both well qualified and uniquely able to provide the financial advisory services that are required by the Debtors in these Chapter 11 Cases.

**B.    The Plan**

82.    To execute their restructuring process, on the Petition Date, the Debtors filed the Plan and Disclosure Statement contemporaneously with the First Day Motions.    The foundation of the Plan is based upon prepetition discussions and negotiations between the Debtors, MidCap and St. Francis.

83.    The prepetition discussions and negotiations resulted in creation of: (a) that certain Restructuring Support Agreement dated as of June 20, 2011 (the "Support Agreement") by and between the Debtors, St. Francis and Midcap; (b) the DIP Facility by and between the Debtors and MidCap, in which MidCap has agreed to make available to the Debtors financing in the form of a senior secured debtor-in-possession revolving credit facility to provide ongoing working capital requirements and, if authorized by further order of the Court, to pay in full the Debtors' existing indebtedness; and (c) an exit financing facility (the "Exit Facility") by and between the Reorganized Debtors (defined below) and MidCap substantially in the form of the term

sheet provided by MidCap prior to the date hereof with respect thereto (the "Exit Facility Proposal") which, upon the effective date of the Plan (the "Effective Date"), will allow the Reorganized Debtors to enter into a new revolving loan agreement, the proceeds of which will be utilized to repay the DIP Facility, repay the Prepetition MidCap Revolving Loan (subject to certain exclusions set forth in the Plan), make payments under the Plan, and for working capital purposes.

84. St. Francis and MidCap, subject to the terms and conditions contained in the Support Agreement, the proposed DIP Facility and the proposed Exit Facility, agree to support the proposed restructuring efforts of the Debtors described in the Plan. At its core, the Plan provides that:

a. allowed section 503(b)(9) administrative expense claims shall be paid, in full;

b. on the Effective Date, the DIP Facility and all accrued but unpaid interest, fees and expenses shall be paid, in full, from the proceeds of the Exit Facility;

c. allowed section 507(a)(8) priority tax claims shall be paid, in full, in quarterly installments over the course of five years;

d. St. Francis shall receive 100% of the membership interests in the Debtors in full and complete release of St. Francis's claims against the Debtors;

e. the Prepetition MidCap Revolving Loan and all accrued but unpaid interest, fees (excluding any early termination fee payable with respect to the termination of the Prepetition MidCap Revolving Loan) and expenses shall be paid, in full, from the proceeds of the Exit Facility;

U.S. Bankruptcy Court - Hawaii #11-01746 Dkt # 10 Filed 06/21/11 Page 37 of 39

f.    allowed priority non-tax claims shall be paid, in full;

g.    general unsecured claims, including unpaid administrative expense claims and unsecured claims from the 2008 chapter 11 bankruptcy filing, shall be cancelled and eliminated;

h.    on or prior to the Effective Date, each of the Debtors will merge with and into direct or indirect subsidiaries of St. Francis (the "Reorganized Debtors"); and

i.    on the Effective Date, the Reorganized Debtors and MidCap will enter into a new revolving loan agreement.

85.    The description of the Plan provided herein is only intended to provide the Court and any other party in interest with an overview of the Plan's significant terms. For a full explanation of the terms of the Plan, it is necessary to review the Plan and Disclosure Statement.

### III.    CONCLUSION

86.    In order to minimize any loss of value to their businesses, the Debtors' immediate objective is to engage in business as usual following the commencement of these Chapter 11 Cases, with as little interruption to the Debtors' operations as possible. I believe that if this Court grants the various relief sought in the First Day Motions, the prospect for achieving these objectives, to the maximum benefit of the creditors and the Debtors' estates, will be substantially enhanced.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: June 21, 2011

/s/ Kenneth J. Silva
Kenneth J. Silva
Member of the Board of Directors