MCDONALD HOPKINS LLC

SHAWN M. RILEY (0037235)
PAUL W. LINEHAN (0070116)
JOHN A. POLINKO (0073967)
600 Superior Avenue, East, Suite 2100
Cleveland, OH 44114-2653
Telephone: (216) 348-5400
Facsimile: (216) 348-5474
Email: **sriley@mcdonaldhopkins.com**
**plinehan@mcdonaldhopkins.com**
**jpolinko@mcdonaldhopkins.com**

MOSELEY BIEHL TSUGAWA LAU & MUZZI
A HAWAII LIMITED LIABILITY LAW COMPANY

CHRISTOPHER J. MUZZI (6939)
Alakea Corporate Tower
1100 Alakea Street, 23rd Floor
Honolulu, HI 96813
Telephone: (808) 531-0490, Facsimile (808) 534-0202
Email: **cmuzzi@hilaw.us**

Proposed Co-Counsel to the Debtors and
Debtors in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re: <br><br> Hawaii Medical Center, et al.,[1] <br><br> Debtors. | Case No. 11-01746 <br> (Chapter 11 Case) <br> (Honorable Robert J. Faris) <br> (Joint Administration Requested) |
| This document relates to: <br> All Cases | |

---

[1] The Debtors are as follows: Hawaii Medical Center, a Hawaii non-profit corporation (Tax No. 20-3409838); Hawaii Medical Center East, a Hawaii non-profit corporation (Tax No. 51-0598670); and Hawaii Medical Center West, a Hawaii non-profit corporation (Tax No. 51-0598672).

**DEBTORS' MOTION FOR INTERIM ORDER (I) AUTHORIZING POSTPETITION SECURED FINANCING PURSUANT TO SECTIONS 105, 361, 362, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) AND 503(B) OF THE BANKRUPTCY CODE; (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE; (III) PROVIDING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES PURSUANT TO SECTIONS 361, 362, AND 363 OF THE BANKRUPTCY CODE; (IV) MODIFYING THE AUTOMATIC STAY PURSUANT TO SECTION 362(D) OF THE BANKRUPTCY CODE; (V) AUTHORIZING EXECUTION OF POSTPETITION AMENDMENT TO PREPETITION REVOLVING CREDIT AGREEMENT; (VI) PROVIDING RELATED RELIEF; AND (VII) SCHEDULING A FINAL HEARING**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby move the Court for entry of an interim order (i) authorizing postpetition secured financing pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 503(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"); (ii) authorizing the Debtors to use cash collateral pursuant to section 363 of the Bankruptcy Code; (iii) providing adequate protection to the prepetition secured parties pursuant to sections 361, 362, and 363 of the Bankruptcy Code; (iv) modifying the automatic stay pursuant to section 362(d) of the Bankruptcy Code; (v) authorizing execution of postpetition amendment to prepetition Revolving Credit Agreement (defined below); (vi) providing related relief; and (vii) scheduling a final hearing.

In support of this Motion, the Debtors hereby state as follows:

## Background and Jurisdiction

1.      On June 21, 2011 (the "<u>Petition Date</u>"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.   The Debtors are continuing in possession of their property and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.  A motion for joint administration of the Debtors' chapter 11 cases (these "<u>Chapter 11 Cases</u>") for procedural purposes is pending before the Court.  No request for the appointment of a trustee or examiner has been made and no committees have been appointed or designated in these Chapter 11 Cases.

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and reference from the District Court for the District of Hawaii pursuant to 28 U.S.C. § 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The venue of these Chapter 11 Cases and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The factual background relating to the Debtors' commencement of these Chapter 11 Cases is set forth in detail in the Declaration of Kenneth J. Silva, a Member of the Board of Directors, in Support of Chapter 11 Petitions and First Day Motions (the "<u>Silva Declaration</u>"), filed contemporaneously herewith.

## Background of the Debtors

## A.    Acquisition of Hospital Facilities

4.    The hospital system currently operated by the Debtors was originally established in 1927 and, until early 2007, was operated as St. Francis Medical Center.  In January, 2007, Hawaii Medical Center, LLC, a Hawaii limited liability company,[2] purchased the two hospital campuses in North Honolulu (Hawaii Medical Center East, commonly referred to as "HMC East") and Ewa Beach (Hawaii Medical Center West, commonly referred to as "HMC West") from St. Francis Medical Center.[3]  At that time, and as remains unchanged today, HMC East and HMC West manage 342 beds.

5.    To fund the purchase of the hospitals and provide adequate working capital, HMC, HMC East and HMC West, as borrowers, entered into certain loan agreements with St. Francis Healthcare System of Hawaii, as Agent, St. Francis Medical Center, and St. Francis Medical Center – West (collectively, "St. Francis") and Siemens Financial Services, Inc. ("Siemens"). Initially, the aggregate amount due and owing under the aforementioned loan agreements was in excess of $69 million.

---

[2]  Hawaii Medical Center, LLC ("HMC") is the predecessor to Debtor Hawaii Medical Center.

[3]  CHA Hawaii, LLC ("CHA Hawaii"), a subsidiary of Cardiovascular Hospitals of America, LLC ("CHA"), provided management services to the Debtors subsequent to the purchase from St. Francis.

## B. 2008 Chapter 11 Bankruptcy Filing

6. Following the acquisition of the hospitals in January of 2007 through August of 2008, HMC and its affiliates suffered significant operating losses. Contributing to such losses were several factors, including, but not limited to, the cost of patient care exceeding actual reimbursement and overstaffing.

7. As a result of these losses, in addition to HMC's and it affiliates' inability to remain current on their debt obligations, HMC and its affiliates were left with little choice but to seek bankruptcy protection and, on August 29, 2008, HMC and its affiliates each filed a petition for relief under chapter 11 of the Bankruptcy Code, captioned In re: CHA Hawaii, LLC; Case No. 08-01369 (Jointly Administered).[4]

8. Over the span of 20-months, HMC, its affiliated debtors, St. Francis and Siemens, among others, worked towards the creation of a confirmable plan of reorganization. Such plan, the *First Amended Joint Plan of Reorganization for Hawaii Medical Center, LLC, Hawaii Medical Center East, LLC, and Hawaii Medical Center West, LLC*, filed on April 10, 2010, was confirmed by the Court on May 28, 2010 (the "2010 Plan").

---

[4] The debtors in the 2008 Chapter 11 Bankruptcy Filing included: CHA Hawaii, LLC, a Delaware limited liability company (Tax No. xx-xxx7186); Hawaii Medical Center LLC, a Hawaii limited liability company (Tax No. xx-xxx9838); Hawaii Medical Center East, LLC, a Hawaii limited liability company (Tax No. xx-xxx8670); and Hawaii Medical Center West, LLC, a Hawaii limited liability company (Tax No. xxx-xxx8672).

9.     Pursuant to the terms of the 2010 Plan, HMC and its affiliated debtors, then each Hawaii limited liability companies, converted to new, Hawaii non-profit corporations — the Debtors herein.   Furthermore, CHA Hawaii, LLC ("CHA Hawaii"), one of HMC's affiliated debtors and a subsidiary of Cardiovascular Hospitals of America, LLC, was, upon emergence, to discontinue any involvement in the management of HMC, HMC East and HMC West.   CHA Hawaii did, in fact, cease involvement in the management of HMC, HMC East and HMC West and its chapter 11 case has since been dismissed.

