MCDONALD HOPKINS LLC

SHAWN M. RILEY (0037235)
PAUL W. LINEHAN (0070116)
JOHN A. POLINKO (0073967)
600 Superior Avenue, East, Suite 2100
Cleveland, OH 44114-2653
Telephone: (216) 348-5400
Facsimile: (216) 348-5474
Email: **sriley@mcdonaldhopkins.com**
**plinehan@mcdonaldhopkins.com**
**jpolinko@mcdonaldhopkins.com**

MOSELEY BIEHL TSUGAWA LAU & MUZZI
A HAWAII LIMITED LIABILITY LAW COMPANY

CHRISTOPHER J. MUZZI (6939)
Alakea Corporate Tower
1100 Alakea Street, 23rd Floor
Honolulu, HI 96813
Telephone: (808) 531-0490, Facsimile (808) 534-0202
Email: **cmuzzi@hilaw.us**

Proposed Co-Counsel to the Debtors and
Debtors in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>Hawaii Medical Center, et al.,[1]<br><br>    Debtors. | Case No. 11-01746<br>(Chapter 11 Case)<br>(Honorable Robert J. Faris)<br>(Joint Administration Requested) |
| This document relates to:<br>All Cases | |

---

[1] The Debtors are as follows: Hawaii Medical Center, a Hawaii non-profit corporation (Tax No. 20-3409838); Hawaii Medical Center East, a Hawaii non-profit corporation (Tax No. 51-0598670); and Hawaii Medical Center West, a Hawaii non-profit corporation (Tax No. 51-0598672).

This document relates to:
All Cases

# DISCLOSURE STATEMENT FOR
# DEBTORS' PLAN OF REORGANIZATION

Dated: June 21, 2011

CHICAGO/#2212541.2

# TABLE OF CONTENTS

## APPENDICES

Appendix A –Plan of Reorganization

Appendix B – Historical Financial Information

Appendix C – Financial Forecast

Appendix D – Liquidation Analysis

# I. INTRODUCTION, DISCLAIMER AND SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS

Hawaii Medical Center LLC ("HMC"), Hawaii Medical Center East, LLC ("HMCE"), and Hawaii Medical Center West, LLC ("HMCW" and collectively with HMC and HMCE, the "Debtors") have proposed a Plan of Reorganization (the "Plan"), a copy of the Plan is annexed as Appendix A to this Disclosure Statement.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.

This Disclosure Statement sets forth certain information regarding the Debtors' history, the need to seek chapter 11 protection, and the anticipated reorganization and restructuring of the Debtors upon successful emergence from chapter 11. This Disclosure Statement also describes terms and provisions of the Plan, certain effects of confirmation of the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

Except as otherwise provided herein, capitalized terms used, but not otherwise defined, in this Disclosure Statement have the meanings ascribed to them in the Plan. Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

This Disclosure Statement describes certain aspects of the Plan and other related matters. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS, APPENDICES, AND SCHEDULES THERETO IN THEIR ENTIRETY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

This Disclosure Statement does not constitute an offer to exchange or sell, or the solicitation of an offer to exchange or buy, any securities that may be deemed to be offered hereby with respect to any creditor that is not

an "accredited investor" as defined in Regulation D under the Securities Act. In any state or other jurisdiction (domestic or foreign) in which any securities that may be deemed to be offered hereby are required to be qualified for offering in such jurisdiction, no offer is hereby being made to, and the receipt of ballots will not be accepted from, residents of such jurisdiction unless and until such requirements, in the determination of the Debtors, have been fully satisfied. Until such time, any ballot submitted with respect to any such creditor will be deemed null and void and will not constitute a rejection or acceptance for purposes of determining whether requisite votes for acceptance of the Plan have been received.

NO PERSON IS AUTHORIZED BY THE DEBTORS TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS, APPENDICES, AND/OR SCHEDULES ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY CREDITOR OR INTEREST HOLDER DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR TO REJECT THE PLAN, AND NOTHING STATED HEREIN WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED A REPRESENTATION OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD LOOKING

CHICAGO/#2212541.2

AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY, INCLUDING ARTICLE V, "RISK FACTORS TO BE CONSIDERED," OF THIS DISCLOSURE STATEMENT, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## SPECIAL NOTE REGARDING
## FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements, including statements concerning possible or assumed future results of operations of the Debtors or the Reorganized Debtors and those preceded by, followed by, or that include the word may, will, should, could, expects, plans, anticipates, believes, estimates, predicts, potential, or continue or the negative of such terms and other comparable terminology. You should understand that the factors described below, in addition to those discussed elsewhere in this Disclosure Statement could materially affect the Debtors' or the Reorganized Debtors' future results and could cause those results to differ materially from those expressed in such forward-looking statements. Holders of Claims against the Debtors should read and consider carefully the information set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan. This information, however, should not be regarded as the only risks involved in connection with the Plan and/or its implementation. These factors include, but are not limited to:

## A.    Failure to Satisfy Vote Requirement

If the Debtors obtain the requisite votes to accept the Plan in accordance with the requirements of the Bankruptcy Code, the Debtors intend, as promptly as practicable thereafter, to seek confirmation of the Plan.

Pursuant to section 1126(c) of the Bankruptcy Code, Classes 1A through 3A and 1B through 3B will be determined to have accepted the Plan if at least two-thirds in amount and more than one-half in number of Allowed Claims in those Classes (that actually vote) vote in favor of the Plan. If such thresholds are not met, the Debtors may not be able to confirm the Plan as it is currently structured.

## B.    Non-Confirmation or Delay of Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of the Plan not be followed by a need for further financial reorganization and that the value of distributions to dissenting creditors and shareholders not be less than the value of distributions such creditors and shareholders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court would reach the same conclusion.

## C.    Non-Consensual Confirmation

In the event an impaired Class of Claims does not accept a plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class of claims has accepted the Plan (with such acceptances being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the Plan, the bankruptcy court determines that the Plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements for Classes 1E through 3E, 1F through 3F, 2G and 3G.

## D.    Risk of Non-Occurrence of the Effective Date

Although Debtors believe that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will occur at all.

## E.    Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors presently anticipate that they would seek (i) to modify the Plan to provide for

CHICAGO/#2212541.2

whatever classification might be required for confirmation and (ii) to use the acceptances received from any creditor pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such creditor ultimately is deemed to be a member, provided that they obtain the prior written consent of St. Francis and MidCap as required under the Plan. Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan of any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder regardless of the Class as to which such Holder is ultimately deemed to be a member. The Debtors believe that under the Federal Rules of Bankruptcy Procedure the Debtors would be required to re-solicit votes for or against the Plan only when a modification adversely affects the treatment of the claim of any creditor or equity holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that it has complied with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the Confirmation and Consummation of the Plan and could increase the risk that the Plan will not be consummated.

### F. Increased Competition on the Island of Oahu for Patient Care Services

It has become increasingly difficult to compete against other, financially strong competitors on the island of Oahu. The healthcare industry in Hawaii has seen the entry of several significant changes during recent years. The level of competition on the island remains formidable.

ANY FINANCIAL FORECASTS OR OTHER FORWARD-LOOKING
ANALYSES CONTAINED HEREIN WERE NOT PREPARED WITH A
VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE
FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE
OF CERTIFIED PUBLIC ACCOUNTANTS. THE DEBTORS' FINANCIAL
ADVISORS HAVE NEITHER COMPILED NOR EXAMINED THE
ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO
DETERMINE THE REASONABLENESS THEREOF AND,
ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER
FORM OF ASSURANCE WITH RESPECT THERETO.

## II. SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

### A. Overview of Treatment

As contemplated by the Bankruptcy Code, Administrative Claims and
Priority Tax Claims are not classified under the Plan. Allowed
Administrative Claims are to be paid in full in accordance with the terms of
the Plan. *See* Article IV, Section D.1 of this Disclosure Statement for a
summary of the treatment proposed under the Plan for Administrative
Claims. *See* Article IV, Section D.1(c) of this Disclosure Statement for a
summary of the treatment proposed under the Plan for Priority Tax Claims.
The Plan further provides that all Other Secured Claims (Classes 1C
through 3C) and Other Priority Claims (Classes 1D through 3D) will remain
unimpaired.

Pursuant to the Plan, the Reorganized Debtors' will repay their
obligations under the anticipated DIP Facility with borrowings under a new
$15 million Exit Facility. The Exit Facility will also be used to repay any
remaining amounts owed to MidCap on account of the Allowed MidCap
Secured Claim, other than MidCap's Early Termination Claim.

In exchange for the satisfaction of the St. Francis Secured Claim, the
Debtors will transfer to St. Francis or its designee all of the Debtors' fee
interest in real property (and enter into amended leases with St. Francis
with respect thereto) and the Debtors and all of their assets shall merge
into subsidiaries of St. Francis. In addition, St. Francis has agreed to
provide at least $2,000,000 and up to $5,200,000 of cash as a contribution
to the Reorganized Debtors to provide security for the Exit Facility and for
working capital purposes.

Other Secured Claims and Other Priority Claims will be either paid in full or reinstated as set forth in the Plan. Holders of General Unsecured Claims, Intercompany Claims, and Interests will not receive any distribution under the Plan and will have their Claims discharged and their Interests cancelled.

The table below summarizes the classification and treatment of the prepetition Claims and Interests under the Plan. The Debtors believe that the Plan provides distributions to all Classes of Claims that reflect an appropriate resolution of the Claims, taking into account the differing nature and priority of such Claims.

### Classification of Debtors' Claims and Interests

| Description of Claims and Interests | Est. Allowed Amount | Treatment | Recovery |
|---|---|---|---|
| Classes 1A – 3A: MidCap Secured Claim<br><br>Impaired | $7,676,495.82, plus interest fees and expenses. | The MidCap Secured Claim shall be Allowed in the principal amount of $7,676,495.82, plus all applicable interest, fees (including without limitation the MidCap Early Termination Claim) and costs of MidCap pursuant to the MidCap Credit Documents (the "Allowed MidCap Secured Claim").<br><br>On the Effective Date, together with other distributions provided for in the Plan, in full satisfaction, settlement, release and discharge of and in exchange for the Allowed MidCap Secured Claim, the Reorganized Debtors shall pay MidCap an amount of Cash, with the proceeds from | Less than 100% |

| Description of Claims and Interests | Est. Allowed Amount | Treatment | Recovery |
|---|---|---|---|
| | | the Exit Facility, equal to (i) the Allowed MidCap Secured Claim, less (ii) the sum of (a) all amounts received by MidCap and applied to permanently reduce the MidCap Secured Claim on or before the Effective Date and (b) the MidCap Early Termination Claim. | |
| Classes 1B – 3B: St. Francis Secured Claim<br><br>Impaired | | The St. Francis Secured Claim shall be Allowed as a Secured Claim in the principal amount of $39,175,277.61, plus all applicable interest, fees and costs of St. Francis pursuant to the St. Francis Credit Documents (the "Allowed St. Francis Secured Claim").<br><br>On the Effective Date, together with other distributions provided for in the Plan, in full satisfaction, settlement, release and discharge of and in exchange for the Allowed St. Francis Secured Claim, (a) the St. Francis Designees shall receive fee title to the Transferred Real Properties; and (b) each of HMC, HMCE, and HMCW will merge with and into the Reorganized Debtors | Less than 100% |