## C.     The Debtors Prepetition Debt Structure

10.     The Debtors' prepetition debt structure is comprised of (i) the Prepetition MidCap Revolving Loan (defined below) by and between the Debtors, as borrowers, and MidCap Financial, LLC, a Delaware limited liability company ("MidCap"), as lender; and (ii) the Prepetition St. Francis Term Loan (defined below) by and between the Debtors, as borrowers, and St. Francis Healthcare System of Hawaii, a Hawaii nonprofit corporation, among others, as lender.  As of the Petition Date, the aggregate outstanding principal on the Prepetition MidCap Revolving Loan and the Prepetition St. Francis Term Loan is approximately $46,851,772.

### (i)     Prepetition MidCap Revolving Loan

11.     MidCap served as the Debtors "exit lender" under the 2010 Plan.

12. On August 17, 2010, the Debtors and MidCap executed that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Prepetition MidCap Revolving Loan Agreement"), along with all agreements, documents, notes and instruments in respect thereof, pursuant to which MidCap made loans and extended other financial accommodations to the Debtors prior to the Petition Date (the "Prepetition MidCap Revolving Loan"). As of the Petition Date, the principal balance of the Prepetition MidCap Revolving Loan is approximately $7,676,495.

13. The Debtors' obligations with respect to the Prepetition MidCap Revolving Loan are secured by MidCap's first priority lien on, among other things: (i) all Accounts[5], and payment intangibles, instruments and other rights to receive payment of the Debtors related to the Accounts; (ii) all general intangibles (including, without limitation, contract rights and intellectual property), chattel paper, documents, letter-of-credit rights and commercial tort claims; (iii) all Lockbox Accounts (as defined in the Prepetition MidCap Revolving Loan Agreement), and all deposit accounts of

---

[5] "Accounts," as described in the Prepetition MidCap Revolving Loan, Annex I, include, but are not limited to: (i) all Debtors' present and future accounts, payment intangibles, instruments, chattel paper (including electronic chattel paper) (all as defined in the UCC) and all other rights of each Debtor to receive payments generated directly and exclusively from the delivery by such Debtor of medical, surgical, diagnostic, treatment or other professional or medical or healthcare related services and/or the supply of goods related to any such services, including, without limitation all health-care-insurance-receivables (as defined in the UCC) and all other rights of reimbursement under any agreements with an Obligor.

the Debtors (other than the St. Francis Collateral Account (as defined in the Prepetition MidCap Revolving Loan Agreement)); and (iv) all books and records of the Debtors evidencing or relating to or associated with any of the foregoing (collectively, the "First Lien Collateral").

14. Furthermore, MidCap holds a second priority lien on, among other things, all right, title and interest of the Debtors in and to all property (other that the First Lien Collateral), including, without limitation all accounts (as defined in the UCC) (other than Accounts), subject to a prior security interest of St. Francis (collectively, the "Second Lien Collateral").

### (ii) Prepetition St. Francis Term Loan

15. On August 17, 2010, the Debtors and St. Francis Healthcare System of Hawaii, a Hawaii nonprofit corporation, as Lender and Agent for the Lenders, St. Francis Medical Center, as Lender, and St. Francis Medical Center — West, as Lender, entered into that certain Term Loan A Loan Agreement (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Prepetition St. Francis Term Loan"), along with all agreements, documents, notes and instruments in respect thereof, in which St. Francis made loans and extended other financial accommodations to the Debtors prior to the Petition Date. As of the Petition Date, the Debtors' owe approximately $39,175,277 on the Prepetition St. Francis Term Loan.

16.    The Debtors' obligations with respect to the Prepetition St. Francis Term Loan are secured by St. Francis's first priority lien on, among other things, all real property in which the Debtors are fee simple owners, the St. Francis Collateral Account, and all collateral described in the Collateral Documents made part of, and associated with, the Prepetition St. Francis Term Loan other than the First Lien Collateral, on which St. Francis holds a second priority lien subject to MidCap's prior lien.

17.    The Debtors have not remitted a debt service payment to St. Francis with respect to the Prepetition St. Francis Term Loan.

### (iii)    Intercreditor Agreement

18.    MidCap, the Debtors and St. Francis are parties to that certain Intercreditor Agreement dated August 17, 2010 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, (the "Intercreditor Agreement"). The Intercreditor Agreement delineates the rights, priorities and obligations of MidCap and St. Francis with respect to their respective liens on the Debtors' prepetition collateral.

### D.    Reasons for Present Chapter 11 Bankruptcy Filing

19.    Since their emergence from bankruptcy in August of 2010 after confirmation of the 2010 Plan, the Debtors suffered numerous set backs which did not allow them to reach the projected goals set forth in the 2010 Plan, nor meet their financial obligations going forward. Specifically, the 2010

Plan called for the Debtors, after conversion to Hawaii non-profit corporations, to reach certain milestones in the several months following the effective date of the 2010 Plan. Although the Debtors were able to achieve some of the tax savings projected through their conversion to Hawaii non-profit corporations, and, further, although the Debtors made certain operational adjustments and took steps to reduce overhead, the projected revenue goals included in the 2010 Plan were, in retrospect, too high.

20.    Furthermore, the 2010 Plan stripped the HMC doctors of their ownership interests in the hospitals. Additionally, the tightened budget projections did not allow for proper capital equipment upgrades. These two factors contributed to a loss of physicians, of referrals, and a corresponding loss of revenue. While revenue continued to decrease, the costs of operating the hospitals remained steady and, in some cases, increased.

21.    The foregoing factors exacerbated the Debtors' then-existing financial condition. In fact, immediately prior to the confirmation of the 2010 Plan, an audit conducted by the Centers for Medicare & Medicaid Services ("CMS") revealed that, following the 2007 sale of the hospitals by St. Francis to HMC, 2008 cost reports filed by HMC East and HMC West with CMS incorrectly claimed certain "bad debt" expenses that were attributable to the period during which St. Francis operated the hospitals. Following the submission of the 2008 cost report, but prior to the final audit conducted in

2010, CMS remitted approximately $3.8 million for such "bad debt" expenses to HMC East and HMC West, of which HMC forwarded a portion to St. Francis as reimbursement for the period during which St. Francis operated the hospital. CMS subsequently advised HMC East and HMC West that approximately $3.2 million of the funds previously advanced (the "2008 Cost Report Liability") would be deemed an overpayment and recouped from future Medicare payments for services rendered. Although other prospective exit lenders advised the Debtors that the 2008 Cost Report Liability made it impossible to fund the exit financing contemplated in the 2010 Plan, MidCap agreed to move forward on the basis that a reserve would be imposed against the Debtors' borrowing availability from the opening date of the Prepetition Revolving Loan until such 2008 Cost Report Liability no longer existed to account for the fact that a portion of the accounts receivable owing from Medicare would be offset to repay the 2008 Cost Report Liability. This reserve, together with other reserves imposed by MidCap since the date on which the Debtors emerged from the 2010 Plan, also impacted the Debtors' ability to meet their financial obligations under the 2010 Plan.

22. The Debtors have been in default under the Prepetition MidCap Revolving Loan Agreement since December 31, 2010, when the Debtors first failed to satisfy certain financial performance covenants set forth therein. The financial performance covenants, which are tested quarterly beginning with

the quarter-ending December 31, 2010, have never been satisfied, meaning the Debtors continuously have failed to achieve the revenue performance goals anticipated by the 2010 Plan.

23.   At or about December 31, 2010, the Debtors also defaulted on their debt service obligations under the 2010 Plan, which caused additional defaults under the Prepetition MidCap Revolving Loan Agreement and the Prepetition St. Francis Term Loan.   Faced with such defaults, and considering the continued decrease in revenue, the Debtors approached St. Francis and MidCap to discuss a strategy to relieve the stresses on the hospitals, while also allowing the Debtors to address their liquidity issues, including their debt service obligations, with the hope of reaching the 2010 Plan milestones. Such strategies included, but were not limited to, extending payment terms as a means to avert financial crisis.