CHICAGO/#2212541.2

| Description of Claims and Interests | Est. Allowed Amount | Treatment | Recovery |
|---|---|---|---|
| | | | |
| Classes 1C through 3C – Other Secured Claims<br><br>Unimpaired | $1 million | On the Effective Date, at the election of the pertinent Reorganized Debtor, the Holder of each Allowed Other Secured Claim shall, on account of such Claim, either: (i) be paid in Cash in full, (ii) have surrendered to it, without representation or warranty, the collateral securing its Claim, (iii) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (A) be paid a cure of any such default that occurred prior to the Effective Date, other than a default of a kind specified in section 365(b)(2) of this title, (B) have Reinstated the maturity of such Claim as such maturity existed before such default, (C) be compensated for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, and (D) otherwise not have altered the legal, equitable, or contractual rights to which such Claim entitles the | 100% |

| Description of Claims and Interests | Est. Allowed Amount | Treatment | Recovery |
|---|---|---|---|
| | | Holder of such Claim, or (iv) have left unaltered the legal, equitable, and contractual rights to which such Claim entitles the Holder of such Claim. | |
| Classes 1D through 3D – Other Priority Claims  Unimpaired | $50,000 | On (a) the later of (i) the Effective Date (or as soon as practicable thereafter), (ii) the date such Other Priority Claim becomes an allowed Other Priority Claim, and (iii) such other date as may be agreed upon by the Reorganized Debtors and the holder of such Other Priority Claim, or (b) on such other date as the Bankruptcy Court may order, each holder of an allowed Other Priority Claim against the Debtors shall receive on account of and in full and complete settlement, release and discharge of such Other Priority Claim, at the Reorganized Debtors' election, (i) cash in the amount of such allowed Other Priority Claim in accordance with section 1129(a)(9) of the Bankruptcy Code and/or (ii) such Other Priority Claim shall be Reinstated. All Allowed Other Priority Claims against | 100% |

| Description of Claims and Interests | Est. Allowed Amount | Treatment | Recovery |
|---|---|---|---|
| | | the Debtors that are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors as and when such claims become due and payable in the ordinary course of business in accordance with their terms. | |
| Classes 1E through 3E -- General Unsecured Claims

Impaired | $19-23 million | Holders of General Unsecured Claims shall not receive any property under the Plan and shall have their Claims discharged. | 0% |
| Classes 1F through 3F – Intercompany Claims

Impaired | $52 million | Holders of Intercompany Claims shall not receive any property under the Plan and shall have their Claims discharged. | 0% |
| Classes 2G and 3G – Interests

Impaired | N/A | All Interests in the Debtors will be canceled on the Effective Date. Holders of Class 9 Interests shall not receive or retain any Interests or property under the Plan. | 0% |

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTORS AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

CHICAGO/#2212541.2

## III. THE DEBTORS AND THE CHAPTER 11 CASES

*The following overview is a general summary only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan.*

### A. Business Overview and History

The hospital system currently operated by HMC was originally established in 1927 under the sponsorship of the sisters of the Third Franciscan Order of Syracuse, New York. The hospitals came to be known as St. Francis Medical Center. Among the programs for which St. Francis Medical Center had become well known were transplant services (operating Hawaii's first and only program), End Stage Renal Disease care, cardiac care and the Institute of Cancer. After a period of sustained success, however, St. Francis Medical Center (along with many other hospitals throughout the country) fell victim to the ever-changing healthcare industry. Such changes, including the steady increase in the cost of patient care coupled with static Medicare and Medicaid reimbursement, contributed to the deferral of certain maintenance and capital expenditures, adversely affecting the long-term viability of the hospitals.

Shortly after the passage of the Balanced Budget Act of 1997, St. Francis Medical Center began to experience financial difficulties, partially due to its role as the primary health care provider for the uninsured or government-insured in the Honolulu market. St. Francis Medical Center faced a 9-week nursing strike in 2002 and the subsequent loss of physician and community support. By 2005, 74% of patients visiting St. Francis Medical Center were either on Medicare or Medicaid. Although the costs of caring for these patients continued to increase, Medicare and Medicaid reimbursements remained flat. The deterioration of St. Francis Medical Center's financial performance contributed to its deferral of maintenance and capital expenditures, further compromising the long-term viability of the hospital system.

In January, 2007, Hawaii Medical Center, LLC, a Hawaii limited liability company, purchased the two hospital campuses in North Honolulu (Hawaii Medical Center East, commonly referred to as "HMC East") and

-12-

Ewa Beach (Hawaii Medical Center West, commonly referred to as "HMC West") from St. Francis.

To fund the purchase of the hospitals and provide adequate working capital, HMC, HMC East and HMC West, as borrowers, entered into certain loan agreements with St. Francis Healthcare System of Hawaii, as Agent, St. Francis Medical Center, and St. Francis Medical Center – West (collectively, "St. Francis") and Siemens Financial Services, Inc. ("Siemens"). Initially, the aggregate amount due and owing under the loan agreements was in excess of $69 million.

Following the acquisition of the hospitals in January of 2007 through August of 2008, HMC and its affiliates suffered significant operating losses. Contributing to such losses were several factors, including, but not limited to, the cost of patient care exceeding actual reimbursement and overstaffing. HMC and it affiliates instituted several initiatives to reduce losses and increase revenues while, at the same time, working to address various defaults under the loan agreement with Siemens.

HMC, its affiliates, and Siemens expended significant time discussing and negotiating the various defaults under the loan agreement, entering into a forbearance agreement, thereafter amended and revised on several occasions. Ultimately, HMC and its affiliates were left with little choice but to seek bankruptcy protection and, on August 29, 2008, HMC and its affiliates filed the Prior Cases, seeking relief under chapter 11 of the Bankruptcy Code (the "Prior Cases").

During the period commencing on the filing date of the Prior Cases and ending in April 2010, HMC, its affiliated debtors, SFMC, Siemens, and the Committee of Unsecured Creditors worked towards the creation of a confirmable plan of reorganization. On April 10, 2010, HMC, its affiliated debtors, and the Official Committee of Unsecured Creditors filed their First Amended Disclosure Statement for First Amended Joint Plan of Reorganization for Hawaii Medical Center, LLC, Hawaii Medical Center East, LLC, and Hawaii Medical Center West, LLC Proposed by the Official Committee of Unsecured Creditors, Hawaii Medical Center, LLC, Hawaii Medical Center East, LLC, and Hawaii Medical Center West, LLC, and Hawaii Physicians Group, LLC, and, on that same day, their First Amended Joint Plan of Reorganization.

On May 27, 2010, the Debtors filed their Revised First Amended Joint Plan of Reorganization for Hawaii Medical Center, LLC, Hawaii Medical

Center East, LLC, and Hawaii Medical Center West, LLC Proposed by the Official Committee of Unsecured Creditors, Hawaii Medical Center, LLC, Hawaii Medical Center East, LLC, Hawaii Medical Center West, LLC, and Hawaii Physicians Group, LLC, which included modifications to resolve St. Francis' objections to confirmation of the Debtors prior plan. On May 28, 2010, the Court entered its Findings of Fact, Conclusions of Law, and Order Under U.S.C. §§ 1126 and 1129(A) and (B) and Fed. R. Bankr. P. 3020 Confirming the First Amended Joint Plan of Reorganization for Hawaii Medical Center, LLC, Hawaii Medical Center East, LLC, and Hawaii Medical Center West, LLC Proposed by the Official Committee of Unsecured Creditors, Hawaii Medical Center, LLC, Hawaii Medical Center East, LLC, and Hawaii Medical Center West, LLC, and Hawaii Physicians Group, LLC.

Pursuant to the terms of the confirmed First Amended Joint Plan of Reorganization (the "2010 Plan"), HMC and its affiliated debtors, then each Hawaii limited liability companies, converted to new, Hawaii non-profit corporations – the Debtors herein. Furthermore, CHA Hawaii, one of HMC's affiliated debtors and a subsidiary of Cardiovascular Hospitals of America, LLC, was, upon emergence, to discontinue any involvement in the management of HMC, HMC East and HMC West. CHA Hawaii did, in fact, cease involvement in the management of HMC, HMC East and HMC West and its chapter 11 case has since been dismissed. The remaining chapter 11 cases remain open.

## B.    Prepetition Equity Structure

As provided in the 2010 Plan, all equity interests in HMC were canceled and HMC is governed by a self-replacing board of directors. HMC in turn owns 100% of the equity interests in HMC East and HMC West.

## C.    Boards of Managers and Executive Officers

Following is a list of the board of directors for HMC and the executive officers for each of HMC, HMCE, and HMCW as of June 1, 2011.

- Collin R. Dang, M.D. Director
- David Hill, Chief Operating Officer West
- Dean Pang, Chief Information Officer
- Gail P. Tiwanak, M.B.A., R.N. Director

-14-

- Gilbert K.T. Tam, Director

- Henry W. Louie, M.D., FACS Director

- Jessica Sphar, Director HR

- Kenneth J. Silva, Director

- Maria Kostylo, Interim CEO and Chief Clinical Officer

- Michael H. Erne, Director

- Paul Ross, Chief Operating Officer East

- Philip Odle, Director of Nursing

- Randy Ching, Director

- Rosalo M. Paeste, M.D., Director

- Suanne Morikuni, Chief Financial Officer

## D.    Prepetition Debt Structure

The Debtors' prepetition debt structure is comprised of (i) the Prepetition MidCap Revolving Loan (defined below) by and between the Debtors, as borrowers, and MidCap Financial, LLC, a Delaware limited liability company ("MidCap"), as lender; and (ii) the Prepetition SFMC Term Loan (defined below) by and between the Debtors, as borrowers, and St. Francis Healthcare System of Hawaii, a Hawaii nonprofit corporation, among others, as lender.  As of the Petition Date, the aggregate outstanding principal on the Prepetition MidCap Revolving Loan and the Prepetition SFMC Term Loan is approximately $46,851,773.82.

### 1.    Prepetition MidCap Revolving Loan

MidCap served as the Debtors "exit lender" under the 2010 Plan.  On August 17, 2010, the Debtors and MidCap executed that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Prepetition MidCap Revolving Loan Agreement"), along with all agreements, documents, notes and instruments in respect thereof, pursuant to which MidCap made loans and extended other financial accommodations to the Debtors prior to the Petition Date (the "Prepetition MidCap Revolving Loan").  As of the Petition Date, the principal balance of the Prepetition MidCap Revolving Loan is approximately $7,676,495.82.

-15-

The Debtors' obligations with respect to the Prepetition MidCap Revolving Loan are secured by MidCap's first priority lien on, among other things: (i) all Accounts (as defined in the Prepetition MidCap Revolving Loan Agreement, Annex I), and payment intangibles, instruments and other rights to receive payment of the Debtors related to the Accounts; (ii) all general intangibles (including, without limitation, contract rights and intellectual property), chattel paper, documents, letter-of-credit rights and commercial tort claims; (iii) all Lockbox Accounts (as defined in the Prepetition MidCap Revolving Loan Agreement), and all deposit accounts of the Debtors (other than the SFMC Collateral Account (as defined in the Prepetition MidCap Revolving Loan Agreement)); and (iv) all books and records of the Debtors evidencing or relating to or associated with any of the foregoing (collectively, the "First Lien Collateral").