24.   On February 3, 2011, MidCap advised the Debtors by letter of the existence of certain events of default under the Prepetition MidCap Revolving Loan Agreement notified Debtors that it was reserving all rights available to it, including the right to cease making further advances under the Prepetition Revolving Loan Agreement.   Notwithstanding that reservation of rights, MidCap continued to fund the Debtors' borrowing requests.   On March 31, 2011, MidCap again advised the Debtors in writing of the continued existence of such events of default and further notified the Debtors of an additional

default based upon the Debtors failure to satisfy its financial performance covenants for the testing period ending March 31, 2011. In the letter, MidCap notified the Debtors that it would cease making advances under the Prepetition Revolving Loan until the Debtors were further notified in writing. Shortly thereafter, MidCap advised the Debtors that it would continue to fund ordinary operating expenses as the Debtors worked toward a restructuring.

25. Recognizing that the hospitals were not reaching their stated goals, the Debtors made a change in management on April 28, 2011, replacing then Chief Executive Officer Salim Hasham with Maria Kostylo.

26. Additionally, the Debtors discovered, and subsequently self-reported, certain technical violations of the Stark Act. The Debtors self-reported these technical, unintentional violations to CMS using the CMS voluntary Self-Referral Disclosure Protocol. While none of the violations were related to fraud, CMS may have certain recoupment rights available to it as a result of payments made while the Debtors were not in compliance with the Stark Act. Accordingly, MidCap notified the Debtors in writing on May 13, 2011 that it would immediately implement additional reserves against the Debtors' borrowing availability to protect against future recoupment actions, further reducing the Debtors' abilities to meet their financial obligations under the 2010 Plan. By separate motion, the Debtors have moved to employ

Robert A. Wade as special counsel to the Debtors to assist in achieving a global resolution of the violations with CMS.

27.     Unfortunately, the Debtors were not able, and have not been able, to adequately solve their liquidity issues.  As a result of declining revenues, coupled with steady and/or increasing operational costs, the Debtors have been unable to reach the 2010 Plan milestones.

28.     After significant negotiations, it was determined that the best solution for the hospitals, all of their creditors, and the citizens of Honolulu was for the Debtors to work with St. Francis and MidCap to form a plan of reorganization.  As part of the proposed reorganization mutually agreed upon by the Debtor, St. Francis and MidCap, the Debtors believe it is in the best interests of all parties involved, including the thousands of patients that present at the hospitals each year, to return the hospitals to the control of St. Francis through a new chapter 11 bankruptcy filing.  In light of this decision, the Debtors have found it necessary, with the support of St. Francis and MidCap, to commence these Chapter 11 Cases.

### Relief Requested

29.     By this Motion, the Debtors, pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 503(b) of the Bankruptcy Code, and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 4001-2 of the Local

Bankruptcy Rules for the United States Bankruptcy Court for the District of Hawaii (the "Local Bankruptcy Rules") request that the Court enter an interim order (the "Interim Order"), substantially in the form attached hereto as Exhibit A:

    a.    authorizing the Debtors to obtain postpetition financing (the "DIP Facility") and enter into a postpetition amendment to the Prepetition MidCap Revolving Loan Agreement by and between the Debtors and MidCap and dated August 17, 2010 (the "DIP Amendment," and together with the Prepetition MidCap Revolving Loan Agreement as so amended and all other lien and loan documents entered into in connection therewith and as further amended, restated, supplemented or otherwise modified from and after the Petition Date, the "DIP Credit Documents"), substantially in the form attached hereto as Exhibit B, by and among the Debtors and MidCap (in such capacity, the "DIP Lender"), all in respect of the obligations set forth in the DIP Credit Documents and herein (the "DIP Obligations");

    b.    authorizing the Debtors to execute and enter into the DIP Credit Documents and to perform such other and further acts as may be required or requested by the DIP Lender in connection with the DIP Credit Documents;

    c.    authorizing the Debtors to grant security interests, liens and superpriority claims to the DIP Lender, more fully described as:

        i.    superpriority administrative expense claims pursuant to Bankruptcy Code § 364(c)(1) with priority over all other administrative expenses pursuant to the Bankruptcy Code (including the kinds specified in, arising or ordered pursuant to Bankruptcy Code §§ 326, 330, 331, 503(b), 506(c), 507(a), 507(b), and 726 thereof or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment), which

superpriority expenses of the DIP Lender shall be subject and subordinate only to the Carve-Out (defined below) (the "DIP Superpriority Claims");

ii.     a first priority, priming security interest in and lien pursuant to Bankruptcy Code § 364(d)(1) on all Revolving Priority Collateral of the Debtors and their Estates of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired (the "Section 364(d)(1) Liens"), which Section 364(d)(1) Liens shall be senior to any existing liens or claims on such collateral, subject and subordinate only to (i) the Carve-Out and (ii) liens on property of a Debtor (including the proceeds of such property) that are in existence on the Petition Date but only to the extent a lien on such property (x) is valid, binding, perfected, enforceable and not avoidable, and (y) the lien on such property (or the proceeds of such property, as applicable) on the Petition Date was senior in priority to the liens of the Prepetition Revolving Lender (the items referenced in the foregoing clauses (x) and (y) being referred to collectively as the "Prior Permitted Senior Liens"); provided, however, for the avoidance of doubt, the liens of the Prepetition Revolving Lender are not Prior Permitted Senior Liens;

iii.    a first priority security interest and lien pursuant to Bankruptcy Code § 364(c)(2) on all unencumbered property of the Debtors and the Estates of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired and, subject to the entry of the Final Order, all Avoidance Action Proceeds (the "Section 364(c)(2) Liens"), which Section 364(c)(2) Liens shall be subject and subordinate only to the Carve-Out; and

iv.     a junior security interest and lien pursuant to Bankruptcy Code § 364(c)(3) on all Term Loan Priority Collateral of the Debtors and their Estates of any

nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired (the "Section 364(c)(3) Liens")[6], which Section 364(c)(3) Liens are also subject and subordinate to the Carve-Out, but are senior to the liens of the Prepetition Revolving Lender on such collateral.

d.    authorizing the Debtors' use of cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), subject to and as set forth in the DIP Budget[7] and the interim order upon this Motion (the "Interim Order");

e.    scheduling an immediate interim hearing (the "Interim Hearing") for the Court to consider the entry of the Interim Order, which authorizes the Debtors, on an interim basis, to obtain from the DIP Lender under the DIP Credit Documents, postpetition financing;

f.    scheduling a final hearing (the "Final Hearing") on the Motion no later than fifteen business days after entry of the Interim Order to consider entry of a Final Order authorizing the borrowings under the DIP Credit Documents;

g.    modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors and the DIP Lender to implement the terms of the Interim Order; and

h.    granting the other relief described in the Interim Order.

---

[6] The Section 364(d)(1) Liens, Section 364(c)(2) Liens, and Section 364(c)(3) Liens shall be collectively referred to as the "DIP Liens" and the Collateral secured by the DIP Liens, wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, shall be referred to as the "DIP Collateral".

[7] "DIP Budget" refers to the budget to be prepared by the Debtors and their financial advisors that is presented in form and substance acceptable to the DIP Lender in its sole discretion setting forth the expenditures, revenues, receipts and disbursements of the Debtors on a weekly basis during the course of these chapter 11 cases.