Furthermore, MidCap holds a second priority lien on, among other things, all right, title and interest of the Debtors in and to all property (other that the First Lien Collateral), including, without limitation all accounts (as defined in the UCC) (other than Accounts), subject to a prior security interest of SFMC (collectively, the "Second Lien Collateral").

## 2.      Prepetition SFMC Term Loan

On August 17, 2010, the Debtors and St. Francis Healthcare System of Hawaii, a Hawaii nonprofit corporation, as Lender and Agent for the Lenders, St. Francis Medical Center, as Lender, and St. Francis Medical Center – West, as Lender, entered into that certain Term Loan A Loan Agreement (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Prepetition SFMC Term Loan"), along with all agreements, documents, notes and instruments in respect thereof, in which SFMC made loans and extended other financial accommodations to the Debtors prior to the Petition Date. As of the Petition Date, the principal balance owed on the Prepetition SFMC Term Loan was approximately $39,175,277.

The Debtors' obligations with respect to the Prepetition SFMC Term Loan are secured by SFMC's first priority lien on, among other things, all real property in which the Debtors are fee simple owners, the SFMC Collateral Account, and all collateral described in the Collateral Documents made part of, and associated with, the Prepetition SFMC Term Loan other than the First Lien Collateral, on which SFMC holds a second priority lien subject to MidCap's prior lien.

The Debtors have not remitted a debt service payment to St. Francis with respect to the Prepetition SFMC Term Loan.

### 3.    Other Indebtedness

Under the 2010 Plan, the Debtors agreed to pay unsecured creditors in full according to a schedule. The Debtors estimate that the total amount of unsecured claims under the 2010 Plan is approximately $19 million. Under the 2010 Plan, the Debtors would have been obligated to make the first payment to unsecured creditors on June 30, 2011 in a total amount of $1.5 million. Over the next four years, the Debtors were obligated to make semi-annual payments of $750,000; the next four years semi-annual payments of $1,000,000; and then the next four years semi-annual payments of $1,250,000 until paid in full.

### E.    Debtors' Need for Further Restructuring.

Since their emergence from bankruptcy in August of 2010, after confirmation of the 2010 Plan, the Debtors suffered numerous set backs that did not allow them to reach the projected goals set forth in the 2010 Plan, nor meet their financial obligations going forward. Specifically, the 2010 Plan called for the Debtors, after conversion to Hawaii non-profit corporations, to reach certain milestones in the several months following the effective date of the 2010 Plan. Although the Debtors were able to achieve some of the tax savings projected through their conversion to Hawaii non-profit corporations, and, further, although the Debtors made certain operational adjustments and took steps to reduce overhead, the projected revenue goals included in the 2010 Plan were, in retrospect, too high.

Furthermore, the 2010 Plan stripped the HMC doctors of their ownership interests in the hospitals. Additionally, the tightened budget projections did not allow for proper capital equipment upgrades. These two factors contributed to a loss of physicians, of referrals, and a corresponding loss of revenue. While revenue continued to decrease, the costs of operating the hospitals remained steady and, in some cases, increased.

The foregoing factors exacerbated the Debtors' then-existing financial condition. In fact, immediately prior to the confirmation of the 2010 Plan, an audit conducted by the Centers for Medicare & Medicaid Services ("CMS") revealed that, following the 2007 sale of the hospitals by St. Francis to HMC, 2008 cost reports filed by HMC East and HMC West with

CMS incorrectly claimed certain "bad debt" expenses that were attributable to the period during which St. Francis operated the hospitals. Following the submission of the 2008 cost report, but prior to the final audit conducted in 2010, CMS remitted approximately $3.8 million for such "bad debt" expenses to HMC East and HMC West, of which HMC forwarded a portion to St. Francis as reimbursement for the period during which SFMC operated the hospital. CMS subsequently advised HMC East and HMC West that approximately $3.2 million of the funds previously advanced (the "2008 Cost Report Liability") would be deemed an overpayment and recouped from future Medicare payments for services rendered. Although other prospective exit lenders advised the Debtors that the 2008 Cost Report Liability made it impossible to fund the exit financing contemplated in the 2010 Plan, MidCap agreed to move forward on the basis that a reserve would be imposed against the Debtors' borrowing availability from the opening date of the Prepetition Revolving Loan until such 2008 Cost Report Liability no longer existed to account for the fact that a portion of the accounts receivable owing from Medicare would be offset to repay the 2008 Cost Report Liability. This reserve, together with other reserves imposed by MidCap since the date on which the Debtors emerged from the 2010 Plan, also impacted the Debtors' ability to meet their financial obligations under the 2010 Plan.

The Debtors have been in default under the Prepetition MidCap Revolving Loan Agreement since December 31, 2010, when the Debtors first failed to satisfy certain financial performance covenants set forth therein. The financial performance covenants, which are tested quarterly beginning with the quarter-ending December 31, 2010, have never been satisfied, meaning the Debtors continuously have failed to achieve the revenue performance goals anticipated by the 2010 Plan.

At or about December 31, 2010, the Debtors also defaulted on their debt service obligations under the 2010 Plan, which caused additional defaults under the Prepetition MidCap Revolving Loan Agreement and the Prepetition SFMC Term Loan. Among other things, the Debtors failed to make a required interest payment to St. Francis under the SFMC Term Loan Agreement. Faced with such defaults, and considering the continued decrease in revenue, the Debtors approached St. Francis and MidCap to discuss a strategy to relieve the stresses on the hospitals, while also allowing the Debtors to address their liquidity issues, including their debt service obligations, with the hope of reaching the 2010 Plan milestones.

-18-

Such strategies included, but were not limited to, extending payment terms as a means to avert financial crisis.

On February 3, 2011, MidCap advised the Debtors by letter of the existence of certain events of default under the Prepetition MidCap Revolving Loan Agreement notified Debtors that it was reserving all rights available to it, including the right to cease making further advances under the Prepetition Revolving Loan Agreement. Notwithstanding that reservation of rights, MidCap continued to fund the Debtors' borrowing requests. On March 31, 2011, MidCap again advised the Debtors in writing of the continued existence of such events of default and further notified the Debtors of an additional default based upon the Debtors failure to satisfy its financial performance covenants for the testing period ending March 31, 2011. In the letter, MidCap notified the Debtors that it would cease making advances under the Prepetition Revolving Loan until the Debtors were further notified in writing. Shortly thereafter, MidCap advised the Debtors that it would continue to fund ordinary operating expenses as the Debtors worked toward a restructuring.

Recognizing that the hospitals were not reaching their stated goals, the Debtors made a change in management on April 28, 2011, replacing then Chief Executive Officer Salim Hasham with Maria Kostylo on an interim basis.

Additionally, the Debtors discovered, and subsequently self-reported, certain technical violations of the Stark Act. The Debtors self-reported these technical, unintentional violations to CMS using the CMS voluntary Self-Referral Disclosure Protocol. While none of the violations were related to fraud, CMS may have certain recoupment rights available to it as a result of payments made while the Debtors were not in compliance with the Stark Act. Accordingly, MidCap notified the Debtors in writing on May 13, 2011 that it would immediately implement additional reserves against the Debtors' borrowing availability to protect against future recoupment actions, further reducing the Debtors' abilities to meet their financial obligations under the 2010 Plan.

Unfortunately, the Debtors were not able, and have not been able, to adequately solve their liquidity issues. As a result of declining revenues, coupled with steady and/or increasing operational costs, the Debtors have been unable to reach the 2010 Plan milestones.

After significant negotiations, it was determined that the best solution for the hospitals, all of their creditors, and the citizens of Honolulu was for the Debtors to work with St. Francis and MidCap to form a plan of reorganization. On July 20, 2011, the Debtors, St. Francis and MidCap executed that certain Restructuring Support Agreement pursuant to which the Debtors agreed to pursue the Plan. The Debtors believe it is in the best interests of all parties involved, including the thousands of patients that present at the hospitals each year, to proceed with the Plan and intend to commence new chapter 11 bankruptcy filings.

## F. Anticipated Need for Post-Petition Financing

The Debtors anticipate that they will have an urgent need for postpetition financing and use of cash collateral to fund their operations during the Reorganization Cases until the occurrence of the Effective Date. The Debtors' financial condition has been continually deteriorating, resulting in a situation in which the Debtors are unable to remain current on their debt service obligations while, concurrently, amassing the requisite working capital to preserve and maintain their businesses. In view of this steady deterioration of the Debtors' cash flow and in order for the Debtors to ensure they possess sufficient liquidity to continue their operations during their restructuring efforts, including confirmation of the proposed Plan, the Debtors, in conjunction with Scouler & Company, LLC ("Scouler"), the Debtors' financial advisor, have undertaken a stark look at their financial condition and forecasted the amount of funding required to sustain operations. Obtaining the financing required, given the current status of the credit markets, in general, and the debtor in possession market, specifically, proved to be overwhelming challenge.

The Debtors have reached an agreement with MidCap to provide postpetition financing through the DIP Facility (as defined in the Plan). In addition, St. Francis has agreed, on the terms and conditions set forth in the proposed Financing Order (as defined in the Plan) to permit the Debtors to use a portion of St. Francis' cash collateral. In connection with the filing of the Reorganization Cases, the Debtors intend to promptly seek approval of the DIP Facility and the entry of the Financing Orders.

## IV. SUMMARY OF THE PLAN OF REORGANIZATION

The primary objectives of the Plan are to alter the Debtors' debt and capital structures to permit them to emerge from their Reorganization Cases with a viable capital structure and maximize the value of the ultimate recoveries to all creditor groups on a fair and equitable basis. The Plan provides for, among other things: (A) the restructuring of certain indebtedness, (B) the discharge of Claims, subject to the terms of the Plan and the Reorganized Debtors' obligations under the Plan and (C) the cancellation of all existing Interests in the Debtors. The Debtors believe that the Plan ensures that the Reorganized Debtors will have requisite funding to be a viable institution and will allow the Reorganized Debtors to become a nonprofit hospital system which will actively serve and participate in its community.

The Debtors believe that, through the Plan, Holders of Allowed Claims will obtain a greater recovery from the estates of the Debtors than the recovery they would receive (a) from any other restructuring (b) if the Debtors were to liquidate under chapter 7 of the Bankruptcy Code, or (c) if MidCap or St. Francis sought and obtained relief from the automatic stay to enforce their claims and rights against the Debtors and their estates. The Debtors also believe that the Plan will afford the Reorganized Debtors the opportunity and ability to continue their businesses as viable going concerns and preserve ongoing employment for the Reorganized Debtors' employees.

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Interests in the Debtors under the Plan and will, upon the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors and their Estates, the Reorganized Debtors and other parties in interest. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document, on the other hand, the terms of the Plan and such other operative document are controlling.