## Basis for Relief Requested

30.     Given the irreparable harm that will be suffered by the Debtors, their estates, their patients and the surrounding communities for which the Debtors serve if the proposed DIP Facility is not approved, the Debtors' request the relief sought herein on an immediate basis. The Debtors have an urgent need to obtain the DIP Facility and the use of cash collateral in order to permit the continuation, in an orderly manner, of the Debtors' businesses, including, but not limited to, preserving business relationships with vendors and suppliers, maintaining employee morale and, most importantly, preserving quality patient care.

31.     As discussed in the Silva Declaration, the Debtors' financial condition has been continually deteriorating, resulting in a situation in which the Debtors are unable to remain current on their debt service obligations while, concurrently, amassing the requisite working capital to preserve and maintain their businesses. In view of this steady deterioration of the Debtors' cash flow and in order for the Debtors to ensure they possess sufficient liquidity to continue their operations during their restructuring efforts, including confirmation of the proposed Plan, the Debtors, in conjunction with Scouler & Company, LLC ("Scouler"), the Debtors' financial advisor, have undertaken a stark look at their financial condition and forecasted the amount of funding required to sustain operations. Obtaining the financing required, given the

current status of the credit markets, in general, and the debtor in possession market, specifically, proved to be overwhelming challenge.

32. The Debtors' search for postpetition financing began and, given the terms proposed, ultimately ended with the most likely candidate to provide such financing — MidCap, the Debtors prepetition lender. Although the Debtors investigated other financial institutions that have traditionally provided postpetition financing, the Debtors were unsuccessful in locating a financial partner willing to lend, exclusive of MidCap.

33. Other parties, exclusive of MidCap, were approached in an attempt to procure postpetition financing. No party, exclusive of MidCap, stepped forward with a proposal of postpetition financing. This was not unexpected for the following reasons, among others:

a. The difficulties experienced by the Debtors in trying to attract "exit financing" during the Prior Cases; in particular, the 2008 Cost Report Liability, which continues today;

b. The perceptions caused by two Chapter 11 filings in a three year period;

c. The Debtors' default under the 2010 Plan less than six (6) months after emerging from the Prior Cases;

d. The ongoing deterioration of the Debtors' financial condition, including decreased revenues and steady or increasing operating costs;

e. The Debtors' disclosure of certain technical violations of the Stark Act, which may give rise to recoupment action by CMS thereby reducing the amount the Debtors (and, thus,

the Debtors' secured lender) may receive from their single largest payor -- Medicare; and

    f.    The existence of two layers of prepetition liens on substantially all of the Debtors' assets, without any "equity cushion."

34.    During negotiations with MidCap, it became evident to the Debtors that several factors weighed heavily in favor of entering into the DIP Facility proposed herein. First, as noted both above and below, no third party was willing to step forward and provide the requisite funding to the Debtors in an amount sufficient to repay the Prepetition MidCap Revolving Note, in addition to providing the necessary working capital. Second, MidCap and St. Francis were not willing to permit the imposition of security interest, including a priming lien, on the Debtors' Prepetition Revolving Loan Priority Collateral or the Prepetition Term Loan Priority Collateral that would leapfrog MidCap and/or St. Francis's security position.

35.    Furthermore, MidCap, as the Debtors' prepetition lender, was in a unique position in that the parties have an established working relationship. MidCap is exceptionally informed with respect to the Debtors' businesses and operating structure and, as such, is cognizant of the risks associated with its placement as the proposed DIP Lender.

36.    Based upon its role as a prepetition lender to the Debtors, coupled with its familiarity with the Debtors, their operations, and the issues

with which they are faced, MidCap is uniquely positioned to provide the Debtors with the postpetition financing necessary to enable them to operate their businesses as debtors in possession. Notwithstanding the foregoing, MidCap, the Debtors and St. Francis expended considerable time and resources making certain that the financial and operational issues confronting the Debtors would be appropriately managed and contained during these Chapter 11 Cases. The result of the parties efforts are described in the Support Agreement (as that term is defined in the Silva Declaration), the DIP Facility, the Plan and the Exit Facility Proposal (as that term is defined in the Silva Declaration). The Debtors are advised that agreement on all aspects set forth in foregoing documents was paramount to MidCap's agreement to provide the DIP Facility as each piece works together to form a comprehensive plan for reorganization.

37. To preserve the Debtors' going concern value during their reorganization efforts, it is imperative that the Debtors be granted access to sufficient working capital and liquidity, both of which would be accomplished through the DIP Facility and the use of cash collateral.

38. Should the Debtors be unable, or unauthorized, to secure the DIP Facility or utilize cash collateral, the Debtors would be forced to discontinue their business operations, to the detriment of their creditors, patients and

other parties in interest.  Such a situation, particularly with respect to patients, is something that the Debtors must avoid, at all costs.

## A.  Summary of Principal Terms of DIP Facility

39.  MidCap is willing to make the DIP Facility available to the Debtors[8] subject to certain terms and conditions set forth in the DIP Credit Documents and entry of the DIP Order (defined below).

40.  Pursuant to Bankruptcy Rule 4001, and Local Bankruptcy Rule 4001-2, the Debtors set forth the significant elements of the DIP Facility and DIP Credit Documents, as follows:[9]

a.  Borrower:  Hawaii Medical Center, Hawaii Medical Center East, and Hawaii Medical Center West.

b.  DIP Lender:  MidCap Financial LLC.

c.  Senior DIP Credit Facility:  Senior secured debtor-in-possession revolving credit facility to provide ongoing working capital requirements and, if authorized under any DIP Order, to pay in full the Existing Indebtedness (defined below).

d.  Existing Indebtedness:  No further borrowings shall be permitted under the revolving credit facility set forth in the existing Prepetition MidCap Revolving Loan dated as of August 17, 2010, among MidCap Financial and the

---

[8] To avoid confusion, the Debtors, collectively, are referred to, at times, in the singular as "Borrower" in the description of the DIP Credit Documents contained herein.

[9] The description of the DIP Credit Documents contained herein is intended to provide the Court and any other party in interest with an overview of the significant terms and conditions.  For a full description of the terms and conditions, reference to the DIP Credit Documents, attached hereto as Exhibit A, should be made.  In the event of any inconsistency between the description contained herein and the terms and conditions of the DIP Credit Documents attached hereto, the DIP Credit Documents shall control.

Borrower on or after the Petition Date. The amount outstanding under such revolving credit facility, together with interest, fees and costs (the "Existing Indebtedness"), shall be due and payable on the earlier of (a) the DIP Credit Facility Maturity Date (as defined below), (b) entry of a DIP Order allowing proceeds of the DIP Facility to be used to pay in full the Existing Indebtedness, and (c) twenty (20) business days after the Petition Date (as defined below). Borrower shall make mandatory prepayments of the Existing Indebtedness in an amount equal to all collections of pre-petition receivables received by Borrower as will be described more fully in the amendment to the Prepetition MidCap Revolving Loan entered into in connection with establishing the DIP Facility. See DIP Credit Amendment, § 2.02.

e.  Maximum Loan Amount:  The Maximum Loan Amount under the DIP Facility shall be $14,000,000.  The amount available to Borrower under the DIP Facility at any one time shall be based upon the Availability (as described below). See DIP Credit Amendment, § 2.01(b).

f.  Availability:  Availability under the DIP Facility shall be the lesser of (a) the Maximum Loan Amount; or (b) an amount up to eighty five percent (85%) of the Net Collectable Value (defined below) of Borrower's post-petition accounts receivable due from eligible third-party payors; provided that, upon the entry of a DIP Order allowing proceeds of the DIP Facility to be used to pay in full the Existing Indebtedness and payment in full of all Existing Indebtedness then-outstanding, Availability shall be calculated with respect to both pre-petition accounts receivable and post-petition accounts receivable due from eligible third-party payors.  Notwithstanding the Availability calculations, the DIP Facility will include an overadvance facility on the closing date of the DIP Facility (the "DIP Facility Effective Date") in an amount up to $800,000 (the "Overadvance") (the exact amount to be determined by reference to approved expenses on Borrower's Budget), which Overadvance shall be repaid in full on the earliest of the date that is the thirteen-week anniversary of the DIP