CHICAGO/#2212541.2

## A. Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and interest holders. Another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the Plan binding upon the debtor, any issuer of securities under the Plan, any person or entity acquiring property under the Plan and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the Plan or (ii) receives or retains any property under the Plan. Subject to certain limited exceptions and other than as provided in the Plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the Plan and substitutes, therefore, the obligations specified under the confirmed plan and terminates all rights and interests of equity security holders.

## B. Overall Structure of the Plan

The Debtors believe that the Plan provides the highest, best and most timely possible recovery to the Debtors' Claim Holders. Under the Plan, Claims against the Debtors are divided into different classes. If the Plan is confirmed by the Bankruptcy Court and consummated, on the Effective Date, and at certain times thereafter as Claims are resolved, liquidated or otherwise allowed, the Reorganized Debtors will make distributions to certain Classes of Claims as provided in the Plan. The Classes of Claims against the Debtors created under the Plan, the treatment of those Classes of Claims under the Plan and distributions to be made under the Plan are described below.

CHICAGO/#2212541.2

Under the Plan, there are four classes of Impaired Claims for each Debtor (Classes 1A through 3A MidCap Secured Claims, Classes 1B through 3B St. Francis Secured Claim, Classes 1E through 3E General Unsecured Claims, and Classes 1F through 3F Intercompany Claims) and one class of Impaired Interests for two Debtors (Classes 2G and 3G). All other Claims are Unimpaired. Holders of Claims in Classes 1C through 3C Other Secured Claims and Classes 1D through 3D Other Priority Claims will be unimpaired by the Plan.

## C. Classification and Treatment of Claims and Interests

### 1. Unclassified Claims.

#### a) Administrative Expense Claims.

Except as provided in Section 2.2 of the Plan or to the extent that the holder of an Allowed Administrative Expense Claim agrees to a different treatment, the applicable Reorganized Debtor shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; provided, however, that all Ordinary Course Administrative Expenses shall be paid in full by the applicable Reorganized Debtor in the ordinary course of business in accordance with the terms and conditions of agreements relating thereto. The Confirmation Order shall contain a bar date for purposes of assertion and allowance of Administrative Expense Claims, other than Ordinary Course Administrative Expenses.

#### b) Compensation and Reimbursement Claims.

Except as provided in Section 2.3 of the Plan, all Professionals that are awarded compensation or reimbursement of expenses by the Bankruptcy Court in the Reorganization Cases in accordance with section 330 or 331 of the Bankruptcy Code or entitled to the priority pursuant to section 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, shall be paid in full, in Cash, the amounts allowed by the Bankruptcy Court (a) on or as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date on which the Bankruptcy Court order allowing such Claim becomes a Final Order, or (b) upon such other terms as may be mutually agreed upon between such

holder of an Allowed Administrative Expense Claim and a Reorganized Debtor.

### c) Payment of DIP Facility Obligations.

On the Effective Date, the DIP Facility Obligations shall be repaid in full with proceeds of the Exit Facility in full satisfaction, settlement, release, and discharge of and in exchange for all of the Debtors' obligations under the DIP Facility.

### d) Payment of Priority Tax Claims.

The Allowed Priority Tax Claim held by the Internal Revenue Service and any state taxing authority relating to any taxable year shall be the lesser of: (a) the Allowed Claim held by such Person; (b) the estimated claim amount held by such Person, if estimated by the Bankruptcy Court for purposes of allowance; or (c) the amount of such claim as determined by any administrative or judicial tribunal of competent jurisdiction before which such issue is brought by final order or as compromised and settled by the pertinent Reorganized Debtor and such taxing authority. Notwithstanding any other provision of the Plan to the contrary, payments in respect of Allowed Priority Tax Claims shall not be made on the Effective Date, but rather shall, at the sole option and discretion of the pertinent Reorganized Debtors be made (a) in full, in Cash, on the later of the Effective Date or the Date of Assessment, (b) in accordance with section 1129(a)(9)(c) of the Bankruptcy Code, in full, in Cash, in up to twenty (20) equal quarterly installments, commencing on the first Business Day following the Date of Assessment of such Allowed Priority Tax Claim, together with interest from the Date of Assessment at a rate to be determined by the Bankruptcy Court, or (c) by mutual agreement of the Holder of such Allowed Priority Tax Claim and pertinent Reorganized Debtors.

Notwithstanding the provisions of Section 2.2 of the Plan, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty will be subject to treatment in Classes 1E through 3E as applicable. The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the pertinent Debtor, pertinent Reorganized Debtor or any of their respective property.

-24-

## 2.     Bar Dates for Administrative Expense Claims.

### a)     General Bar Date Provisions

Except as otherwise provided in the Plan, unless previously Filed, requests for payment of Administrative Expense Claims must be Filed and served on the pertinent Reorganized Debtors, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 30 days after the Effective Date (the "Administrative Claims Bar Date").  Holders of Administrative Expense Claims that are required to File and serve a request for payment of such Administrative Expense Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Expense Claims against the Debtors or the Reorganized Debtors or their respective property, and such Administrative Expense Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party within 60 days after the Filing of the applicable request for payment of Administrative Expense Claims.

### b)     Bar Dates for Certain Administrative Expense Claims

Professionals asserting a Professional Fee Claim for services rendered to the Estates before the Effective Date must File and serve on the Reorganized Debtors and such other Persons who are designated by the Bankruptcy Rules, the Confirmation Order, the Professional Fee Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim, as it relates to services provided to the Estates, no later than 60 days after the Effective Date.  Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting Professional by the later of (1) 90 days after the Effective Date or (2) 30 days after the Filing of the applicable request for payment of the Professional Fee Claim.  To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court, including the Professional Fee Order, regarding the payment of Professional Fee Claims.

CHICAGO/#2212541.2

### 3. Classified Claims and Interests.

#### a) Classes 1A through 3A – MidCap Secured Claim.

Classes 1A through 3A consist of the MidCap Secured Claim. The MidCap Secured Claim shall be Allowed in the principal amount of $7,676,495.82, plus all applicable interest, fees (including without limitation the MidCap Early Termination Claim) and costs of MidCap pursuant to the MidCap Credit Documents (the "Allowed MidCap Secured Claim").

On the Effective Date, together with other distributions provided for in the Plan, in full satisfaction, settlement, release and discharge of and in exchange for the Allowed MidCap Secured Claim, the Reorganized Debtors shall pay MidCap an amount of Cash, with the proceeds from the Exit Facility, equal to (i) the Allowed MidCap Secured Claim, less (ii) the sum of (a) all amounts received by MidCap and applied to permanently reduce the MidCap Secured Claim on or before the Effective Date and (b) the MidCap Early Termination Claim.

Classes 1A through 3A are Impaired. Because Classes 1A through 3A are Impaired and Holders of Claims in Classes 1A through 3A receive consideration under the Plan, the Holders of Claims in Classes 1A through 3A are permitted to vote to accept or reject the Plan.

#### b) Classes 1B through 3B – St. Francis Secured Claim.

Classes 1B through 3B consist of the St. Francis Secured Claim. The St. Francis Secured Claim shall be Allowed as a Secured Claim in the principal amount of $39,175,277.61, plus all applicable interest, fees and costs of St. Francis pursuant to the St. Francis Credit Documents (the "Allowed St. Francis Secured Claim").

On the Effective Date, together with other distributions provided for in the Plan, in full satisfaction, settlement, release and discharge of and in exchange for the Allowed St. Francis Secured Claim, (a) the St. Francis Designees shall receive fee title to the Transferred Real Properties; and (b) each of HMC, HMCE, and HMCW will merge with and into the Reorganized Debtors as set forth in Section 5.2 of the Plan.

Classes 1B through 3B are Impaired. Because Classes 1B through 3B are Impaired and Holders of Claims in Classes 1B through 3B receive

consideration under the Plan, the Holders of Claims in Classes 1B through 3B are permitted to vote to accept or reject the Plan.

### c) Classes 1C through 3C – Other Secured Claims

Classes 1C through 3C consist of all Other Secured Claims. On the Effective Date, at the election of the pertinent Reorganized Debtor, the Holder of each Allowed Other Secured Claim shall, on account of such Claim, either: (i) be paid in Cash in full, (ii) have surrendered to it, without representation or warranty, the collateral securing its Claim, (iii) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (A) be paid a cure of any such default that occurred prior to the Effective Date, other than a default of a kind specified in section 365(b)(2) of this title, (B) have Reinstated the maturity of such Claim as such maturity existed before such default, (C) be compensated for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, and (D) otherwise not have altered the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim, or (iv) have left unaltered the legal, equitable, and contractual rights to which such Claim entitles the Holder of such Claim. In the case of option (ii) or (iii), in the event that any such Claim is not completely satisfied by such distribution, the Deficiency Amount will constitute a Deficiency Claim against the Debtors and will be classified in the appropriate other Class and will receive the same treatment as other Claims in such Class. Any Holder of an Other Secured Claim may agree to accept less favorable treatment.

Classes 1C through 3C are Unimpaired. The Holders of Claims in Classes 1C through 3C will not vote to accept or reject the Plan.

### d) Classes 1D through 3D – Other Priority Claims

Classes 1D through 3D consist of all Other Priority Claims. On (a) the later of (i) the Effective Date (or as soon as practicable thereafter), (ii) the date such Other Priority Claim becomes an allowed Other Priority Claim, and (iii) such other date as may be agreed upon by the Reorganized Debtors and the holder of such Other Priority Claim, or (b) on such other date as the Bankruptcy Court may order, each holder of an allowed Other Priority Claim against the Debtors shall receive on account of and in full and complete settlement, release and discharge of such Other Priority Claim, at the Reorganized Debtors' election, (i) cash in the amount of such

allowed Other Priority Claim in accordance with section 1129(a)(9) of the Bankruptcy Code and/or (ii) such Other Priority Claim shall be Reinstated. All Allowed Other Priority Claims against the Debtors that are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors as and when such claims become due and payable in the ordinary course of business in accordance with their terms.

Classes 1D through 3D are Unimpaired.  The Holders of Claims in Classes 1D through 3D will not vote to accept or reject the Plan.

### e)    Classes 1E through 3E – Unsecured Claims

Classes 1E through 3E consist of all Unsecured Claims.  Holders of Unsecured Claims shall not receive any distribution under the Plan.

Classes 1E through 3E are Impaired.  Because Classes 1E through 3E are Impaired and Holders of Claims in Classes 1E through 3E do not receive consideration under the Plan, the Holders of Claims in Classes 1E through 3E are deemed to reject the Plan and are not permitted to vote.

### f)    Classes 1F through 3F – Intercompany Claims

Classes 1F through 3F consist of all Intercompany Claims.  Holders of Intercompany Claims shall not receive any distribution under the Plan.

Classes 1F through 3F are Impaired.  The Holders of Claims in Classes 1F through 3F shall not receive any property under the Plan, Classes 1F through 3F are deemed to reject the Plan.

### g)    Classes 2G and 3G – Interests

Classes 2G and 3G consist of all Interests in the Debtors.  All Interests in the Debtors will be canceled on the Effective Date.  Holders of Interests in Classes 2G and 3G shall not receive or retain any Interests or property under the Plan.

Classes 2G and 3G are Impaired.  Because holders of Interests in Classes 2G and 3G shall not receive any property under the Plan, Classes 2G and 3G are deemed to reject the Plan.