Facility Effective Date; provided that the maximum principal amount of the Overadvance shall be reduced by $100,000 increments each week, beginning on the six-week anniversary of the DIP Facility Effective Date. The net collectable value of Borrower's post-petition accounts receivable (and, if applicable, pre-petition accounts receivable) is the amount Borrower bills such payors less bad debt, contractual allowances and other standard ineligibles, which shall be determined by DIP Lender based on its due diligence, in a manner consistent with the terms of the Prepetition MidCap Revolving Loan. Availability under the DIP Facility shall be reduced for such availability reserves and/or adjustments as may be established and maintained from time to time by DIP Lender in its sole discretion including, without limitation, the Carve-Out, the Regulatory Reserve and the General Reserves (as each is hereinafter defined). The "Carve-Out" shall mean a reserve against borrowing availability for the payment of (i) allowed professional fees permitted to be paid by orders of the Bankruptcy Court and (ii) fees payable to the United States Trustee pursuant to 28 U.S.C. §1930(a)(6). The "General Reserves" shall mean certain reserves against borrowing available that are in place under the Prepetition MidCap Revolving Loan on the Petition Date (as defined below) in an aggregate amount equal to $800,000, which reserves shall be implemented on the earlier of (a) the date that is twenty (20) business days after the Petition Date (as defined below) or (b) the date on which the Existing Indebtedness is paid in full (the "Implementation Date"); provided that DIP Lender shall establish the reserves over a period of three weeks beginning on the Implementation Date such that one-fourth of the General Reserves is applied to borrowing availability on the Implementation Date and on each one-week anniversary thereof during such three-week period. The "Regulatory Reserve" shall mean a $1,500,000 reserve (such amount to be increased to $2,000,000 as set forth herein and otherwise in DIP Lender's sole discretion) against Medicare availability only (after application of liquidity factors and applicable advance rates), which reserve shall be implemented according to the following schedule: (i) on the DIP Facility Effective Date, the

Regulatory Reserve shall be $0 so long as St. Francis consents to the use of its cash collateral in an amount equal to $500,000 and consents to the disbursement of such amount to Borrower (it being agreed that, if St. Francis does not consent to the disbursement of $500,000 of its cash collateral to Borrower on the DIP Facility Effective Date, the Regulatory Reserve shall be $2,000,000 from and after such date and further increases as contemplated hereby shall not be implemented), (ii) on the one-week anniversary of the DIP Facility Effective Date, the Regulatory Reserve shall equal $500,000, (iii) on the two-week anniversary of the DIP Facility Effective Date, so long as St. Francis consents to the use of its cash collateral in an amount equal to $200,000 and consents to the disbursement of such amount to Borrower (it being agreed that, if St. Francis does not consent to the disbursement of $200,000 of its cash collateral to Borrower, the Regulatory Reserve shall be $2,000,000 from and after such date and further increases and contemplated hereby ), shall not be implemented the Regulatory Reserve shall equal $800,000, and (iv) on the three-week anniversary of the effective date of the Senior DIP Credit Facility, the Regulatory Reserve shall equal $1,500,000.  <u>See</u> DIP Credit Amendment, §§ 2.01(a) and 2.02.

g.    <u>Minimum Balance</u>:    Borrower shall maintain an average minimum drawn balance under the DIP Facility of 85% of Availability, as determined monthly.    <u>See</u> DIP Credit Amendment, § 2.01.

h.    <u>Term</u>:  The earlier of (a) 12 months from entry of the Interim Order approving the DIP Facility; or (b) the occurrence of a DIP Credit Facility Termination Event (as defined below) (in either case, the "<u>DIP Credit Facility Maturity Date</u>").  "<u>DIP Credit Facility Termination Event</u>" means the termination of the DIP Facility by DIP Lender, in its sole discretion, based upon any one of the following events:  (i) the occurrence of an event of default under the DIP Loan Documentation (as defined below) or the Support Agreement, (ii) the indefeasible payment in full of the indebtedness and obligations under the DIP Facility, (iii) a sale of all,

substantially all or any material portion of the assets of Borrower, (iv) the conversion of any of the chapter 11 cases to cases under chapter 7, (v) the effective date of a Plan (as defined below) confirmed by a final order in the chapter 11 case, (vi) the entry (or the intention to enter into) a settlement agreement with the Center for Medicare Services (CMS) with respect to any potential liabilities of Borrowers in respect of Stark or related regulations unless DIP Lender shall have consented in writing to the terms thereof, (vii) the imposition by CMS of any administrative freeze, stop payment order or other event which could cause receivables of Borrowers to be withheld, delayed in payment or otherwise not paid on a schedule consistent with the payment of such receivables prior to the date of this letter, (viii) the termination or expiration of the exclusive period in which Borrower may file a plan, (ix) the filing of any request for relief from stay by St. Francis, and (x) such other events as designated by DIP Lender. The DIP Facility shall be cross-defaulted with the Existing Indebtedness. <u>See</u> DIP Credit Amendment, § 2.01(c).

i.  <u>Use of Proceeds</u>: The proceeds of the DIP Facility will be used (i) to pay, in full, all Interest and Fees (as defined below), (ii) if permitted by a DIP Order, to pay, in full, all Existing Indebtedness, and (iii) except as set forth in (i) and (ii), exclusively for working capital of the Borrower in accordance with a budget to be prepared by the Borrower and its financial advisors in form and substance acceptable to DIP Lender in its sole discretion setting forth the expenditures, revenues, receipts and disbursements of the Borrower on a weekly basis during the chapter 11 cases (the "<u>Budget</u>"); provided, however, that if the Existing Indebtedness is not paid in full within twenty (20) business days of the Petition Date (as defined below), or if collections of pre-petition receivables shall, for any reason, fail to be made in accordance with the cash management procedures established by the holder of the Existing Indebtedness, or if pre-petition receivables shall fail to be paid with the same frequency as historical collections, then, in DIP Lender's discretion, if permitted by the terms of a DIP Order, all future proceeds of the DIP Facility shall be remitted to pay the

Existing Indebtedness until paid in full. If the terms of a DIP Order do not permit the proceeds of the DIP Facility to be used to pay the Existing Indebtedness, DIP Lender shall implement a reserve against Availability in an amount not to exceed the amount of the Existing Indebtedness then outstanding; provided that, DIP Lender may, in its discretion, apply collections of post-petition accounts receivable to the Existing Indebtedness (other than the termination fee described in Section 2.03(c) of the Prepetition Revolving Loan Agreement, as amended by the DIP Amendment (the "Prepetition Termination Fee")) until the Existing Indebtedness (other than the Prepetition Termination Fee) is paid in full in lieu of implementing such reserve, or may implement a combination of the foregoing.