### D. Means For Implementation Of The Plan.

#### 1. Non-Substantive Consolidation.

Although the Plan is presented as a plan of reorganization respecting three Debtors, the Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason. Allowed Claims held against one Debtor will be satisfied solely from the Cash and assets of such Debtor and its Estate, provided that, to the extent of any insufficiency, funds may be advanced to the relevant Debtors by the Estate of HMC or any of the Debtors at the option of the advancing Debtor, as applicable. Except as specifically set forth herein, nothing in the Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor. A Claim against multiple Debtors will be treated as a separate Claim against each Debtor's Estate for all purposes including, but not limited to, voting and distribution; provided, however, that no Claim will receive value in excess of 100% of the Allowed amount of such Claim. Notwithstanding anything to the contrary in the Plan, the Reinstated Claims and Impaired Claims receiving distributions under the Plan of a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of the Plan, the Reorganization Cases, or otherwise.

#### 2. Transfer of Assets.

Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Estates of the Debtors, including all Rights of Action, and any property acquired by the Debtors under or in connection with the Plan shall be assigned to and will vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests. On or prior to the Effective Date, or as soon as possible thereafter, (a) HMC will merge with St. Francis Hospitals Hawaii, a Hawaii nonprofit corporation ("SFHH"), with SFHH being the surviving entity; (b) HMCE will merge with St. Francis Hospital-Liliha, a Hawaii nonprofit corporation ("SFH-Liliha"), with SFH-Liliha being the surviving entity; and (c) HMCW will merge with St. Francis Hospital-Ewa, a Hawaii nonprofit corporation ("SFH-Ewa") with SFH-Ewa being the surviving entity. After giving effect to the foregoing mergers, HMC, HMCE, and HMCW shall cease their corporate existence. On and after the Effective Date, the

Reorganized Debtors may operate their business and may use, acquire and dispose of property and compromise or settle any Claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

### 3.    Articles of Incorporation & By-Laws.

The Articles of Incorporation will, among other things, prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code.  After the Effective Date, the Reorganized Debtors may amend and restate their Articles of Incorporation, By-Laws and other constituent documents as permitted by applicable non-bankruptcy law.

### 4.    Management/Board of Directors.

From and after the Effective Date, the persons named in Plan Exhibit 5.4, which shall be filed with the Plan Supplement, shall serve as the Reorganized Debtors' board of directors subject to the terms and conditions of the Articles of Incorporation, the By-Laws and applicable law. Plan Exhibit 5.4 shall also disclose the officers of the Reorganized Debtors. St. Francis shall have the right to identify the directors and officers included in Plan Exhibit 5.4.

### 5.    Corporate Actions.

On the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects (subject to the provisions of the Plan), including, without limitation, the following:  (a) the adoption and the filing with the Director of the Department of Commerce and Consumer Affairs of the Articles of Incorporation; (b) the adoption of the By-Laws; (c) the execution and delivery of the Amended St. Francis Leases; (d) the cancellation of the Interests; (e) the execution and delivery of the Exit Facility; and (f) the execution and the delivery of, and the performance under, all documents and agreements contemplated by or relating to any of the foregoing.  All matters provided for under the Plan involving the corporate structure of the Reorganized Debtors and any corporate action required by the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect pursuant to the Bankruptcy Code, without any requirement of further action by the shareholders or the directors of the Reorganized Debtors.  On the Effective Date, the

appropriate officers of each of the Reorganized Debtors are authorized and directed to execute and to deliver all agreements, documents and instruments contemplated by the Plan in the name and on behalf of the pertinent Reorganized Debtors.

### 6. Sources of Cash for Plan Distributions.

The sources of Cash for distribution under the Plan will include, *inter alia*, the Debtors' Cash, proceeds of the Exit Facility, and future revenues of the Reorganized Debtors that may be retained by the Reorganized Debtors or transferred to the Disbursing Agent as necessary for distribution pursuant to the terms and conditions of the Plan.

### 7. Exit Facility.

The Reorganized Debtors shall be authorized to enter into the Exit Facility, grant any liens and security interests and incur or guarantee the indebtedness as required under the Exit Facility, and issue, execute and deliver all documents, instruments and agreements necessary to implement and effectuate borrowings under the Exit Facility. The Exit Facility consists of a $15,000,000 secured revolving credit facility to be entered into by the Reorganized Debtors and MidCap as the Exit Lender as of the Effective Date on the terms and conditions set forth in Plan Exhibit 5.7.

### 8. St. Francis Contribution.

On the Effective Date, St. Francis shall contribute an amount of Cash between $2,000,000 and $5,200,000 as an equity contribution to the Reorganized Debtors (the "St. Francis Contribution"). The Reorganized Debtors shall use some or all of the St. Francis Contribution as security for the Exit Facility and for working capital purposes.

## E. Treatment Of Executory Contracts And Unexpired Leases

### 1. Assumption and Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, all executory contracts or unexpired leases to which any of the Debtors is a party shall be deemed automatically rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such executory contracts or

unexpired leases (i) shall have been previously assumed by the Debtors by Final Order of the Bankruptcy Court, (ii) shall be the subject of a motion to assume pending on or before the Effective Date, (iii) are listed on Plan Exhibit 6.1, which shall be the schedule of executory contracts or unexpired leases assumed pursuant to the Plan, or (iv) are otherwise assumed pursuant to the terms of the Plan. Plan Exhibit 6.1 shall be Filed no later than five Business Days prior to the Confirmation Date. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections and assumptions contemplated hereby pursuant to sections 365(a) and 1123 of the Bankruptcy Code as of the Effective Date. Each executory contract and unexpired lease assumed pursuant to this Article VI shall revest in, be assigned to, and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law. Neither the exclusion nor the inclusion by the Debtors of a contract or lease on Plan Exhibit 6.1 nor anything contained in the Plan shall constitute an admission by the Debtors that such lease or contract is an unexpired lease or executory contract that any Debtor or Non-Debtor Affiliate has any liability thereunder. The Debtors reserve the right, subject to notice, to amend, modify, supplement, or otherwise change Plan Exhibit 6.1 on or before the Effective Date, provided, however, that Plan Exhibit 6.1 may only be amended with the prior written consent of St. Francis.

## 2. Collective Bargaining Agreements.

Upon the Effective Date, any Collective Bargaining Agreement entered into by the Debtors that has not expired by its terms and is in effect as of the Effective Date shall be deemed to have been assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the survival, and/or the pertinent Debtor's assumption of the Collective Bargaining Agreements then in effect, except to the extent that such agreements have already been assumed prior to the entry of the Confirmation Order, and shall be a determination that there are no defaults existing as of the Effective Date or, if there are any defaults, the amount necessary to cure such defaults under sections 365 and 1123 shall be zero ($0). Upon the Effective Date, with respect to any Collective Bargaining Agreement entered into by the Debtors that has expired by its terms, the rights and obligations, if any, of the Reorganized Debtors with respect to such expired

agreement shall not be affected by the Confirmation Order, and the Reorganized Debtors shall continue to have the same rights and obligations with respect to any such expired agreement as the Debtors had immediately prior to the entry of the Confirmation Order and any such rights and obligations of the Reorganized Debtors under any such expired agreement shall continue to be determined in accordance with applicable federal labor law.

### 3. St. Francis Leases.

The St. Francis Leases shall be assumed in substantially the form of the Amended St. Francis Leases, which shall include, among other things, the modifications set forth on Plan Exhibit 6.4.

### 4. Assumption of Medicare and Medicaid Provider Agreement(s).

The Reorganized Debtors shall expressly assume all of the Debtors' Medicare provider agreement(s) and numbers with CMS. Such assumption shall be "with assignment" (as such term is used in 42 C.F.R. § 489.18(d)). The Debtors shall expressly assume all of the Debtors' Medicaid provider agreement(s) and numbers, which assumption shall be "with assignment" to the Reorganized Debtors.

### 5. Cure of Defaults in Connection with Assumption.

The proposed cure amount for any executory contract or unexpired lease that is assumed pursuant to the Plan shall be zero ($0) dollars unless otherwise indicated in a schedule to be filed with the Bankruptcy Court as part of the Plan Supplement or other pleading filed by the Debtors. Any monetary amounts by which each executory contract and unexpired lease to be assumed is in default and not subsequently cured shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the pertinent Reorganized Debtor: (a) by payment of the default amount in Cash within 60 days of the Effective Date or (b) on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be

made following the entry of a Final Order resolving the dispute and approving the assumption. Pending the Bankruptcy Court's ruling on such motion, the executory contract or unexpired lease at issue shall be deemed conditionally assumed by the relevant Debtor unless otherwise ordered by the Bankruptcy Court.

### 6. Bar Date for Rejection Damages.

If the rejection of an executory contract or unexpired lease pursuant to the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Reorganized Debtors, their successors or properties unless a proof of Claim is Filed and served on the pertinent Reorganized Debtor and its counsel within 30 days after the Effective Date. Notice of the Bar Date for rejection damages shall be sent to all parties to such Executory Contracts and Unexpired Leases that were rejected. All such Claims for which proofs of Claim are required to be filed, if Allowed, will be, and will be treated as, Unsecured Claims (or Convenience Claims, if appropriate) subject to the provisions of the Plan.

### 7. Bar Date for Bankruptcy Code § 365(n) Election.

If the rejection of an executory contract pursuant to the Plan gives rise to the right by the other party or parties to such contract to make an election under § 365(n) of the Bankruptcy Code to either treat such contract as terminated or to retain its rights under such contract, such other party to such contract will be deemed to elect to treat such contract as terminated unless such other party files and serves a notice of its alternative election on the pertinent Reorganized Debtor and its counsel within 30 days after the Effective Date.

### 8. Licensing Requirements.

The Reorganized Debtors shall, as of the Effective Date, comply with all the proper state and federal regulatory requirements, including but not limited to, acquiring any certificates of need, licenses, permits, notices and approvals necessary to operate without restriction as healthcare facilities and to participate in Medicare, Medicaid, and any other government health benefit program in which the Debtors are currently participants under federal and Hawaii law, each without interruption in payment.

-34-

### F. Distributions and Procedures For Resolving Disputed Claims

#### 1. Reorganized Debtors to Serve As Disbursing Agent.

The Reorganized Debtors shall serve as the Disbursing Agents to hold and distribute Cash and such other property as may be distributed pursuant to the Plan, provided however, that the Reorganized Debtors, in their sole and absolute discretion, may employ another Person, on such terms as may be determined by the Reorganized Debtors, to hold and distribute Cash and such other property as may be distributed pursuant to the Plan. Even if the Disbursing Agent is a Person other than the Reorganized Debtors, the Disbursing Agent shall be an agent of the Reorganized Debtors and not a separate taxable Person with respect to, for example, the assets held, income received or disbursements or distributions made for the Reorganized Debtors. The Reorganized Debtors shall not be required to post or otherwise provide a bond in connection with the making of any distributions pursuant to the Plan.