Notwithstanding anything to the contrary herein, none of the proceeds of the DIP Facility shall be used in connection with (a) any investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against DIP Lender, (b) the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against DIP Lender of its affiliates with respect to any loans or other financial accommodations made prior to the commencement of the Chapter 11 Cases, or (c) any matter described in parts (vi) through (viii) of the definition of DIP Facility Termination Event. See DIP Credit Amendment, § 2.06.

j.  Interest and Fees:

i.  Interest on the outstanding balance of the DIP Facility shall be payable monthly in arrears at an annual rate of 30-day, reserve adjusted, LIBOR (subject to a 2.50% floor) plus 5.50%, reset monthly. Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year. Collections of cash by DIP Lender under the DIP Facility shall be credited to Borrower's obligations thereunder on a daily basis, but shall be subject to seven business clearance days for purposes of calculating interest and fees.

ii. Borrower shall pay DIP Lender a collateral management fee of .125% per month on the outstanding balance of the DIP Facility.

iii. Borrower shall pay DIP Lender an unused line fee equal to .042% per month of the average unused portion of the DIP Facility.

iv. Borrower shall pay DIP Lender a fully earned, non-refundable origination fee equal to the sum of $350,000, due and payable in increments as follows: 10% on the first Monday following the DIP Facility Effective Date and 10% on each following Monday until paid in full or until the occurrence of a DIP Facility Termination Event, whichever is earlier.

v. At the time of final payment under the DIP Facility or the DIP Facility Maturity Date, whichever is earlier, Borrower shall pay DIP Lender a final payment fee of 3.0% of the DIP Facility amount (the "Final Payment Fee"). The Final Payment Fee shall be waived upon repayment of the DIP Facility in the event that (i) none of the Chapter 11 Cases are converted to Chapter 7 and (ii) DIP Lender (or one of its affiliates) provides exit financing as part of the Plan on the terms set forth in the exit facility term sheet attached to the plan of reorganization filed by Borrower on the Petition Date.

vi. Except as modified by the DIP Credit Amendment, interest and fees shall continue to accrue with respect to the Existing Indebtedness as set forth in the Prepetition MidCap Revolving Loan and related financing documents on the date hereof.

See DIP Credit Amendment, §§ 2.03 and 2.09.

k. Security: The DIP Facility will be secured by valid court-authorized (a) first priority perfected priming security interests and liens in (i) all now existing and hereafter acquired pre-petition and post-petition First Lien Collateral, and (ii) subject to the approval set forth in a DIP Order, proceeds from all causes of action arising under Chapter 5

of the Bankruptcy Code, (b) junior security interests (subject only to the prior perfected security interests of St. Francis) in the Second Lien Collateral, (c) first priority security interests in all unencumbered property, and (d) all proceeds and products of the foregoing (such security interests and liens collectively referred to herein as the "<u>DIP Liens</u>"; and such assets, products and proceeds collectively referred to herein as the "<u>Collateral</u>"). The DIP Liens shall be accorded super-priority administrative claim priority status under Section 364(c)(1) of the Bankruptcy Code, having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all expenses and claims of the Borrower, whether heretofore or hereafter incurred, including, but not limited to, the kind specified in sections 105, 326, 330, 331, 503(b), 506(c), 507 or 1114 of the Bankruptcy Code, subject only to the Carve-Out. If permitted by the terms of a DIP Order, the Existing Indebtedness shall be secured by the DIP Liens. All post-petition First Lien Collateral shall further secure all Existing Indebtedness on a first lien priority basis subject only to the liens of the DIP Facility and all orders approving the DIP Facility (including, but not limited to, the Interim Order and other relevant first day orders) shall so provide and confirm in a manner satisfactory to DIP Lender. The terms and conditions of the Intercreditor Agreement among MidCap, Borrower and St. Francis shall remain in full force and effect. St. Francis shall subordinate its security interests in the First Lien Collateral to the security interests securing the DIP Facility and the Existing Indebtedness. <u>See</u>, generally DIP Credit Amendment.

I.   <u>Financial Covenants</u>:   Financial covenants shall include, without limitation, (1) minimum monthly revenue and (2) minimum monthly cash receipts. In addition, Borrower shall furnish a borrowing base certificate to DIP Lender at least once each week, and on a monthly basis, a 13-week budget setting forth on a weekly basis cash revenue, receipts, expenses, disbursements, variances to the prior budget and other information as reasonably requested by DIP Lender. <u>See</u> DIP Credit Amendment, § 6.06.

m.  Cash Management:

  i.  Borrower shall implement (or continue, as the case may be) cash management procedures reasonably satisfactory to DIP Lender including blocked account and lockbox agreements that will provide for full dominion and automatic daily sweeps into a collection account controlled by DIP Lender or its designee. All collections of pre-petition receivables shall be applied, first, to repay in full the Existing Indebtedness and, after repayment in full of the Existing Indebtedness, shall be applied to the indebtedness arising under the DIP Facility. All collections of post-petition receivables shall be applied, first, to repay in full the indebtedness arising under the DIP Facility and, after repayment in full of the DIP Facility and termination of the DIP Lenders' commitments to lend thereunder (or earlier if so elected by DIP Lender), shall be applied to the Existing Indebtedness.

  ii.  DIP Lender shall perform, at Borrower's expense, periodic field audits on Borrower's books and records and collateral-related information.

    See DIP Credit Amendment, § 2.07.

n.  Loan Documents:  Borrower shall execute and deliver, and cause to be executed and delivered, to DIP Lender such loan and security agreements, instruments, documents, certificates, and assurances as are reasonable and customary for similar loans and as DIP Lender may reasonably require in connection with the closing of the DIP Facility.  See, generally DIP Credit Amendment, §§ 2.01(b) and 6.07(a)(ix).

o.  Conditions Precedent:  Customary conditions for financings of this type, including, but not limited to: (i) DIP Lender's review and approval of the Support Agreement, Disclosure Statement, and Plan of Reorganization; (ii) agreement between the Debtors, DIP Lender and St. Francis to terms and conditions of any Interim and Final Orders authorizing the DIP Facility (which shall include, without limitation, a

declaration that all post-petition First Lien Collateral shall secure all Existing Indebtedness on a first lien priority basis subject only to the liens of DIP Lender securing the DIP Facility; (iii) the Bankruptcy Court's entry of the DIP Order, in a form acceptable to the DIP Lender; (iv) execution of all requisite credit documentation; (v) perfection on a first priority basis of all security interests and liens in the Collateral; and (vi) receipt by the DIP Lender of the Budget, satisfactory to the DIP Lender in its sole discretion. <u>See</u>, generally DIP Credit Amendment.

p. <u>Plan or Reorganization</u>: Any plan of reorganization (and order confirming such plan), and any interim order that approves the disposition of any material portion of any Borrower's assets, or the relief from stay in favor of St. Francis, or the entry into a settlement agreement with CMS with regard to regulatory matters (other than a settlement agreement approved by DIP Lender in writing) shall provide for the irrevocable payment in full in cash of all obligations under the DIP Facility and any Existing Indebtedness then outstanding on or before the effective date of the Plan and a full release of any and all claims against the DIP Lender. <u>See</u> DIP Credit Amendment, § 8.01(z) .

q. <u>DIP Facility Costs</u>: All reasonable costs associated with the DIP Facility, including, but not limited to DIP Lender's out-of-pocket expenses associated with the transaction, professional fees, recording fees, search fees, and filing fees will be paid by Borrower regardless of whether the transaction closes. <u>See</u> DIP Credit Amendment, § 2.07(f)

41. Pursuant to and upon entry of the Interim Order and the closing of the DIP Facility, the DIP Lender shall make available to the Debtors the Overadvance, with the exact amount of the Overadvance subject to the approved expenses in the Debtors' Budget. Under the Budget, the Debtors intend to use the Overadvance of funds to pay, among other things, payroll,

postpetition trade amounts and for other working capital and general corporate purposes. Without the ability to utilize the Overadvance, the Debtors would face the risk of severe disruption to their businesses, damage to their relationships with their trade vendors, and the loss of confidence by patients, both past and present, with respect to the Debtors' ability to provide quality medical care.