#### 2. Dates of Distributions.

The sections of the Plan on treatment of Administrative Expense Claims, Claims, and Interests specify the times for distributions. Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day. Distributions due on the Effective Date will be paid on such date or as soon as practicable thereafter, provided that if other provisions of the Plan require the surrender of securities or establish other conditions precedent to receiving a distribution, the distribution may be delayed until such surrender occurs or conditions are satisfied. If, under the terms of the Plan, the resolution of a particular Disputed Claim, (*e.g.*, it is Disallowed), entitles other Holders of Claims or Interests to a further distribution, either (a) the Reorganized Debtors or the Disbursing Agent may make such further distribution as soon practicable after the resolution of the Disputed Claim or (b) if the further distribution is determined in good faith, by the Reorganized Debtors or the Disbursing Agent who is to make such distribution, to be less than $500 for any Creditor, then, in order to afford the Reorganized Debtors an opportunity to minimize costs and aggregate such distributions, the Reorganized Debtors or the Disbursing Agent may make such further distribution any time prior to sixty (60) days after the Final Resolution Date.

CHICAGO/#2212541.2

### 3. Cash Distributions.

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors, as applicable, except that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### 4. De Minimis Distributions.

The Reorganized Debtors or Disbursing Agent shall not distribute Cash to the holder of an Allowed Claim in an Impaired Class if the total aggregate amount of Cash to be distributed on account of such Claim is less than $25, unless the Reorganized Debtors or the Disbursing Agent determines within its sole discretion to make such distribution. Any holder of an Allowed Claim on account of which the total aggregate amount of Cash to be distributed is less than $25 will have its claim for such distribution discharged and will be forever barred from asserting any such claim against the Debtors, the Reorganized Debtors or Disbursing Agent, or their respective property.

### 5. Disputed Claims.

Distributions of consideration due in respect of a Disputed Claim shall be held and not made pending resolution of the Disputed Claim. After an objection to a Disputed Claim is withdrawn, resolved by agreement, or determined by Final Order, the distributions due on account of any resulting Allowed Claim, Allowed Interest or Allowed Administrative Expense Claim shall be made by the Reorganized Debtors or the Disbursing Agent. Such distribution shall be made at the time provided in the Plan for the next scheduled distribution to the class or type of Claim or Administrative Expense Claim of such Holder and, if there is no such further scheduled time, within forty-five (45) days of the date that the Disputed Claim becomes an Allowed Claim or Allowed Administrative Expense Claim. No interest shall be due to a Holder of a Disputed Claim based on the delay attendant to determining the allowance of such Claim or Administrative Expense Claim. If a Claim is Disallowed (by example only, under 11 U.S.C. § 502(d)), such Holder's Claim shall be cancelled, retired and of no further force and effect and such Holder shall be obligated to surrender any document, certificate or other matter evidencing such Claim. The Holders of any such cancelled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities or

-36-

other documentation, or the cancellation thereof, except the rights provided pursuant to the Plan.

### 6. Undeliverable and Unclaimed Distributions.

If any distribution under the Plan is returned to any Reorganized Debtors or its agents as undeliverable or the check or other similar instrument or distribution by any Reorganized Debtor remains uncashed or unclaimed for one hundred eighty (180) days, such distribution shall be deemed to be "Unclaimed Property." Upon a distribution becoming Unclaimed Property, it immediately shall be revested in the pertinent Reorganized Debtor. Pending becoming Unclaimed Property, such distribution will remain in the possession of the Disbursing Agent and, if the Disbursing Agent is notified in writing of a new address for the Holder, it shall cause distribution of the Cash or New Notes, as appropriate, within 45 days thereafter. Once there becomes Unclaimed Property for a Holder, no subsequent distributions for such Holder which may otherwise be due under the Plan will accrue or be held for such Holder, provided that, if the pertinent Reorganized Debtor is notified in writing of such Holder's then-current address and status as a Holder under the Plan, thereafter, the Holder will become entitled to its share of distributions, if any, which first become due after such notification.

### 7. Objections to Claims.

All objections to Claims must be Filed and served on the holders of such Claims by the Claims Objection Bar Date, and, if Filed prior to the Effective Date, such objections will be served on the parties on the then-applicable service list in the Reorganization Cases. If an objection is required to be Filed and has not been Filed to a proof of Claim or a scheduled Claim by the Claims Objection Bar Date, the Claim to which the proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier. An objection is deemed to have been timely Filed as to all Tort Claims, thus making each such Claim a Disputed Claim as of the Claims Objection Bar Date. Each such Tort Claim will remain a Disputed Claim until it becomes an Allowed Claim.

### 8. Authority to Prosecute Objections.

After the Effective Date, only the Reorganized Debtors will have the authority to File, settle, compromise, withdraw or litigate to judgment

objections to Claims, including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court.

### 9. Setoff.

The Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim or Administrative Expense Claim (other than the MidCap Secured Claim) the payments or other distributions to be made pursuant to the Plan in respect of such Claim, Administrative Expense Claim, or claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim or Administrative Expense Claim; provided, however, that neither the failure to do so nor the allowance of any Claim or Administrative Expense Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder.

### 10. Rights of Action.

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors, to the extent set forth below, and their successors, any assigns hereunder and future assigns will retain and may exclusively enforce any Rights of Action subject only to any express waiver or release thereof in the Plan or in any other contract, instrument, release, indenture or other agreement entered into in connection with the Plan, and the Confirmation Order's approval of the Plan shall be deemed a res judicata determination of such rights to retain and exclusively enforce such Rights of Action. Absent such express waiver or release, the Reorganized Debtors, or its successors or assigns may pursue Rights of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors (or their successors or future assigns). The Rights of Actions may be asserted or prosecuted before or after solicitation of votes on the Plan or before or after the Effective Date.

Absent an express waiver or release as referenced above, nothing in the Plan shall (or is intended to) prevent, estop or be deemed to preclude the Reorganized Debtors from utilizing, pursuing, prosecuting or otherwise acting upon all or any of their Rights of Action and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Rights of Action upon or after

Confirmation or Consummation. By example only and without limiting the foregoing, the utilization or assertion of a Right of Action or the initiation of any proceeding with respect thereto against a Person, by the Reorganized Debtors or any successor to or assign of them, shall not be barred (whether by estoppel, collateral estoppel, res judicata or otherwise) as a result of: (a) the solicitation of a vote on the Plan from such Person or such Person's predecessor in interest; (b) the Claim, Interest or Administrative Expense Claim of such Person or such Person's predecessor in interest having been listed in the Debtors' Schedules, List of Holders of Interests, or in the Plan, Disclosure Statement or any exhibit thereto; (c) prior objection to or allowance of a Claim, Interest or Administrative Expense Claim of the Person or such Person's predecessor in interest; or (d) Confirmation of the Plan.

Notwithstanding any allowance of a Claim or Administrative Expense Claim, the Reorganized Debtors reserve the right to seek, among other things, to have such Claim or Administrative Expense Claim disallowed if the Reorganized Debtors, at the appropriate time, determine that one or more of them has a defense under 11 U.S.C. § 502(d), e.g., a Reorganized Debtor holds a Right of Action for an Avoidance claim against the Holder of such Claim or Administrative Expense Claim and such Holder after demand refuses to pay the amount due in respect thereto. Such reservation shall remain subject to any limitation on application of 11 U.S.C. § 502(d) to Administrative Expense Claim under applicable law.

## G. Confirmation And Effectiveness Of The Plan

### 1. Conditions to Confirmation.

The Bankruptcy Court will not enter the Confirmation Order unless and until the following conditions have been satisfied or duly waived pursuant to Section 10.3 of the Plan:

a) The Bankruptcy Court shall have entered an order, in a form reasonably acceptable to the Debtors, St. Francis, and MidCap approving the adequacy of the Disclosure Statement.

b) The Confirmation Order will be reasonably acceptable in form and substance to the Debtors, St. Francis, and MidCap.

c) The Confirmation Order shall include the language set forth in Section 9.2 of the Plan.

-39-

d) All Exhibits to the Plan and documents in the Plan Supplement are in form and substance reasonably satisfactory to the Debtors and St. Francis.

e) All Exhibits to the Plan and documents in the Plan Supplement affecting the treatment of the MidCap Secured Claims, including without limitation the DIP Facility, the Exit Facility and the structure of the Reorganized Debtors, shall be in a form and substance reasonably acceptable to the Debtors, St. Francis, and MidCap.

## 2. Conditions to the Effective Date.

The Effective Date will not occur, and the Plan will not be consummated, unless and until each of the following conditions have been satisfied or duly waived pursuant to Section 10.3 of the Plan:

a) The Confirmation Order has been entered, has not been reversed, stayed, modified or amended and has become a Final Order.

b) The Confirmation Order shall authorize the Reorganized Debtors to take all actions necessary or appropriate to implement the Plan, including consummation of the transactions contemplated by the Plan, as well as the implementation and consummation of all contracts, instruments, releases and other agreement or documents generated in connection with the Plan.

c) No default or event of default shall have occurred under any Financing Order entered in the Reorganization Cases or the DIP Facility.

d) All government approvals, if any, necessary for the operation of the hospitals in accordance with the Plan shall have been obtained, including without limitation any approvals necessary for any changes to certificates of need or transfers of Medicare and Medicaid provider numbers.

e) The Bankruptcy Court shall have entered an order authorizing the assumption and assignment of the Medicare and Medicaid provider agreements issued to HMCE and HMCW to the Reorganized Debtors and finding that such transfer shall not

have the effect of delaying or suspending the Reorganized Debtors' ability to continue to bill and collect from Medicare, Medicaid and other payors under such provider agreements and corresponding provider numbers in the normal course without interruption.

f) The Bankruptcy Court shall have entered an order (a) determining that neither Debtors nor Reorganized Debtors are subject to any unresolved, unpaid, or unliquidated claims for alleged or actual violations of the so-called "Stark Law" and related regulations that occurred prior to the Effective Date of the Reorganization Plan (other than unpaid claims in connection with any settlements with CMS to which the Exit Lender has consented) and (b) barring any future actions by CMS against Reorganized Debtors with respect to any alleged or actual violations of the so-called "Stark Law" and related regulations that may have occurred prior to the Effective Date of the Reorganization Plan.

g) St. Francis shall have determined, in its sole discretion, that the aggregate amount of Allowed Administrative Expense Claims, other than Ordinary Course Administrative Expense Claims and Professional Fee Claims, shall not exceed $50,000.

h) St. Francis shall have determined, in its sole discretion, that the aggregate amount of Allowed Priority Tax Claims shall not exceed $1,600,000.

i) St. Francis shall have determined, in its sole discretion, that the aggregate amount of Allowed Priority Non-Tax Claims shall not exceed $50,000.

j) All other documents material to the consummation of the transactions contemplated under the Plan shall be in a form acceptable to St. Francis.

k) All definitive documentation affecting the treatment of the MidCap Secured Claim (including without limitation, the Exit Facility and the structure of the Reorganized Debtors) shall be in a form acceptable to the Debtors, St. Francis and MidCap.

l) The Plan shall not have been amended, altered or modified from the Plan as confirmed, in any material respect, unless

-41-

such amendment, alteration or modification has been consented to in accordance with Section 14.1, and all Exhibits to the Plan remain in form and substance reasonably satisfactory to the Debtors.

m) The Effective Date has occurred by September 1, 2011.