## B. Supplemental Disclosures Pursuant to Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001-2(c)

42. Bankruptcy Rule 4001, adopted in this District by Local Bankruptcy Rule 4001-2(c), require disclosures with respect to certain provisions of a credit agreement, if, in fact, such provisions are included in the proposed credit agreement. In compliance with such disclosures, the Debtors state as follows:

a. <u>Lien Investigation</u>. Bankruptcy Rule 4001(c)(1)(B)(iii) and (viii), as adopted by Local Bankruptcy Rule 4001-2(c), requires the disclosure of findings of fact that are intended to bind the estate with respect to the validity, enforceability, priority, or amount of a claim, without first providing certain parties in interest an opportunity to conduct an investigation as to the claims. The proposed Interim Order attached hereto contains findings of fact agreed to by the Debtors, but provides for a period in which a party-in-interest[10] with standing and the requisite authority can commence an appropriate proceeding to challenge the claims (a "<u>Challenge</u>"). Any Challenge is to be commenced by the earlier of (i) 30 days from the Petition Date, or (ii) the

---

[10] Such a "party-in-interest" would include the Official Committee of Unsecured Creditors (the "<u>Committee</u>") in these Chapter 11 Cases.

hearing on confirmation of the Plan (the "<u>Challenge Deadline</u>"). The proposed Interim Order also finds that the Challenge Deadline may be extended from time to time in the sole discretion of (i) the Debtors' prepetition secured lenders, or (ii) by further order of the Court for good cause shown pursuant to an application filed by a party-in-interest and determined by the Court prior to the expiration of the Challenge Deadline. <u>See</u> Interim Order ¶¶ 15(c) and 16(a).

b.   <u>Section 506(c) Surcharge Waiver</u>.   Bankruptcy Rule 4001(c)(1)(B)(x), as adopted by Local Bankruptcy Rule 4001-2(c), requires the disclosure of findings of fact that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code. The proposed Interim Order finds, subject to the entry of the Final Order, that the Debtors' prepetition secured lenders are entitled to a waiver of (a) the provisions of section 506(c) of the Bankruptcy Code, and (b) any "equities of the case" claims or other claims under section 105(a) or 552(b) of the Bankruptcy Code.   Further, the proposed Interim Order finds, subject to the approval of the Court, that the Final Order may provide that no costs or expenses of administration or other charge, lien, assessment or claim incurred at any time (including, without limitation, any expenses set forth in the Budget) by any Debtor or any other person or entity shall be imposed or charged against any or all of the DIP Collateral, the Collateral, or the Debtors' prepetition secured lenders or their respective claims under the   Bankruptcy Code, including sections 105(a), 506(c) and 552(b), with the Debtors affirmatively waiving such rights. <u>See</u> Interim Order ¶ 13.

c.   <u>Lien on Avoidance Actions</u>.   Bankruptcy Rule 4001(c)(1)(B)(xi), as adopted by Local Bankruptcy Rule 4001-2(c), requires the disclosure of provisions that grant liens on any cause of action arising under sections 554, 545, 547, 548, 549, 553(b), 723(a), or 724(a) of the Bankruptcy Code. The proposed Interim Order finds that, subject to the entry of the Final Order, that the proceeds of avoidance actions shall be DIP Collateral and shall be subject to DIP Liens until such time as the DIP Obligations

have been indefeasibly paid in full in cash. The proposed Interim Order further finds that the proceeds of avoidance actions shall not be subject to the Adequate Protection Liens, or the section 507(b) claims, of the Debtors' prepetition secured lenders. <u>See</u> Interim Order ¶ 18.

43. Accordingly, the facts and circumstances of the Debtors' chapter 11 cases justify the inclusion of the terms that require disclosure under Bankruptcy Rule 4001, as adopted by Local Bankruptcy Rule 4001-2(c).

## C.    Applicable Authority in Support of Relief Requested

44. As described above, it is vital to the success of the Debtors' reorganization efforts that they obtain access to postpetition financing and the use of cash collateral, therefore allowing the Debtors to continue to operate their businesses and provide high quality care to their patients. Continuation of the Debtors' businesses and the ability to continue to provide high quality care to patients is entirely dependent on immediate approval of the DIP Facility and the use of cash collateral. Absent such approval, the Debtors will face, as noted previously, severe disruption to their businesses and operations, damage to their relationships with their trade vendors, and the loss of confidence by patients, both past and present, with respect to the Debtors' ability to provide high quality medical care.

45. The Court should approve the relief sought herein in light of the following factors: (i) the Debtors are unable to obtain financing on an unsecured basis; (ii) the Debtors prepetition lenders' interests in the Debtors'

collateral are adequately protected; (iii) the proposed DIP Facility is on market terms; and (iv) approval of the DIP Facility is in the best interests of the Debtors, their estates, creditors and other parties in interest, including past and present patients.

      **(i)**      **The Debtors Meet the Requirements of Sections 363 and 364 of the Bankruptcy Code with Respect to the Incurrence of Secured Debt and the Use of Cash Collateral**

46.    Pursuant to section 364(c) of the Bankruptcy Code, "[i]f the [debtor in possession] is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt." 11 U.S.C. § 364(c). Furthermore, with respect to the credit obtained or the debt incurred, the Court may authorized that such credit or debt be: (i) given priority over any and all administrative expenses of any kind specified in §§ 503(b) or 507(b) of the Bankruptcy Code; (ii) secured by a lien on property of the debtor's estate that is not otherwise subject to a lien; or, (iii) secured by a junior lien on property of the estate that is subject to a lien. See 11 U.S.C. § 364(c)(1), (c)(2) and (c)(3); see also In re Fleetwood Enterprises, Inc., 427 B.R. 852, 858 (Bankr. C.D. Cal. 2010) ("[t]he language of [section] 364(c)(1) is clear enough — a debtor's authority to obtain unsecured credit under that subsection is expressly premised on its inability to obtain credit under

[section] 503(b)(1), i.e., as an allowable administrative expense under [section] 364(b)").

47. Section 363(c)(2) of the Bankruptcy Code provides that a debtor (or, debtor in possession) "may not use, sell or lease cash collateral…unless (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section." See 11 U.S.C. § 363(c). The Court, in authorizing the use of cash collateral, may do so if it finds that the interest of the entity holding a lien on cash collateral is, or will be, adequately protected. In this case, the Prepetition Revolving Loan Priority Collateral is protected by the forms of adequate described in further detail below.

48. Additionally, section 364(d)(1) of the Bankruptcy Code authorizes a debtor in possession to incur superpriority senior secured or "priming" liens if: (a) the debtor is unable to obtain financing from another source, and (b) the interests of the secured creditors whose liens are being primed by the DIP financing are adequately protected. See 11 U.S.C. § 364(d)(1)(A) and (B). Accordingly, the Debtors may incur "priming" liens and use cash collateral if the Debtors are unable to obtain unsecured or junior secured credit and either (i) the prepetition lenders have consented, or (ii) the prepetition lenders' interests in collateral are adequately protected.

### (ii) Financing is Not Available on an Unsecured Basis

49.     As set forth in the Silva Declaration, and as the Debtors shall demonstrate at the Final Hearing, the Debtors sought, but were not able to obtain, postpetition financing on the terms and of the type required in these cases on an unsecured basis.