### 3. Waiver of Conditions to the Confirmation or Effective Date.

The conditions to Confirmation set forth in Sections 10.1 of the Plan and the conditions to the Effective Date set forth in Sections 10.2 of the Plan may be waived, in writing, in whole or in part by the Debtors, with the prior written consent of St. Francis and MidCap, at any time without an order of the Bankruptcy Court, provided, however, that the provisions in Sections 10.2.7, 10.2.8, and 10.2.9 of the Plan may only be waived by St. Francis in its sole discretion.

### 4. Cramdown.

The Debtors request Confirmation under section 1129(b) of the Bankruptcy Code with respect to any impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors reserve the right to modify the Plan, with the prior written consent of St. Francis and MidCap, to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

### 5. Binding Effect of Confirmation.

Confirmation will bind the Debtor, all Holders of Claims, Administrative Expense Claims or Interests and other parties in interest to the provisions of the Plan whether or not the Claim, Administrative Expense Claim or Interest of such Holder is Impaired under the Plan and whether or not the Holder of such Claim, Administrative Expense Claim or Interest has accepted the Plan.

### 6. Good Faith.

Confirmation of the Plan shall constitute a finding that: (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all Persons' solicitations of acceptances or rejections of the Plan and the offer, issuance, sale, or

purchase of a security offered or sold under the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

### 7. No Limitations on Effect of Confirmation.

Nothing contained in the Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

### 8. Discharge of Claims, Administrative Expenses and Interests.

Except as provided in the Plan or Confirmation Order, the rights afforded hereunder and the treatment of Claims, Administrative Expense Claims and Interests thereunder will be in exchange for and in complete satisfaction, discharge and release of all Claims and Administrative Expense Claims and termination of all Interests, including any interest accrued on Claims from the Petition Date. Except as provided in the Plan or the Confirmation Order, Confirmation will: (i) discharge the Debtors and Reorganized Debtors from all Claims, Administrative Expense Claims or other debts that arose before the Confirmation Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (c) the Holder of a Claim or Administrative Expense Claim based on such debt has accepted the Plan; and (ii) terminate all Interests and other rights of Interest Holders in the Debtors. As of the Confirmation Date, except as provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtors, the Reorganized Debtors, their successors or their property, any other or further claims, debts, rights, causes of action, liabilities or equity interests based upon any act, omission, transaction or other activity of any nature that occurred prior to the Confirmation Date. For greater certainty, no guarantee executed by any person other than a Debtor shall be discharged or otherwise affected by the Plan or by the Confirmation Order. All such guarantees shall remain in full force and effect.

### 9. Judicial Determination of Discharge.

As of the Confirmation Date, except as provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtors and the Reorganized Debtors any other or further Claims,

Administrative Expense Claims, Interests, debts, rights, causes of action, liabilities, or equity interests based on any act, omission, transaction or other activity of any kind or nature that occurred before the Confirmation Date. In accordance with the foregoing, except as provided in the Plan or in the Confirmation Order, the Confirmation Order will be a judicial determination of discharge of all such Claims, Administrative Expense Claims and other debts and liabilities against the Debtors and termination of all such Interests and other rights of Interest Holders in the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharges shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged liability, Claim, or Administrative Expense Claim or terminated Interest.

## 10. Injunctions.

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold or may hold a Claim or other debt or liability that is satisfied or released, as applicable, or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan will be permanently enjoined from taking any of the following actions on account of any such discharged or satisfied Claims, debts or liabilities or terminated Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against the Debtors, the Estates, the Reorganized Debtors or their respective property, other than to enforce any right pursuant to the Plan to a distribution; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors or their respective property, other than as permitted pursuant to (a) above; (c) creating, perfecting or enforcing any lien or encumbrance against the Debtors, Estates, the Reorganized Debtors or their respective property; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors, Estates, or the Reorganized Debtors; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

As of the Effective Date, all Persons that have held, currently hold or may hold any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that are released pursuant to the Plan will be permanently enjoined from taking any of the following actions against any released Person or its property on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights,

CHICAGO/#2212541.2

causes of action or liabilities: (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any Lien; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released Person; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

By accepting any distributions pursuant to the Plan, each Holder of an Allowed Claim or Interest receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in Section 13.6 of the Plan.

### 11.  Creditors Committee.

Any Committee appointed in the Bankruptcy Cases shall be terminated on the Effective Date.

## V.  RISK FACTORS TO BE CONSIDERED

*Holders of Claims against the Debtors should read and consider carefully the information set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan. This information, however, should not be regarded as the only risks involved in connection with the Plan and/or its implementation.*

### A.  Failure to Satisfy Vote Requirement

If the Debtors obtain the requisite votes to accept the Plan in accordance with the requirements of the Bankruptcy Code, the Debtors intend, as promptly as practicable thereafter, to seek confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may be forced to pursue an alternative restructuring.

Pursuant to section 1126(c) of the Bankruptcy Code, Classes 1A through 3A and 1B through 3B will be determined to have accepted the Plan if at least two-thirds in amount and more than one-half in number of Allowed Claims in Classes 1A through 3A and 1B through 3B (that actually vote) vote in favor of the Plan. If such thresholds are not met, the Debtors may not be able to confirm the Plan as it is currently structured.

-45-

## B.      Non-Confirmation or Delay of Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of the Plan not be followed by a need for further financial reorganization and that the value of distributions to dissenting creditors and shareholders not be less than the value of distributions such creditors and shareholders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court would reach the same conclusion.

## C.      Non-Consensual Confirmation

In the event any impaired Class of Claims does not accept a plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class of claims has accepted the Plan (with such acceptances being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the Plan, the bankruptcy court determines that the Plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. Debtors believe that the Plan satisfies these requirements for Classes 1E through 3E, 1F through 3F, 2G, and 3G.

## D.      Risk of Non-Occurrence of the Effective Date.

Although Debtors believe that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will occur at all. The Plan contains several conditions to the occurrence of the Effective Date, some of which are described below. In addition, the Plan requires that certain claims, such as Administrative Expense Claims (other than Ordinary Course Administrative Expense Claims and Professional Fee Claims), Priority Tax Claims, and Priority Claims are estimated to be within certain limits. At this time, no bar date has been set for the assertion of those Claims. Accordingly, there is no assurance that the estimates for those Claims will fall below those thresholds.

## E.      Failure to Close Exit Facility.

The Debtors believe that it is necessary to have the Exit Facility to provide additional liquidity after the Effective Date for the Reorganized

Debtors.  The Exit Facility term sheet contains several conditions to closing.

## F.    Resolution of Issues with CMS.

The Plan provides for the merger of the Debtors into the Reorganized Debtors along with the assumption and assignment of the Debtors' Medicare and Medicaid provider numbers.  The Plan requires as a condition to the occurrence of the Effective Date that the transfers of the Medicare and Medicaid provider numbers will not have the effect of delaying or suspending the Reorganized Debtors' ability to continue to bill and collect from Medicare, Medicaid and other payors under such provider agreements and corresponding provider numbers in the normal course without interruption.  In addition, as a result of the Stark issues raised by the Debtors, the Plan requires the entry of an order (a) determining that neither Debtors nor Reorganized Debtors are subject to any unresolved, unpaid, or unliquidated claims for alleged or actual violations of the so-called "Stark Law" and related regulations that occurred prior to the Effective Date of the Reorganization Plan (other than unpaid claims in connection with any settlements with CMS to which the Exit Lender has consented) and (b) barring any future actions by CMS against Reorganized Debtors with respect to any alleged or actual violations of the so-called "Stark Law" and related regulations that may have occurred prior to the Effective Date of the Reorganization Plan.  To the extent that the Debtors are unsuccessful in meeting these conditions, the Effective Date may not occur.

## G.    Classification and Treatment of Claims and Interests.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtors.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors presently anticipate that they would seek (i) to modify the Plan to provide for whatever classification might be required for confirmation and (ii) to use the acceptances received from any creditor pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such

-47-

creditor ultimately is deemed to be a member, with the consent of St. Francis and MidCap. Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan of any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder regardless of the Class as to which such Holder is ultimately deemed to be a member. The Debtors believe that under the Federal Rules of Bankruptcy Procedure, the Debtors would be required to re-solicit votes for or against the Plan only when a modification adversely affects the treatment of the claim of any creditor or equity holder. The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that they have complied with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

### H. Increased Competition on the Island of Oahu for Patient Care Services

It has become increasingly difficult to compete against other, financially strong competitors on the island of Oahu. The healthcare industry in Hawaii has seen the entry of several significant changes during recent years. The level of competition on the island remains formidable.

## VI.  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The discussion below summarizes certain anticipated U.S. Federal income tax consequences of the Plan to the Debtors and certain Holders of Claims or Interests.  This summary is provided for information purposes only and is based on the Internal Revenue Code of 1986 (as amended, the "Code"), Treasury regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect, that could adversely affect the U.S. Federal income tax consequences described below.

This summary does not address all aspects of U.S. Federal income taxation that may be relevant to a particular Holder of a Claim or Interest in light of its particular facts and circumstances or to certain types of Holders of Claims or Interests subject to special treatment under the Code (for example, non-U.S. taxpayers, financial institutions, broker-dealers, life insurance companies, tax exempt organizations, real estate investment trusts, regulated investment companies, grantor trusts, persons holding a Claim as part of a "hedging," "integrated," or "constructive" sale or straddle transaction, persons holding claims through a partnership or other pass-through entity, persons that have a "functional currency" other than the U.S. dollar, and persons who have acquired an Interest in HMC or a security in any Debtor in connection with the performance of services).

This summary does not address the tax considerations applicable to Holders who obtained their Claims or Interests (or the rights underlying such Claims or Interests) in connection with the performance of services. In addition, this summary does not discuss any aspects of state, local, or non-U.S. taxation, nor does this summary address the U.S. Federal income tax consequences to Holders of Claims that are unimpaired under the Plan and Holders of Claims that are not entitled to receive or retain any property under the Plan.

A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution or transfer under the Plan.  Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. Federal income tax consequences of the Plan and the transactions contemplated thereby.  There can be no assurance that the Internal Revenue Service (the "IRS") will not take a

contrary view with respect to one or more of the issues discussed below. No ruling will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtors with respect thereto.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## A.  U.S. Federal Income Tax Consequences to the Debtors

Each of the Debtors is a nonprofit corporation taxed as a pass-through entity for U.S. federal income tax purposes.  Because the Debtors are nonprofit corporations, the Debtors are not likely to be required to pay tax on any income or gain recognized by HMCE, HMCW, or HMC.