50.     To show that the credit required is unobtainable on an unsecured basis, a debtor need only demonstrate that a "reasonable effort" was made without the protections afforded to potential lenders by sections 364(c) or 364(d) of the Bankruptcy Code.  See Sun-Trust Bank v. Den-Mark Const., Inc., 406 B.R. 683, 691 (Bankr. E.D.N.C. 2009); see also In re Snowshoe Co., Inc., 789 F.2d 1085, 1088 (4th Cir. 1986) (a debtor need not show it sought credit from every possible source); In re Reading Tube Industries, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) (a debtor's efforts to obtain financing should be considered on a case-by-case basis).  Furthermore, when it is unlikely that many lenders will extend the requisite financing to a debtor, "it is unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988).

51.     As noted above, other parties, exclusive of MidCap, were approached in an attempt to procure postpetition financing.  As was not

unexpected, no party, exclusive of MidCap, stepped forward with a proposal of postpetition financing. In fact, while forming the 2010 Plan, exit financing was sought by the Debtors; however, at that time, only MidCap presented a proposal that was acceptable to the Debtors. In light of this prior experience, the Debtors expectations related to postpetition financing in these chapter 11 bankruptcy cases were tempered.

52. In addition to the factors noted above, the Debtors believe that the lack of potential financing can be tied, in some respects, to potential lenders' concerns with the Debtors' locations, in addition to unfamiliarity with the Debtors' hospitals and operations. In many ways, the Debtors are unique in that the hospitals are not located on the mainland, but rather the Hawaiian Islands. The distance alone, the Debtors submit, creates an understandable concern for lenders; however, this is clearly not a concern for MidCap.

### (iii) The Interests of the Debtors' Prepetition Lenders are Adequately Protected.

53. If a debtor is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien. See 11 U.S.C. § 364(d). Such relief may be granted so long as there is adequate protection of the interests of the holder of the lien on the property on which the senior lien is proposed to be granted. Id. Although the

Bankruptcy Code does not explicitly define "adequate protection," section 361 of the Bankruptcy Code suggests that it may be provided by (i) periodic cash payments to the extent that there is a decrease in the lien holder's interest in the property; (ii) providing additional or replacement liens; or (iii) other relief resulting in the realization of the "indubitable equivalent" of the lien holder's interest in the property. See 11 U.S.C. § 361.

54.    Additionally, adequate protection may be established by demonstrating that the cash is being used to maintain and enhance the value of the underlying income producing property in which the creditor also usually holds a security interest.  Other factors are also considered, such as whether or not there is equity in the property, whether the property is declining in value, and whether or not postpetition payments due the creditor are current. See In re The Atrium Development Company, 159 B.R. 464, 471 (Bankr. E.D. Va. 1993).

55.    Ultimately, what constitutes adequate protection must be decided on a case-by-case basis.  See Mbank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985); see also, S. Rep. No. 95-989, 95th Cong., 2d Sess. 54 (1978).  The focus of the requirement is to protect a secured creditor from diminution in the value of its collateral during the use period.  See Matter of Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); Delbridge v. Production

Credit Association and Federal Land Bank (In re Delbridge), 104 B.R. 824 (E.D. Mich. 1989); In re Beker Industries Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

56.     Here, the measures of protection in the proposed Interim Order to the DIP Lender provide sufficient adequate protection for any diminution in the value of the prepetition collateral; specifically (i) the use of cash collateral and the use of the funds from the DIP Facility will augment the value of the prepetition collateral from and after the Petition Date, and (ii) the Debtors' Prepetition Lender will receive, to the extent there is a diminution in value of their liens on their prepetition collateral, further adequate protection in the form of DIP Liens in the Collateral, described as:

a.      first priority perfected priming security interests and liens in all now existing and hereafter acquired pre-petition and post-petition First Lien Collateral;

b.      subject to the approval set forth in a DIP Order, proceeds from all causes of action arising under Chapter 5 of the Bankruptcy Code, (b) junior security interests (subject only to the prior perfected security interests of St. Francis) in the Second Lien Collateral, (c) first priority security interests in all unencumbered property, and (d) all proceeds and products of the foregoing;

c.      The DIP Liens shall be accorded super-priority administrative claim priority status under Section 364(c)(1) of the Bankruptcy Code, having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all expenses and claims of the Borrower, whether heretofore or hereafter incurred, including, but not limited to, the kind

specified in sections 105, 326, 330, 331, 503(b), 506(c), 507 or 1114 of the Bankruptcy Code, subject only to the Carve-Out. If permitted by the terms of a DIP Order, the Existing Indebtedness shall be secured by the DIP Liens; and

d.    All post-petition First Lien Collateral shall further secure all Existing Indebtedness on a first lien priority basis subject only to the liens of the DIP Facility and all orders approving the DIP Facility (including, but not limited to, the Interim Order and other relevant first day orders) shall so provide and confirm in a manner satisfactory to DIP Lender.

57.    In summary, for their use of cash collateral and the DIP Facility, the Debtors propose to provide their Prepetition Lenders with adequate protection in several forms, each of which would be sufficient to carry the Debtors burden of proof with respect to the adequacy of such protection pursuant to section 363(p) of the Bankruptcy Code.

### (iv)    The DIP Facility is on Market Terms

58.    The Debtors made a good-faith effort to obtain credit on the most favorable terms available under the circumstances. As noted previously, upon confirmation of the 2010 Plan, the Debtors sought out exit financing. During this search, only MidCap stepped forward to provide what the Debtors believed, at that time, to be sufficient financing. As such, the Debtors, in their search to obtain credit as described herein, acknowledged that the universe of lenders who would commit to meet the Debtors' postpetition financing requirements would be extremely limited; that a true "market" for the financing sought did not exist. Nevertheless, the Debtors have expended significant

time and resources working with MidCap to negotiate postpetition financing that is in their best interests and likely to assist the Debtors in successfully navigating their reorganization efforts.

59.     Bankruptcy courts consistently defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  See In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflected sound and prudent business judgment [and] were reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); see also In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("business judgments should be left to the board room and not this Court.").

60.     Consistent with the bankruptcy court's inclination to defer to the debtor's business judgment, as noted above, the Debtors submit that this Court should approve the Debtors' decision to accept and enter into the DIP Facility.

### (v)     Approval of the DIP Facility is in the Best Interests of the Debtors' Estates

61.     Should this Court decide that the relief sought herein is not appropriate and deny same, the ramifications on the Debtors, their estates,

their creditors, their patients and other parties in interest would be devastating. Without the ability to utilize cash collateral and the DIP Facility, the Debtors' prospects of continuing their businesses and operations, including providing high quality medical care to patients, would become nonexistent. Conversely, if this Court were to grant the Debtors the use of cash collateral and the DIP Facility, the Debtors can begin the process of reorganizing and continue to provide their patients with the vital professional medical services that such patients have come to expect from the Debtors.

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order: (i) authorizing the Debtors to incur postpetition secured financing pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 503(b) of the Bankruptcy Code; (ii) authorizing the Debtors to use cash collateral pursuant to section 363 of the Bankruptcy Code; (iii) providing adequate protection to the prepetition secured parties pursuant to sections 361, 362, and 363 of the Bankruptcy Code; (iv) modifying the automatic stay pursuant to section 362(d) of the Bankruptcy Code; (v) authorizing execution of postpetition amendment to Prepetition MidCap Revolving Loan; (vi) scheduling a final hearing; and (vii) providing such further relief as the Court deems appropriate.

Dated:  June 21, 2011

/s/ Christopher J. Muzzi
CHRISTOPHER J. MUZZI
Moseley Biehl Tsugawa Lau & Muzzi

And

SHAWN M. RILEY
PAUL W. LINEHAN
JOHN A. POLINKO

MCDONALD HOPKINS LLC

PROPOSED CO-COUNSEL FOR THE
DEBTORS AND DEBTORS IN
POSSESSION