## B.  U.S. Federal Income Tax Consequences to Holders of Claims

The U.S. Federal income tax consequences to Holders of Claims arising from the distributions to be made in satisfaction of their Claims pursuant to the Plan may vary, depending upon, among other things: (a) the type of consideration received by the Holder of a Claim in exchange for the Claim; (b) the nature of the indebtedness owed to it; (c) whether the Holder has previously claimed a bad debt or worthless security deduction in respect of its Claim against the corporation; (d) whether such Claim constitutes a security; (e) whether the Holder of a Claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. Federal income tax on a net income basis; (f) whether the Holder of a Claim reports income on the accrual or cash basis; and (g) whether the Holder of a Claim receives distributions under the Plan in more than one taxable year.  For tax purposes, the modification of a Claim may represent

an exchange of the Claim for a new Claim, even though no actual transfer takes place. In addition, where gain or loss is recognized by a Holder of a Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long the Claim has been held or is treated as having been held, whether the Claim was acquired at a market discount, and whether and to what extent the Holder previously claimed a bad debt or worthless stock or securities deduction with respect to the underlying Claim. A Holder who purchased its Claim from a prior holder at a discount to its face amount may be subject to the market discount rules of the Code. Under those rules, assuming that the Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

### 1. General Treatment of Holders of Claims

Pursuant to the Plan, the Debtors will transfer assets of the Debtors, either directly or indirectly, to holders of Allowed Claims in satisfaction and discharge of such Claims. Holders of such Claims will likely recognize gain or loss equal to the amount realized under the Plan in respect of their Claims less their respective tax bases in their Claims. The amount realized for this purpose will generally equal the sum of the cash and the fair market value of any other consideration received under the Plan in respect of their Claims. Any gain or loss recognized in the exchange will be capital or ordinary depending on the status of the Claim in the Holder's hands.

To the extent that cash received or deemed received by a Holder of a Claim is attributable to accrued interest on the Claim, the cash will be deemed made in payment of such interest. The federal income tax laws are unclear on how much consideration will be deemed attributable to accrued interest when partial payments are made on a debt on which both principal and interest are owed. To the extent that the Holder of a Claim has not yet included the accrued interest in gross income, the cash deemed received in payment of such interest will generally be included in the Holder's gross income for federal income tax purposes. To the extent the Holder has previously included accrued interest on the Claim in gross income, the cash deemed received in payment of such interest generally will not be included in gross income. The Holder of an Allowed Claim may

be able to claim a deductible loss if the cash deemed received for the accrued interest is less than the amount the Holder had previously included in gross income.

## 2. Bad Debt Deduction

The Holder of an Allowed Claim who under the Plan will receive in respect of a Claim an amount less than the Holder's tax basis in such Claim may be entitled to a bad debt deduction under section 166(a) of the Code. The rules regarding the ability of a taxpayer, who believes that a debt owed to it will not be collected in full to take a deduction related to such debt's partial or total worthlessness are very complex. Moreover, the application and impact of such rules vary greatly depending upon a taxpayer's individual circumstances, including the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Claims are therefore urged to consult their tax advisors with respect to the allowability of such a deduction.

## 3. Information Reporting and Backup Withholding

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting to the IRS. Moreover, under certain circumstances, Holders of Claims may be subject to "backup withholding" with respect to payments made pursuant to the Plan, unless such Holder either (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (ii) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the Holder is a United States person, the taxpayer identification number is correct and the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder of a Claim's U.S. Federal income tax liability, and such Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. Federal income tax return).

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. Federal income tax return of certain types of transactions in which the taxpayer participated, including, among other

types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Each Holder of a Claim is strongly urged to consult its tax advisor regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on such taxpayer's tax returns.

### 4. Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN POTENTIAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR INDIVIDUALLY TAILORED TAX ADVICE FROM A COMPETENT TAX ADVISOR. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.

THE TAX CONSEQUENCES OF THE PLAN ARE IN MANY CASES COMPLEX, UNCLEAR AND UNCERTAIN AND MAY VARY DEPENDING ON A NUMBER OF DIFFERENT FACTORS, INCLUDING A CLAIMHOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIMHOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## VII. FEASIBILITY OF THE PLAN AND BEST INTEREST OF CREDITORS

### A. Feasibility of the Plan

The Bankruptcy Code requires that the Bankruptcy Court determine that confirmation of a Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors. For purposes of showing that the Plan meets this feasibility standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business. At the Confirmation Hearing, the Debtors will be prepared to demonstrate that the Plan is feasible.

To support the belief in the feasibility of the Plan, the Debtors have attached a pro forma financial forecast for the three year period after the Effective Date (the "Financial Forecasts"), which are set forth in Appendix C of this Disclosure Statement. The Financial Forecasts indicate that the Reorganized Debtors should have sufficient cash flow to pay and service debt obligations and to fund their operations. Accordingly, Debtors believe

CHICAGO/#2212541.2

that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The Financial Forecasts were not prepared with a view toward compliance with the published guidelines of the American Institute of Certified Public Accountants or any other regulatory or professional agency or body or generally accepted accounting principles. Furthermore, the Debtors' financial advisors have not compiled or examined the Financial Forecasts in accordance with AICPA standards relating to prospective financial information and accordingly do not express any opinion or any other form of assurance with respect thereto and assume no responsibility for the Financial Forecasts.

The Financial Forecasts assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, including environmental legislation or regulations, that will have an unexpected effect on the operations of the Reorganized Debtors, (iii) there will be no change in the United States regarding generally accepted accounting principles that will have a material effect on the reported financial results of the Reorganized Debtors, and (iv) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Debtors. To the extent that the assumptions inherent in the Financial Forecasts are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and considered reasonable by the Debtors when taken as a whole, the assumptions and estimates underlying the Financial Forecasts are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Accordingly, the Financial Forecasts are only estimates that are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Financial Forecasts will not be realized and that actual results will vary from the Financial Forecasts, which variation may be material. The Financial Forecasts should therefore not be regarded as a representation by the Debtors or any other person that the results set forth in the Financial Forecasts will be achieved. In light of the foregoing, readers are cautioned not to place undue reliance on the Financial Forecasts. The Financial Forecasts should be read together with the information in Article V of this Disclosure Statement entitled "Risk Factors to Be Considered," which sets forth important factors that could cause actual results to differ from those in the Financial Forecasts.

The Debtors do not intend to update or otherwise revise the Financial Forecasts, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtors do not intend to update or revise the Financial Forecasts to reflect changes in general economic or industry conditions.

## B. Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances. Section 1126 of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds (2/3) in dollar amount and more than one half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.

## C. Best Interests Test

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a Bankruptcy Court to determine that the Plan is in the best interests of all holders of claims or interests that are impaired by the Plan and that have not accepted the Plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a Bankruptcy Court to find either that all members of an impaired class of claims or interests have accepted the Plan or that the Plan will provide a member who has not accepted the Plan with a recovery of property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the Debtors were liquidated under chapter 7 under the Bankruptcy Code, a bankruptcy court must first determine the aggregate dollar amount that would be generated from such Debtors' assets if their chapter 11 cases were converted to chapter 7 cases. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtors' assets by a chapter 7 trustee. If a liquidation were to occur in these cases, the costs and expenses associated with a liquidation and the claims of the MidCap and St. Francis would erode any liquidation

value available to unsecured creditors. More specifically, costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, and claims arising from any operations of the Debtors during the chapter 7 cases. In addition, there may be unpaid expenses incurred in the Reorganization Cases (such as compensation of attorneys, financial advisors and accountants and claims arising from the operations of the Debtors during the Reorganization Cases). The liquidation might also prompt the rejection of a large number of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection claims. Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the Plan, then the Plan is not in the best interests of creditors and equity security holders.

### D.    Liquidation Analysis

In order to determine the amount of liquidation value available to creditors, the Debtors have prepared a liquidation analysis that provides an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the Debtors (the "Liquidation Analysis") attached hereto as Appendix D. It is possible that certain of the assumptions in the Liquidation Analysis would not be realized in an actual liquidation.

The Debtors believe that any liquidation analysis with respect to the Debtors' assets is inherently speculative. The liquidation analysis for the Debtors necessarily contains estimates of the net proceeds that would be received from a forced sale of assets and/or business units, as well as the amount of Claims that will ultimately become Allowed Claims. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

The Liquidation Analysis demonstrates that, in an orderly liquidation, General Unsecured Creditors would not receive more than what they would receive under the Plan.

-56-

### E. Application of the 'Best Interests' of Creditors Test to the Liquidation Analysis

The Debtors believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied because the Debtors believe that the members of each Impaired Class will receive greater or equal value under the Plan than they would receive in a liquidation. Although the Debtors believe that the Plan meets the "best interests test" of section 1129(a)(7) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will determine that the Plan meets this test.

### F. Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative

In view of the rejection by certain Holders of Claims, the Debtors intend to seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the Plan is not accepted by all Impaired classes, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of the debtors if the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the Plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank. The Debtors believe the Plan does not discriminate unfairly with respect to Holders of Claims in Classes 1E through 3E and 1F through 3F, Interests in Classes 2G and 3G.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (i) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or

the value of such interest; or (ii) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

The Debtors believe that they will meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to Holders of Claims in Classes 1E through 3E and 1F through 3F and Interests in Classes 2G and 3G.

## VIII. THE SOLICITATION; VOTING PROCEDURE

### A. Parties in Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (i) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (ii) the claim or interest is impaired by the plan. If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.

If a claim or interest is not impaired by the Plan, the Bankruptcy Code deems the Holder of such claim or interest to have accepted the Plan and, accordingly, Holders of such claims and interests are not entitled to vote on the Plan. Claims in Classes 1C through 3C and 1D through 3D are Unimpaired under the Plan, and Holders of such Claims are therefore not entitled to vote. Furthermore, because Holders of Claims in Classes 1E through 3E and 1F through 3F do not receive any consideration under the Plan and all Interests Classes 2G and 3G are to be cancelled pursuant to the Plan, those Classes are deemed to reject the Plan and are also not entitled to vote. Accordingly, only Holders of Claims in Classes 1A through 3A and 1B through 3B are entitled to vote on the Plan.

CHICAGO/#2212541.2

## B.    Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Debtors in their sole discretion, which determination will be final and binding. As indicated below under "Withdrawal of Ballots; Revocation," effective withdrawals of Ballots must be delivered to counsel for the Debtors prior to the deadline for receipt of Ballots, which is June 21, 2011 at 12:00 p.m. H.S.T. (the "Voting Deadline"). The Debtors reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot.

## C.    Withdrawal of Ballots; Revocation

Any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to counsel for the Debtors at any time prior to the Voting Deadline. A notice of withdrawal, to be valid, must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be received by counsel for the Debtors in a timely manner. The Debtors will determine whether any withdrawals of Ballots were received and whether the requisite acceptances of the Plan have been received.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of Ballots which is not received in a timely manner will not be effective to withdraw a previously cast Ballot. Any party who has previously submitted prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change his or its vote by submitting prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received, only the Ballot that bears the latest date of receipt will be counted for purposes of determining whether the requisite acceptances have been received.

## D.    Further Information; Additional Copies

If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of material you

received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d)), please contact the party listed below:

MOSELEY BIEHL TSUGAWA LAU & MUZZI
Attention: Christopher J. Muzzi
Alakea Corporate Tower, 23rd Floor
1100 Alakea Street
Honolulu, HI 96813
Fax (808) 534-0202
Email: cmuzzi@hilaw.us

DATED: June 21, 2011

_Kenneth J Silva_

Hawaii Medical Center, Hawaii Medical Center – West, and Hawaii Medical Center East
Kenneth J. Silva
Member, Board of Directors