PACHULSKI STANG ZIEHL & JONES LLP
Samuel Maizel (CA Bar No. 189301)
Bruce Grohsgal (DE Bar No. 3583)
Malhar Pagay (CA Bar No. 189289)
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Telephone: 310-277-6910
Facsimile: 310-201-0760
E-mail: smaizel@pszjlaw.com; bgrohsgal@pszjlaw.com; mpagay@pszjlaw.com

WAGNER CHOI & VERBRUGGE
James A. Wagner
Chuck C. Choi
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: 808-566-1877
Facsimile: 808-566-6900
E-mail: jwagner@hibklaw.com; cchoi@hibklaw.com

[Proposed] Attorneys for the Official Committee of Unsecured Creditors

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>HAWAII MEDICAL CENTER, et al.[1],<br><br>    Debtors. | Case No. 11-01746<br>Chapter 11<br>(Jointly Administered) |
| This document relates to:<br>ALL CASES | |

---

[1] The Debtors are as follows: Hawaii Medical Center, a Hawaii non-profit corporation (Tax No. 20-3409838); Hawaii Medical Center East, a Hawaii non-profit corporation (Tax No. 51¬0598670); and Hawaii Medical Center West, a Hawaii non-profit corporation (Tax No. 51¬0598672).

i

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................2

II. STATEMENT OF FACTS.................................................................................9

      A.    Background ................................................................................9

      B.    The Prepetition Debt ..............................................................10

      C.    The DIP Financing ...............................................................11

      D.    Unsecured Creditors. .............................................................16

      E.    Refusal to Provide Committee Adequate Opportunity to Respond to the DIP Motion..................................................16

III. OBJECTIONS.................................................................................................17

      A.    The Motion Should Be Denied Because The DIP Financing Inappropriately Is Being Used Simply To Recirculate The Prepetition Secured Indebtedness At The Expense Of General Unsecured Creditors ..............................................20

      B.    In Its Current Form, the DIP Financing Has a Myriad of Problems ...............................................................................21

IV. RESERVATION OF RIGHTS ........................................................................37

V. CONCLUSION .................................................................................................38

DOCS_LA:240969.1 35097-001

U.S. Bankruptcy Court - Hawaii  #11-01746  Dkt # 99  Filed  07/07/11  Page 2 of 42

# TABLE OF AUTHORITIES

## CASES

*Hartford Fire Ins. Co. v. Nw. Bank Minn. (In re Lockwood Corp.)*,
  223 B.R. 170 (8th Cir. B.A.P. 1998) ................................................................35

*In re 495 Central Park Ave. Corp.*,
  136 B.R. 626 (Bankr. S.D. N.Y. 1992) ...........................................................28

*In re Ames Dep't Stores, Inc.*,
  115 B.R. 34 (Bankr. S.D.N.Y. 1990) ..............................................................18

*In re Aqua Assocs.*,
  123 B.R. 192 (Bankr. E.D. Pa. 1991) .............................................................18

*In re Big Rivers Elec. Corp.*,
  233 B.R. 726 (Bankr. W.D. Ky. 1998) ............................................................19

*In re Colad Group, Inc.*,
  324 B.R. 208 (Bankr. W.D.N.Y. 2005) ...........................................................35

*In re Crouse Group, Inc.*,
  71 B.R. 544 (Bankr. E.D. Pa. 1987) .........................................................18, 22

*In re Equalnet Communications Corp.*,
  258 B.R. 368 (Bankr. S.D. Tex. 2000) ............................................................24

*In re FCX, Inc.*,
  54 B.R. 833 (Bankr. E.D.N.C. 1985) ..............................................................18

*In re Forest Ridge, II, Ltd. Partnership*,
  116 B. R. 937 (Bankr. W.D.N.C. 1990) ..........................................................29

*In re Hubbard Power & Light*,
  202 B.R. 680 (Bankr. E.D. N.Y. 1996) ...........................................................28

*In re Kain*,
  86 B.R. 506 (Bankr. W.D. Mich. 1988) ..........................................................27

*In re Martin*,
  761 F.2d 472 (8th Cir. 1985) ...........................................................................27

*In re Monach Circuit Indus, Inc.*,
  41 B.R. 859 (Bankr. E.D. Pa. 1984) ...............................................................24

*In re Orlando Trout Creek Land*,
  80 B.R. 190 (Bankr. N.D. Cal. 1987) ..............................................................29

*In re Oxford Mgmt., Inc.*,
  4 F.3d 1329 (5th Cir. 1993) .............................................................................24

*In re Pine Lake Village Apartment Co.*,
  16 B.R. 750 (Bankr. S.D. N.Y. 1982) .............................................................29

*In re Roblin Industries, Inc.*,
  52 B.R. 241 (Bankr. W.D.N.Y. 1985) ...............................................17, 19, 31

*In re Saybrook Mfg Co.*,
  963 F.2d 1490 (11th Cir. 1992) .......................................................................24

*In re Snowshoe Co.*,
  789 F2d. 1085 (4th Cir. 1986) .........................................................................37

DOCS_LA:240969.1 35097-001

*In re St. Mary Hospital*,
  86 B.R. 393 (Bankr. E.D. Pa. 1988) ................................................22

*In re Stein*,
  19 B.R. 458 (Bankr. E.D. Pa. 1982) ................................................29

*In re Swedeland Development Group, Inc.*,
  16 F.3d 552 (3d Cir. 1993) ................................................26, 27, 30

*In re Tenney Village Co., Inc.*,
  104 B.R. 562 (Bankr. D. N.H. 1989)............................ 17, 18, 19, 31

*In re Tri-Union Development Corp.*,
  253 B.R. 808 (Bankr. S.D. Tex. 2000) ...........................................24

*In re Vanguard Diversified, Inc.*,
  31 B.R. 364 (Bankr. E.D.N.Y. 1983) ..............................................25

**STATUTES**

11 U.S.C. § 105(a) ..........................................................................15, 35

11 U.S.C. § 506................................................................................36

11 U.S.C. § 506(c) ....................................................................15, 35, 36

11 U.S.C. § 552(b) ....................................................................15, 35, 36

11 U.S.C. § 1129(b)(2)(B) ..............................................................20

DOCS_LA:240969.1 35097-001

U.S. Bankruptcy Court - Hawaii   #11-01746   Dkt # 99   Filed 07/07/11   Page 4 of 42

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO THE DEBTORS' MOTION FOR INTERIM ORDER (I)
AUTHORIZING POSTPETITION SECURED FINANCING PURSUANT
TO SECTIONS 105, 361, 362, 364(C)(1), 364 (C)(2), 364(C)(3), 364(D)(1) AND
503(B) OF THE BANKRUPTCY CODE; (II) AUTHORIZING THE
DEBTORS TO USE CASH COLLATERAL PURSUANT TO SECTION 363
OF THE BANKRUPTCY CODE; (III) PROVIDING ADEQUATE
PROTECTION TO THE PREPETITION SECURED PARTIES PURSUANT
TO SECTIONS 361, 362, AND 363 OF THE BANKRUPTCY CODE;
(IV) MODIFYING THE AUTOMATIC STAY PURSUANT TO SECTION
362(D) OF THE BANKRUPTCY CODE; (V) AUTHORIZING EXECUTION
OF POSTPETITION AMENDMENT TO PREPETITION REVOLVING
CREDIT AGREEMENT; (VI) PROVIDING RELATED RELIEF;
AND (VII) SCHEDULING A FINAL HEARING**

        The Official Committee of Unsecured Creditors (the "<u>Committee</u>"),

respectfully submits this objection (the "<u>Objection</u>") to the *Debtors' Motion for*

*Interim Order (I) Authorizing Postpetition Secured Financing Pursuant to Sections*

*105, 361, 362, 364(c)(1), 364 (c)(2), 364(c)(3), 364(d)(1) and 503(b) of the*

*Bankruptcy Code; (II) Authorizing the Debtors to Use Cash Collateral Pursuant*

*to Section 363 of the Bankruptcy Code; (III) Providing Adequate Protection to the*

*Prepetition Secured Parties Pursuant to Sections 361, 362, and 363 of the*

*Bankruptcy Code; (IV) Modifying the Automatic Stay Pursuant to Section 362(d) of*

*the Bankruptcy Code; (V) Authorizing Execution of Postpetition Amendment to*

*Prepetition Revolving Credit Agreement; (VI) Providing Related Relief; and (VII)*

*Scheduling a Final Hearing* (the "<u>DIP Motion</u>", "<u>DIP Facility</u>" and "<u>DIP</u>

<u>Financing</u>") filed by the debtor Hawaii Medical Center ("<u>HMC</u>") and its captioned

affiliates (collectively, with HMC, the "Debtors").  In support of the objection, the Committee respectfully sets forth and represents as follows:

## I.

## INTRODUCTION

1.      The threshold issue raised by this DIP Financing (and these cases in general) is the proper use of the chapter 11 process.  The Debtors are non-profit corporations that operate two hospitals.  The Debtors' prepetition lenders are MidCap Financial, LLC ("MidCap" or the "DIP Lender"), which asserts a $7.7 million prepetition secured claim, and St. Francis Healthcare System of Hawaii and its affiliates (collectively "St. Francis"), which asserts a $39.0 million prepetition secured claim.  St. Francis and MidCap (collectively the "Prepetition Lenders") desire to cause the transfer of the Debtors' hospital facilities and other assets to St. Francis.  MidCap proposes to roll-up its prepetition debt into a refinancing characterized as the DIP Facility.  These transactions could just as easily be accomplished outside of the chapter 11 process.  The Prepetition Lenders, however, desire to improperly use the chapter 11 process to maximize the returns on their underwater prepetition debt and preordain a non-confirmable plan, all at the expense of the Debtors' general unsecured creditors.  The only purpose of these chapter 11 cases appears to be to eliminate in their entirety the claims of general unsecured creditors for the benefit of the Prepetition Lenders, while preserving

preference and other avoidance claims against unsecured creditors also for the benefit of the Prepetition Lenders. Approval of the DIP Financing at substantial cost to these estates and to the rights of unsecured creditors in these cases is step one in this effort.

2.      The Debtors emphasize in the DIP Motion that "it was determined that the best solution for the hospitals" and "all of their creditors" for the Debtors to work with the Prepetition Lenders to form a plan of reorganization, and it was in the best interest of the Debtors, their estates and creditors to obtain the DIP Facility and the Exit Facility referred to in the Proposed Plan. DIP Motion, ¶¶ 29, 61. The Debtors suggest that these determinations and their proposed plan of reorganization (the "Proposed Plan") have general creditor support and that the Debtors' business judgment about what is best for their unsecured creditors is unassailable. The Debtors rely on these suggestions of global harmony to obtain extraordinary relief in the earliest days of the cases, including a roll-up of prepetition debt and all-extensive postpetition liens and superpriority claims in favor of the Prepetition Lenders without any disclosure of why such relief is necessary.

3.      The Proposed Plan, however, is neither "consensual," nor is it in the best interest of the Debtors or their estates or creditors. The first day motions do not advise the Court that the Proposed Plan - which the Debtors are

apparently contractually bound to support pursuant to a prepetition support agreement (the "Support Agreement") that has not been approved by this Court - offers nothing to the holders of general unsecured claims, even while preserving the Prepetition Lenders' unjustified power to bring avoidance actions against them.

4.      The Committee does not know whether the Proposed Plan is confirmable.  The Debtors have offered no valuation evidence, and it remains to be seen whether there are "holes" in the Prepetition Lenders' collateral positions. (Inside or outside of chapter 11, holders of general unsecured claims are, of course, as entitled as the holders of any other unsecured claims to reap the value of any such unencumbered assets.)

5.      The primary purpose of the DIP Financing appears to be to fill any such possible "holes" and pre-ordain the Proposed Plan.  The DIP Facility includes a $7.7 million roll-up of MidCap's undersecured prepetition loan (the "Roll-Up") in the first 20 days of these cases.  DIP Motion, ¶ 40.i.  The budget attached to the DIP Motion (the "Budget") states that the borrowing base availability was $11,379,942 under the prepetition MidCap line of credit on the June 21, 2011, petition date (the "Petition Date"), and will be nominally higher ($11,649,201) at the end of the 13-week initial period of the DIP Facility, suggesting that the DIP Facility is unnecessary.  Nonetheless, the liens serving the DIP Financing and the Prepetition Lenders' interests are not limited to any

diminution in value, and also attach to all possible previously unencumbered assets of these estates (including avoidance actions), and the superpriority claims granted to the Prepetition Lenders attach to all proceeds (including those arising from avoidance actions and other unencumbered assets). In sum, the DIP Financing is largely an exercise in granting additional liens and manufacturing administrative claims and superpriority claims in order to ensure that whatever asset value exists in these estates is captured by the Prepetition Lenders at the outset.

6. The DIP Lender receives many extraordinary and/or inappropriate protections in return for the purported "benefits" to the estate of the DIP Financing. Among the most problematic aspects of the DIP Financing are as follows:

o As indicated, the Roll-Up and grant of liens on avoidance actions and other unencumbered assets (DIP Motion, ¶¶ 29.A.c, 40.i, 40.k and 42.c) is inappropriate in the context of these cases.

o The DIP Facility requires that any plan will provide for the full release of any and all claims against MidCap, even though the Committee has not had an opportunity at this early date to investigate or bring any such claims.

o The Committee is given only 30 days (under the DIP Motion) or 45 days (under the Interim Order) to challenge the liens and claims of the

U.S. Bankruptcy Court - Hawaii   #11-01746   Dkt # 99   Filed  07/07/11   Page 9 of 42

Prepetition Lenders, and the relief sought by the DIP Motion requires the Committee to immediately seek standing and authority to bring such actions or risk being time-barred in the first 30 or 45 days of these cases. DIP Motion ¶ 42.a.

o      Further, the DIP Motion completely precludes any possibility that the Committee might be compensated for pursuing such claims against the Prepetition Lenders by tying up all prepetition and postpetition assets and proceeds of the Debtors and then expressly prohibiting any use of the DIP Facility to investigate, commence or prosecute such claims, with the exception of $25,000 as set forth in the Interim Order to investigate such claims.  DIP Motion ¶ 40.i.  The DIP Financing hamstrings the Committee from doing anything meaningful in these cases to protect its constituents.

o      The DIP Lender and Prepetition Lenders also seek a section 506(c) surcharge waiver and a section 552(b) "equities of the case" waiver. DIP Motion, ¶ 42.c.  These waivers are inappropriate under the circumstances of this DIP Financing and these cases where the Prepetition Lenders have determined that trade creditors are to receive nothing (and be subjected to avoidance action suits against them) in return for the waiver imposed upon them.

o      The DIP Motion requires the Debtors to pay substantial fees, including a $350,000 "origination fee," a 3.0% "Final Payment Fee," a 1.5% per annum "collateral management fee," a 0.5% per annum "unused line fee," and all of the DIP Lender's out-of-pocket costs whenever arising.  All of these fees and charges are improper, since all that is really happening here is that the DIP Facility and the Proposed Plan are being used to protect and maximize the return on the Prepetition Lenders' prepetition loans.

o      The Debtors in the DIP Motion allege that the claims of the Prepetition Lenders are undersecured.  DIP Motion, ¶ 33.f.  (This also is the premise of the Proposed Plan - the Debtors could not otherwise confirm a plan that paid nothing to the holders of general unsecured claims.)  By agreeing to the 20-day Roll-Up, the Debtors nonetheless propose to use proceeds of the DIP Financing (and incur a corresponding administrative liability) to make ongoing interest, fee and expense payments to the Prepetition Lenders.  Assuming (as the Prepetition Lenders appear to claim) that the Prepetition Lenders are undersecured, these payments are in violation of section 506 of the Bankruptcy Code.  Even if, as MidCap may assert, its prepetition claim is oversecured, the DIP Facility protections are inappropriate

since MidCap is priming only itself and can be adequately protected by postpetition liens in its postpetition collateral to the extent of any diminution in value.

7.    St. Francis – which is advancing no funds toward the Debtors' operations and whose primary asserted collateral is not even cash collateral but is the real estate – is given even more extraordinary and inappropriate grants under the DIP Facility.  The Proposed Final Order gives St. Francis "Adequate Protection Liens" and a superpriority claim in *all* assets (including free assets) and proceeds of the Debtors, which liens are given first priority in all property other than the Revolving Priority Collateral.  Proposed Final Order, ¶¶ 19(b) and (c).  The DIP Motion fails to state what cash collateral of St. Francis is being utilized or, if it is, why these protections are necessary to adequately protect St. Francis' interest in that cash collateral.

8.    In sum, the Committee submits that the Prepetition Lenders are using the Bankruptcy Court and the chapter 11 process for no purpose other than to eliminate trade claims, and grab any asset value that might otherwise be available to trade creditors, while taking avoidance claims against trade creditors resulting from the filing of these cases in order to enhance their own returns as Prepetition Lenders.  The Committee respectfully submits that this is an improper use of the Bankruptcy Code and the chapter 11 process.  The Court will obviously have to

DOCS_LA:240969.1 35097-001
U.S. Bankruptcy Court - Hawaii   #11-01746   Dkt # 99   Filed  07/07/11   Page 12 of 42

make its own determination on this threshold issue. The Committee respectfully submits that, at a bare minimum, if the Prepetition Lenders' desire is to use the chapter 11 process to effectuate their debt for property conversion, the interests of trade creditors should not be harmed beyond the injury that would have been inflicted had the Prepetition Lenders simply foreclosed and these cases had never been filed.

9. The Committee therefore respectfully requests that the Court deny final approval of the DIP Financing and terminate the Debtors' ability to borrow thereunder until (a) the Roll-Up payments by the Debtors to their Prepetition Lenders are reversed, and (b) the other objectionable provisions identified herein are modified or stricken.

## II.

## STATEMENT OF FACTS

According to the Debtors' submissions in these cases, the relevant facts are as follows:

**A.** **Background**

10. The Debtors are comprised of three (3) related entities which own and operate two hospitals, Hawaii Medical Center East ("HMC East") and Hawaii Medical Center West ("HMC West" and, with HMC East, the "Hospitals").

11.     The Hospitals were purchased from St. Francis by Hawaii Medical Center, LLC (the "Prior HMC Debtor"), the predecessor to the Debtor, Hawaii Medical Center.  DIP Motion, ¶ 4.

12.     The 2007 purchase was financed by the seller, St. Francis and its affiliates, and by Siemens Financial Services, Inc. ("Siemens").

13.     The Prior HMC Debtor and its affiliates (collectively, the "Prior HMC Debtors") each filed a petition for relief under chapter 11 of Bankruptcy Code in August 2008.  DIP Motion, ¶ 7.

14.     The Prior HMC Debtors confirmed their joint plan of reorganization in May 2010 (the "Prior Plan").  DIP Motion, ¶ 8.

## B.     The Prepetition Debt

15.     According to the Debtors, each Debtor is directly or indirectly liable to MidCap on the Prepetition MidCap Revolving Loan,[1] pursuant to a secured revolving credit facility agreement dated August 17, 2010, immediately following confirmation of the Prior Plan (as amended from time to time, the "Prepetition MidCap Credit Agreement"), as the "exit lender" under the Prior Plan. The Debtors further assert that the Prepetition MidCap Revolving Loan is secured by a first or second lien in all of the Debtors' property, and that the principal

---

[1]  A capitalized term used herein and not defined herein shall have the meaning given to such term in the DIP Motion.

U.S. Bankruptcy Court - Hawaii   #11-01746   Dkt # 99   Filed  07/07/11   Page 14 of 42

balance of the Prepetition MidCap Revolving Loan on the Petition Date in these cases was approximately $7,676,495.  DIP Motion, ¶¶ 12-14.

16.     According to the Debtors, each Debtor also is jointly and severally liable to St. Francis on the Prepetition St. Francis Term Loan pursuant to a Term Loan A Loan Agreement also dated August 17, 2010 (as amended from time to time, the "Prepetition St. Francis Term Loan Agreement").  The Debtors further assert that the Prepetition St. Francis Term Loan is secured by a first priority lien in the Debtors' real property and certain other property, and by second liens in the Debtors' other property, and that the principal balance of the Prepetition St. Francis Term Loan on the Petition Date in these cases was approximately $39,175,277.  DIP Motion ¶¶ 15-17.[2]

**C.     The DIP Financing**

17.     The Debtors allege that the Debtors are unable to obtain financing on an *unsecured* basis, that the proposed DIP Facility is on market terms, and that approval of the DIP Facility is in the best interest of the Debtors and their estates and creditors.  DIP Motion, ¶ 45.

18.     The Debtors do not state whether they sought DIP financing (secured or unsecured) from any other lender or, if they did not, the basis on which they assert that the DIP Financing is on market terms.

---

[2]  The Debtors also allege that MidCap, St. Francis and the Debtors are parties to an Intercreditor Agreement that delineates the rights, priorities and obligations of MidCap and St. Francis with respect to their respective liens in the prepetition collateral.  DIP Motion, ¶ 18.

U.S. Bankruptcy Court - Hawaii   #11-01746   Dkt # 99   Filed  07/07/11   Page 15 of 42

19.     The Debtors, significantly, do not refute the unavoidable fact that the Prepetition Lenders could and can be expected to protect their prepetition collateral by making protective advances to the Debtors or by a more reasonable and less expensive DIP financing.

20.     The Debtors assert that the DIP facility is in the best interest of creditors when, in fact, only the Prepetition Lenders are benefitted.   Instead, the Debtors' unsecured creditors will benefit not at all, but will be harshly treated under the DIP Facility and the Proposed Plan, well beyond the grim enough prospect of non-payment in these chapter 11 cases.

21.     The principal relevant provisions of the DIP Facility are as follows:

    a.     Maximum Loan Amount: $14,000,000.  DIP Motion, ¶ 40.e.

    b.     Use of Proceeds: Among other things, $7.7 million is used to fund the Roll-Up, which must be paid within 20 days of the Petition Date (failing which the DIP Facility is in default), and approximately $800,000 is to pay initial DIP Lender's fees and professional fees.  DIP Motion, ¶ 40.i and Budget.

    c.     Term: The DIP Facility matures, at the latest, 12 months after entry of the Interim Order.  DIP Motion, ¶ 40.h.

U.S. Bankruptcy Court - Hawaii  #11-01746  Dkt # 99  Filed  07/07/11  Page 16 of 42

d.       Priority: The DIP Facility (subject only to the Carve-Out) constitutes a superpriority administrative expense claim, including against proceeds of avoidance actions.  DIP Motion, ¶ 40.k.

e.       Liens: The DIP Facility grants to MidCap liens on all assets, including unencumbered assets and avoidance actions.  DIP Motion, ¶ 40.k. Prepetition Existing Indebtedness allegedly owed to MidCap is proposed to be secured by DIP Liens in all of the Debtors' property.  DIP Motion, ¶ 40.k.

f.       Adequate Protection: In addition to the DIP Liens referred to above, both of the Prepetition Lenders, MidCap and St. Francis (which is advancing no postpetition funds and has a questionable, if any, interest in the cash collateral being used) are proposed to be granted adequate protection liens in all assets (including unencumbered assets and avoidance actions) and superpriority claims.  Proposed Final Order, ¶¶ 19(b) and (c).  The claims and liens of the Prepetition Lenders in the Revolving Priority Collateral will be "primed" by the liens in favor of the DIP Lender.  DIP Motion, ¶ 29.A.c.ii.  St. Francis appears to receive a first priority lien (subordinate to nothing at all including the Carve-Out) in all collateral other than the Revolving Credit Collateral.  Proposed Final Order, ¶¶ 19(b) and (c).

g.      Carve-Out:  Reserve against borrowing availability for the payment of allowed professional fees.  DIP Motion, ¶ 40.f.

U.S. Bankruptcy Court - Hawaii  #11-01746  Dkt # 99  Filed  07/07/11  Page 17 of 42

        h.      Final Payment Fee: 3.0% of the DIP Facility.  DIP

Motion, ¶ 40.j.v.

        i.      Origination Fee: $350,000.  DIP Motion, ¶ 40.j.iv.

        j.      Collateral Management Fee: 1.5% (.125% per month).

DIP Motion ¶ 40.j.ii.

        k.      Unused Line Fee: 0.5% (.042% per month).  DIP Motion,

¶ 40.j.iii.

        l.      Expenses: All out-of-pocket costs and expenses of the

DIP Lender.  DIP Motion, ¶ 40.8.

        m.      Interest Rate: LIBOR (subject to a 2.50% floor) plus

5.5% per annum reset monthly.  DIP Motion, ¶ 40.j.i.

        n.      Conditions Precedent:  DIP Lender's review and

approval of DIP Facility Budget, Proposed Plan Support Agreement, Proposed

Plan, and Disclosure Statement (among other conditions).  DIP Motion, ¶ 40.0.

        o.      Financial Covenants:  As set forth in DIP Motion, ¶ 40.i

and DIP Credit Agreement, including requirement of Roll-Up in 20 days.  DIP

Motion, ¶¶ 40.i and 40.p.

        p.      Plan Confirmation Requirements:  Any plan must

provide for full repayment to the DIP Lender and a full release of any and all

claims against the DIP Lender.  DIP Motion, ¶ 40.p.

q.      Waiver of Surcharge Rights:  The Debtors waive their right to surcharge prepetition or postpetition collateral pursuant to sections 105(a), 506(c) or 552(b) of the Bankruptcy Code.

r.      Availability:  As indicated, availability under the Prepetition MidCap Revolving Loan was $11,379,942 on the Petition Date, and is projected to increase to $11,649,201 by the end of the 13-week Budget.  DIP Motion, Budget.

s.      Committee Challenge:  As indicated, the Committee's investigation of and any challenge to the Prepetition Lenders' liens and claims are completely defunded by the DIP Motion, though $25,000 was provided for investigation only, pursuant to the Interim Order.  The DIP Lender's liens and claims extend to all assets of the Debtors, and no proceeds of the DIP Facility may be used to investigate or challenge the Prepetition Lenders' liens or claims (other than such investigation amount in the Interim Order).  DIP Motion, ¶¶ 29.A.c and 40.i.

t.      Budget:  Notwithstanding the filing of the Budget with the DIP Motion, the DIP Motion defines the DIP Budget as the budget "to be prepared by the Debtors that is presented in form and substance acceptable to the DIP Lender in its sole discretion," making the DIP Facility arguably completely non-binding on the DIP Lender.  DIP Motion, ¶ 29.A.d.n.7.  Excluding the Roll-

Up, and given the minimal increase in availability provided by the DIP Facility and immediate operational needs of the Debtors, it is not even clear that the Debtors require the DIP Facility rather than to operate simply through the use of cash collateral.

**D.**     **Unsecured Creditors.**

22.     The Prepetition Lenders' self-protective and self-serving DIP facility and Proposed Plan come at great cost to the unsecured creditors who funded the Debtors' operations by extending trade credit to the Debtors prepetition. The unsecured creditors - whose claims are estimated by the Debtors in the Disclosure Statement to be between $19 million and $23 million – will receive nothing but lawsuits against them under the Proposed Plan.

**E.**     **Refusal to Provide Committee Adequate Opportunity to Respond to the DIP Motion**

23.     On July 5, 2011, one business day after the Committee's retention of counsel in these cases, the Debtors afforded the Committee an extension until 12:00 a.m. (Pacific Time), on July 8, 2011 (essentially, a period of two days), to respond to the DIP Motion.

24.     On July 7, 2011, the Debtors, DIP Lender, St. Francis and the Committee agreed to a continuance of the hearings regarding various matters,

including the DIP Motion, scheduled to be heard on July 11, 2011, at 10:30 a.m., until July 22, 2011, at 2:30 p.m.

25.     Notwithstanding the eleven day continuance of the hearing regarding the DIP Motion, the DIP Lender and St. Francis refused to provide the Committee with a further extension of time to respond to the DIP Motion and insisted that it be filed on July 7, 2011.  Accordingly, since the Committee retained counsel on July 1, 2011 (one day after the Committee was formed), on the eve of the Fourth of July holiday weekend, realistically, <u>the Committee was given no more than three (3) business days to review and analyze the relief sought in the DIP Motion and accompanying documentation, and to prepare this Objection</u>.

### III.

### <u>OBJECTIONS</u>

26.     A court should approve a proposed debtor in possession financing only if such financing "is in the best interest of the general creditor body."  *In re Roblin Industries, Inc*., 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (*citing Texlon Corp., supra*, 596 F.2d at 1098-99 (2d Cir. 1979) and *In re Vanguard Diversified, Inc*., 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983) ("*Roblin*"). *See also In re Tenney Village Co., Inc*., 104 B.R. 562, 569 (Bankr. D. N.H. 1989) ("The debtor's prevailing obligation is to the bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries").  Moreover, the proposed

financing must be "fair, reasonable, and adequate."  *In re Crouse Group, Inc*., 71

B.R. 544, 546 (Bankr. E.D. Pa. 1987 ("*Crouse*")).

       27.    Postpetition financing also should not be authorized if its

primary purpose is to benefit or improve the position of a particular secured lender.

*See*, *e.g.*, *In re Aqua Assocs.*, 123 B.R. 192, 195-98 (Bankr. E.D. Pa. 1991)

("[C]redit should not be approved when it is sought for the primary benefit of a

party other than the debtor."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37

(Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is

apparent that the purpose of the financing is to benefit a creditor rather than the

estate."); *In re Tenney Village Co., Inc.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989)

(debtor-in-possession financing terms must not "pervert the reorganizational

process from one designed to accommodate all classes of creditors and equity

interests to one specially crafted for the benefit of the secured creditor").

       28.    Indeed, the law has long acknowledged the unequal bargaining

power inherent in negotiations leading to proposed postpetition financing, as well

as the very significant harm that can befall creditors if the proposed financier is

enabled to exploit its leverage.  *See In re FCX, Inc.*, 54 B.R. 833, 838 (Bankr.

E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement

in which the debtor, acting out of desperation, has compromised the rights of

unsecured creditors.").

29.     A financing proposal that contemplates a delegation or compromise of the debtor's fiduciary responsibilities is especially problematic. *Tenney Village Co.*, 104 B.R. at 569 (denying approval of proposed debtor-in-possession financing that was so onerous as to violate the Debtors' fiduciary obligations to the estate); *In re Roblin Indus., Inc.* 52 B.R. 241, 243 (Bankr. W.D.N.Y. 1985) (denying approval of proposed debtor-in-possession financing where, as a condition to extending the loan, the Debtors were required to waive avoidance actions against the lenders in violation of their fiduciary duties); *In re Big Rivers Elec. Corp.*, 233 B.R. 726, 736 (Bankr. W.D. Ky. 1998) (agreements requiring a debtor to breach its fiduciary duties are illegal under the Bankruptcy Code and applicable state law).

30.     The Committee respectfully submits that the Court must be particularly sensitive to the "best interests of the estates" standard in these cases, given the Debtors' stated goals.  Put simply, the Debtors' and their Prepetition Lenders' stated intention is to expedite consummation of the Proposed Plan on a fast track having as a primary purpose the elimination of tens of millions of dollars of legitimate unsecured trade claims while preserving for the Debtors and the Prepetition Lenders the proceeds of avoidance actions against those same unsecured creditors.  These bankruptcy cases have no other purpose.  As indicated, the transfer of the Debtors' property contemplated by the Proposed Plan could be

DOCS_LA:240969.1 35097-001

accomplished outside of chapter 11. The Committee respectfully submits that the DIP Facility preordains the Proposed Plan which fails the best interest of creditor test of Bankruptcy Code § 1129(b)(2)(B) and that "heightened sensitivity" is justified here.

31.     Heightened sensitivity or not, however, all of the concerns articulated by the courts above are triggered to some degree by the DIP Financing Motion. Specifically:

**A.** **The Motion Should Be Denied Because The DIP Financing Inappropriately Is Being Used Simply To Recirculate The Prepetition Secured Indebtedness At The Expense Of General Unsecured Creditors**

32.     Initially, a Court should only approve DIP financing (and provide the DIP lender with its demanded benefits in return for such financing) if the financing is in the best interest of the estates.

33.     Such considerations are fundamental here because it seems clear that the DIP Financing and purposes of these cases in general are completely antithetical to the interests of general unsecured creditors – the Debtors can not seriously argue otherwise when the Debtors are committed to paying general unsecured creditors nothing, while reserving the right to sue them for avoidance actions. As indicated above, the Debtors have committed to use $7.7 million of the DIP Financing to pay the Roll-Up and the balance of the DIP Facility to pay

operating and bankruptcy costs until such time as the Debtors will transfer the Debtors' property to St. Francis (the prior owner) and release the DIP Lender pursuant to the Proposed Plan's confirmation and effective date.

34.     The sole purpose of the DIP Financing is to maximize the return to the Prepetition Lenders on their alleged prepetition claims, which interests the Prepetition Lenders could be expected to protect on their own and without the Debtors' aid and involvement.  The Debtors' need for the DIP Financing is self-engineered by the Prepetition Lenders to manufacture large administrative claims to pay favored creditors (themselves) in violation of the rules governing priority and the best interests of creditors.

**B.     In Its Current Form, the DIP Financing Has a Myriad of Problems**

35.     Even if final approval of the DIP Financing were justified at this time (it isn't), the DIP Financing is overreaching and should not be approved in its present form.  Specifically:

- *Avoidance Actions or the Proceeds Thereof And Any Other Unencumbered Assets As of the Petition Date Must Not Become Collateral for the DIP Lender or the Prepetition Lenders.*

36.     The Motion proposes to grant the DIP Lender and the Prepetition Lenders liens in and superpriority administrative expense claims attaching to the proceeds of avoidance actions and any other unencumbered assets

as of the Petition Date (collectively, the "Unencumbered Assets"). The grant of payment rights to lenders in bankruptcy-created rights (and other unencumbered assets) is inappropriate, particularly here where (a) the Debtors propose that holders of general unsecured claims will receive nothing under the Proposed Plan, (b) the Prepetition Lenders therefore need a going-concern far more than do the unsecured creditors, and (c) DIP Lender will already have benefited by the use of the DIP Financing simply to refinance its existing $7.7 million prepetition debt into an administrative claim additionally secured by postpetition property and Unencumbered Assets, or to make interest and expense payments on the DIP Financing, and St. Francis will benefit by receiving back the Hospitals that it previously sold to the Prior HMC Debtors. *See Crouse*, 71 B.R. at 551; *In re St. Mary Hospital*, 86 B.R. 393, 402 (Bankr. E.D. Pa. 1988) (proposed priority postpetition lending by creditor denied where court believed it would lend on non-priority basis). In sum, given that this case is being administered solely for the benefit of the Prepetition Lenders, equity compels that there should be a "carve out" for avoidance claims and other Unencumbered Assets, and their proceeds, from the liens and superiority claims of the DIP Lender and the Prepetition Lenders. In short, general unsecured creditors should not be placed in a worse position than they would be in had the Prepetition Lenders simply foreclosed.

37.     The Adequate Protection priming liens and superpriority claims proposed to be given to St. Francis - in *all* assets (including Unencumbered Assets) and proceeds of the Debtors (Proposed Final Order, ¶¶ 19(b) and (c)) - are inappropriate on additional grounds.  St. Francis is advancing no funds toward the Debtors' operations and its collateral primarily consists of real estate.  The DIP Motion fails to state what cash collateral of St. Francis is being utilized or why, if it is, these liens and claims are necessary to adequately protect St. Francis' interest in that cash collateral, if any, that is being used.

- **The Court Should Require that the Roll-Up Be Repaid**
  - <u>*Roll-Ups Are Antithetical to Fundamental Bankruptcy Principles.*</u>

38.     As indicated, the DIP Lender demanded the conversion of its $7.7 million in alleged prepetition debt (which theoretically could be crammed down) into an administrative claim (which can not be crammed down), secured by the Unencumbered Assets and other liens in postpetition assets and a superpriority claim.  This proposed Roll-Up was gratuitous – there is no possible economic justification for the provision other than the incestuous relationship between the Prepetition Lenders and the Debtors.

39.     Provisions in postpetition financing agreements that deem prepetition secured debt to be postpetition debt, or that use the proceeds of postpetition financing from a prepetition secured lender to pay part or all of that

lender's prepetition debt, are highly extraordinary provisions that are strongly disfavored in bankruptcy and require greater scrutiny.  Such provisions have been found by some Courts to be *per se* impermissible because they are "directly contrary to the fundamental priority scheme of the Bankruptcy Code."  *In re Saybrook Mfg Co.*, 963 F.2d 1490, 1495 (11th Cir. 1992) (holding postpetition financing arrangement *per se* impermissible where undersecured prepetition lender provided postpetition financing in exchange for a security interest in debtor's postpetition property to secure its prepetition debt); *see also In re Monach Circuit Indus, Inc.*, 41 B.R. 859 (Bankr. E.D. Pa. 1984). A roll-up is extraordinary and can not be granted simply because the lender demands it.[3]

40.     Some courts have reluctantly approved a financing order including cross-collateralization provisions, but required the debtor to demonstrate (l) that its business operations would fail absent the proposed financing, (2) that it is unable to obtain alternative financing on acceptable terms, (3) that the proposed lender will not accept less preferential terms and (4) that the proposed financing is

---

[3]  *See also In re Equalnet Communications Corp.*, 258 B.R. 368 (Bankr. S.D. Tex. 2000). There, a secured creditor attempted to pay off its prepetition loan balance with a postpetition line of credit. *Id.* at 369. The result of this roll-up of prepetition debt into postpetition financing was to enhance the secured creditors collateral position and to grant administrative priority for the refinanced prepetition debt. *Id.*  Noting that "the payment of pre-petition claims prior to confirmation of a plan in a Chapter 11 case has been proscribed by the 5th Circuit in *In re Oxford Mgmt., Inc.*, 4 F.3d 1329 (5th Cir. 1993)," the bankruptcy court held that "based on the Eleventh Circuit's ruling in [Saybrook], a secured creditor's prepetition debt balance may not be paid off and/or 'rolled into' a post petition line of debtor in possession financing, with resultant enhancement of collateral position and administrative priority. *Id.  See also In re Tri-Union Development Corp.*, 253 B.R. 808, 814 (Bankr. S.D. Tex. 2000) (noting that "it is improper under the current Code and case law for the debtor, pre-confirmation to cross-collateralize or 'refinance and re-collateralize' a pre-petition secured debt secured by substantially all of the debtor's assets").

U.S. Bankruptcy Court - Hawaii  #11-01746  Dkt # 99  Filed  07/07/11  Page 28 of 42

in the general creditor body's best interest. *In re Vanguard Diversified, Inc.*, 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983).

41.     Even under such a standard, however, this Roll-Up is indefensible – it fails to satisfy prongs 2, 3 and 4 of the *Vanguard* test. Most obviously, as to prongs 2 and 3, it is beyond belief that the DIP Lender would not make the DIP Financing if it did not receive the Roll-Up – the DIP Lender is a Prepetition Lender and these cases are plainly being run to maximize the returns to, and for the sole benefit of, the Prepetition Lenders.

42.     The proposed Roll-Up also fails prong 4 of the *Vanguard* test – the Debtors can make no showing that the Roll-Up is in the best interests of the general creditor body. The general unsecured creditors vehemently oppose the Roll-Up. On a purely economic basis, the Roll-Up either transforms undersecured non-interest bearing debt into interest bearing debt secured by previously unencumbered assets, or provides that holder of adequately secured debt with a protection to which it is not entitled. The only parties benefitted by the Roll-Up are the direct beneficiary of the Roll-Up, MidCap, and the indirect beneficiary, St. Francis, who through the DIP Facility and the Proposed Plan obtains both the Debtors' property and the Exit Financing from MidCap. The Roll-Up therefore does not satisfy prong 4 of the *Vanguard* test as well.

U.S. Bankruptcy Court - Hawaii   #11-01746   Dkt # 99   Filed  07/07/11   Page 29 of 42

o        *The Roll-Up and Postpeition Liens and Superpriority Claim Can Not
Be Justified Simply By Labeling Them  as "Adequate Protection."*

43.      The Debtors' suggestion that the Roll-Up, the DIP liens and the
superpriority claims are justifiable components of "adequate protection" (DIP
Motion, ¶ 56) contorts the concept of "adequate protection" beyond recognition.

44.      Initially, a "priming loan" generally connotes a bankruptcy loan
made by a new lender at a court-ordered senior priority, subordinating the existing
senior lender.  *See, generally, e.g., In re Swedeland Development Group, Inc.,* 16
F.3d 552 (3d Cir. 1993).  Such priming loans are rarely granted.  *See id.*  The
negative connotations of "priming" do not exist, however, if the DIP lender and the
existing lender is the same institution.  That is precisely the case here.  MidCap, as
DIP Lender, is "priming" MidCap, as Prepetition Lender.  The Debtors' contention
that the Roll-Up, the DIP liens and the superpriority claims granted to MidCap as
Prepetition Lender are justified because of the draconian nature of a priming loan
being made by the same MidCap as DIP Lender (DIP Motion, ¶ 53) is difficult to
take seriously.

45.      A secured creditor is entitled to adequate protection under
section 363 of the Bankruptcy Code <u>only</u> for protection against injury to its
"interests . . . in property" that a debtor proposes to use and only to the extent of
any diminution in the value of that property.  This requirement of "proportionality"

is mandated because "the basic purpose of providing adequate protection is to safeguard the secured creditor from *diminution in the value of its interests*."[4]  *See, e.g., Swedeland*, 16 F.3d at 564 ("the whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy. . . .  Accordingly, a proposal depending upon a Prepetition lender having protection, no matter its form, 'should as nearly as possible under the circumstances of the case provide the creditor with the value of its bargained-for rights.'" *Citing In re Martin*, 761 F.2d 472, 476 (8th Cir. 1985)).  As stated by the United States Court of Appeals for the Third Circuit in *Swedeland*, "whether protection is adequate depends directly on how effectively it compensates the secured creditor for loss of value caused by the superpriority given to the postpetition loan."  *Id.*

46.     Application of the foregoing principle of "reasonable equivalence" renders the Roll-Up, the DIP Liens, and the superpriority claim indefensible as "adequate protection."  Put simply, there is no evidence before the Court which would suggest that the MidCap, as Prepetition Lender, will suffer <u>any</u> harm by reason of the proposed DIP Financing by MidCap as DIP Lender, or that

---

[4]  *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D. N.Y. 1996) (emphasis added).  *Accord, In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988) (citations omitted); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D. N.Y. 1992).  Thus, where the value of the secured creditor's collateral is not diminishing by the debtor's use of the collateral or is in fact increasing in value, it necessarily follows that the secured creditor's interest is adequately protected.  *E.g., 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *Hubbard Power & Light*, 202 B.R. at 685.

St. Francis will be harmed by the MidCap funding. To the contrary, at least two factors support the conclusion that the Prepetition Lenders are entitled to <u>no</u> additional adequate protection beyond a continuing lien on the proceeds of their collateral. Specifically:

47. First, as a general matter, the use of additional funding to protect or enhance the value of the Prepetition Lenders' existing collateral, by definition, can not constitute "injury." Various courts have recognized that a secured creditor is adequately protected if the proposed financing and/or cash collateral (or other collateral) will be used to enhance the value of the creditor's collateral. *See, e.g., In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D. N.Y. 1992) (undersecured creditor adequately protected where senior postpetition financing would be used to improve/renovate debtor's real property to attract new tenants and enhance value of creditor's collateral; "[T]here is no question that the property would be improved by the proposed renovations and that an increase in value will result. In effect, a substitution occurs in that the money spent for improvements will be transferred into value. This value will serve as adequate protection for [creditor]'s secured claim."); *In re Hubbard Power & Light*, 202 B.R. 680, 684-85 (Bankr. E.D. N.Y. 1996) (secured party was adequately protected where proposed priming loan proceeds would be used to clean up debtor's property so that debtor's operations could resume, thereby

enhancing value of real property collateral). *See also In re Orlando Trout Creek Land*, 80 B.R. 190, 192 (Bankr. N.D. Cal. 1987) (undersecured creditor is adequately protected where value of its collateral is increasing; citations omitted); *In re Forest Ridge, II, Ltd. Partnership*, 116 B. R. 937, 949-50 (Bankr. W.D.N.C. 1990) (no adequate protection payments were required because real property in question not decreasing in value); *In re Pine Lake Village Apartment Co.*, 16 B.R. 750, 756 (Bankr. S.D. N.Y. 1982) (debtor permitted to use cash collateral to enhance value of real property and secured creditor's collateral); *In re Stein*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (secured creditor adequately protected where use of cash collateral was necessary for debtor's operations and "[creditor's] secured position can only be enhanced by the continued operation of the [debtor's business]").

        48.    In this case, while the Debtors' assets obviously will become subject to a senior lien securing the amount borrowed under the DIP Facility, the Prepetition Lenders have already determined that their collateral will be enhanced by at least a like amount. The proceeds of the DIP Financing do not simply vanish into the ether – they are expended in enhancing the Debtors' business pursuant to a Budget blessed by the Prepetition Lenders and overseen by the Debtors, who under the DIP Facility and the Proposed Plan are obviously doing the bidding of the Prepetition Lenders.

49.     Second (and underscoring the point that the DIP Financing directly enhances the value of MidCap's and the other the Prepetition Lender's collateral), the Prepetition Lenders here *want* the Debtors to borrow under the DIP Financing – this is not a nonconsensual priming fight (such as in *Swedeland*) where the debtor has commenced a hostile chapter 11 case and seeks to borrow funds on a priming basis that the existing secured creditors believe should not be spent.  *See Swedeland,* 16 F. 3d at 564.  To the contrary, the Prepetition Lenders here want these cases to proceed to confirmation of a Proposed Plan under which they would be the sole beneficiaries, and presumably have spent extensive time scrubbing the Budget to insure that the Debtors' expenditure of the funds in question *was* in *their* best interests.

50.     In sum, the facts make obvious that the Roll-Up, DIP liens, superpriority claims and other lender protections have only one purpose which has nothing to do with any traditional justification for "adequate protection" of a lender who is being primed by a third party – to protect and maximize the interests of the Prepetition Lenders and prejudice the interests of general unsecured creditors.  The DIP Financing and these cases in general also have only one purpose – to benefit the Prepetition Lenders by extinguishing general unsecured claims and giving to the Prepetition Lenders the Debtors' avoidance actions against those same general unsecured creditors.  The Prepetition Lenders do not need added incentives or

U.S. Bankruptcy Court - Hawaii   #11-01746   Dkt # 99   Filed  07/07/11   Page 34 of 42

encouragement cast as "adequate protection" to continue along the path they obviously elected to take.  The Prepetition Lenders - who are the only beneficiaries under the Proposed Plan - have ample incentive to fund these cases without the Roll-Up, the DIP liens, the superpriority claims or the other bells and whistles requested.  Given the proposed treatment of general unsecured creditors in these cases, the only parties that the Prepetition Lenders would be injuring by failing to fund these cases are themselves.

51.     The Committee therefore respectfully submits that the Court should deny final approval of the DIP Motion or deny approval of the Roll-Up, the DIP liens, the superpriority claims and the other lender protections as conditions to final approval of the DIP Financing.

- ***The Prepeition Lenders Can Not Be Permitted to Usurp the Debtors' Fiduciary Responsibilities In respect to Challenges to the Prepetition Lenders' Claims and Confirmation of a Plan of Reorganization***

52.     As indicated above, Courts are particularly loath to approve proposed DIP financings which impinge on a Debtors' fiduciary obligations to other creditors and the estate generally.  *See, e.g., Tenney Village Co.,* 104 B.R. at 509; *Roblin Indus.*, 52 B.R. at 243.  This principle is implicated here by the DIP Facility, which leaves wholly unclear whether the Debtors are even acting independently of the Prepetition Lenders.

U.S. Bankruptcy Court - Hawaii   #11-01746   Dkt # 99   Filed  07/07/11   Page 35 of 42

53.     As indicated, the Debtors have already filed their Proposed Plan which is presumably "acceptable" to the Prepetition Lenders (and pays nothing to general unsecured creditors).  The Debtors are bound by the Proposed Plan Support Agreement to seek confirmation of the Proposed Plan.  The Prepetition Lenders have effectively made themselves lenders-in-possession – the Debtors are simply doing their bidding.

54.     The Committee is given a mere 30 days to investigate and challenge the Prepetition Lenders' liens and claims, is given no standing or funding to do so and the DIP Facility swallows up all Unencumbered Assets, (DIP Motion, ¶¶ 29. A.c and 42.a)

55.     The Committee respectfully submits that the Committee must have a meaningful right to defend the interests of general unsecured creditors.  The Prepetition Lenders' and Debtors' Proposed Plan (to which the Debtors are contractually bound) and the absurd charade of a Challenge makes obvious that the Debtors are not acting as fiduciaries to all economic interests of these estates.  In short, the Committee respectfully submits that the Prepetition Lenders' desire to steamroll general unsecured creditors should not be endorsed or condoned by the Court.  The Committee therefore respectfully submits that the plan confirmation requirements imposed on the Debtors should be eliminated from the DIP Facility and the Challenge period should be extended to 120 days.

- ***The Professional Fee Carve-Out Must Be Clarified***

56.     The Committee respectfully submits that the funding of a workable professional fee carve-out is a required "price of admission" for secured creditors that hope to use the benefits of chapter 11 to maximize the value of their collateral.  The DIP Lender and the other Prepetition Lender, St. Francis, seek all of the benefits the chapter 11 process affords them (such as collateralizing avoidance actions and the Court-supervised maintenance of the Debtors' going concern value for their benefit while they seek to extinguish general unsecured claims), while seeking to avoid the necessary costs.  To be blunt, the Prepetition Lenders appear committed through various limitations on the Carve-Out to deny the Committee the right to do its statutorily mandated job.

57.     Initially, and most strikingly, as mentioned, the Carve-Out and use of proceeds provisions of the DIP Facility (other than the investigation amount set forth in the Interim Order) expressly preclude the Committee from investigating the Prepetition Lenders' liens and claims or litigating against any of the Prepetition Lenders.  DIP Motion, ¶ 40.i.  This language is rather stunning in its scope.  Taken literally, this exclusion would deny the Committee the right to even contest the Proposed Plan.  The Committee respectfully submits that this exclusion must be stricken – to leave it in place is effectively to deny the Committee its very purpose for existing.

58.     The Committee respectfully submits that the Prepetition Lenders' whitewash efforts to protect themselves at the expense of other, unsecured creditors must be rejected.  Investigation of the Prepetition Lenders' liens and claims, and investigation and the commencement and prosecution of the possible claims against them, is a fundamental purpose of a statutory committee. In the context of these cases, it is perhaps the most crucial purpose.

59.     In sum, the Committee must be permitted to do its job.  Given the context of these cases, there should be no prohibition or other limitation on the DIP Facility proceeds by the Committee in investigating, commencing or prosecuting a Challenge, contesting the Proposed Plan, or otherwise doing its job. The Court, not the Prepetition Lenders, must be the final arbiter of whether the Committee has incurred reasonable fees.

- ***There Should Be No Impediments On The Ability Of The Committee To Bring A Challenge***

60.     As also indicated, even if the Committee uncovers an action to be brought against the Prepetition Lenders, the proposed Final Order does not give the Committee standing to bring such an action.  Proposed Final Order, ¶ 16(a)(i). Presumably, the Prepetition Lenders' intent here is that the Committee must first ask the Court for standing.  This is a pointless exercise that has no purpose other than to essentially shorten the Committee's investigatory period.  (Rather than

U.S. Bankruptcy Court - Hawaii   #11-01746   Dkt # 99   Filed  07/07/11   Page 38 of 42

having 30 or 45 days to commence an action against the Prepetition Lenders, the Committee must determine whether such an action exists well before the expiration of the 30- or 45-day period, because it must first bring a motion seeking standing to file the action.)  The provision should also be stricken.

- ***§§ 506(c) and § 552(b) Surcharge Rights Should Not be Waived.***

61.  The DIP Motion also proposes the waiver of the Debtors' and estates' ability to surcharge the Lenders/DIP Lender's collateral under 11 U.S.C. §105(a), §506(c) and §552(b).

62.  Courts routinely reject the waiver of surcharge rights under sections 506(c) and 552(b).  <u>See</u> <u>e.g.</u>, *Hartford Fire Ins. Co. v. Nw. Bank Minn. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (8th Cir. B.A.P. 1998) (holding that provision in financing order purporting to immunize the postpetition lender from section 506(c) surcharges was unenforceable); *In re Colad Group, Inc.,* 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to approve postpetition financing agreement to the extent that the agreement purported to modify statutory rights and obligations created by the Bankruptcy Code by prohibiting any surcharge of collateral under section 506(c)).

63.  The waiver of sections 506(c) and 552(b) rights is particularly improper given the circumstances here.  As described above, the Debtors' general unsecured creditors receive no benefit from the DIP Financing, given (a) the terms

U.S. Bankruptcy Court - Hawaii   #11-01746   Dkt # 99   Filed  07/07/11   Page 39 of 42

of the Proposed Plan and (b) that the bulk of the funds to be advanced will be used to satisfy or pay interest and expenses on the Prepetition Lenders' prepetition debt, generate administrative claims to be used to deny general unsecured creditors a recovery, or preserve the Prepetition Lenders' prepetition collateral for the sole benefit of the Prepetition Lenders. It therefore can not plausibly be argued that general unsecured creditors are receiving any benefit in these cases equitably sufficient to justify denying them the right to assert section 506(c) surcharge claims against the Prepetition Lender or asserting section 552(b) equities of the case exceptions to the general rule of section 552(b). As such, the waivers should be stricken from the proposed Final Order.

- ***Interest and Expense Payments On The Prepetition Debt Are Inappropriate.***

    64. Finally, the DIP Financing requires the postpetition payment of interest and expenses on the Prepetition debt (DIP Motion, ¶¶ 40.i and 40.j), even though the Debtors and Prepetition Lenders contend that the prepetition debt is undersecured. The Debtors are also required to pay interest and expenses that presumably accrued prepetition but were not paid as of the Petition Date. DIP Motion, ¶ 40.q. Section 506 of the Bankruptcy Code establishes a claim as secured only to the extent of the value of the collateral securing the claim. A creditor is only entitled to postpetition interest and fees (let alone prepetition interest and

U.S. Bankruptcy Court - Hawaii  #11-01746   Dkt # 99   Filed  07/07/11   Page 40 of 42

fees) on a claim if the claim is oversecured. Given that the repetition debt has not been established as oversecured (and indeed, the Prepetition Lenders assert the opposite), the broad "adequate protection" payments on the prepetition debt are unwarranted and violative of the Code. *See In re Snowshoe Co.*, 789 F2d. 1085, 1088 (4th Cir. 1986) (what is necessary for adequate protection is a question of fact).

**IV.**

**RESERVATION OF RIGHTS**

65.     As set forth above, even though the parties agreed to an eleven day continuance of the hearing regarding the DIP Motion, St. Francis, the DIP Lender and the Debtors refused to provide the Committee with more than three (3) business days for its counsel to review, analyze and formulate a response to the relief requested in the DIP Motion.

66.     Accordingly, in light of the unreasonable time constraints imposed on the Committee, the Committee reserves the right to revise, supplement, correct, withdraw, supersede and otherwise amend the Objection in any fashion, to raise any issue and present any evidence or argument in connection with the DIP Financing, the DIP Facility, and/or the DIP Motion, at any time prior to or at the hearing regarding the DIP Motion.

# V.

## CONCLUSION

67.    For all of the foregoing reasons, the Committee respectfully

requests that the Court deny final approval to the DIP Financing or condition such

approval as set forth herein.

DATED:    Honolulu, Hawaii, July 7, 2011.

WAGNER CHOI & VERBRUGGE

/s/ Chuck C. Choi
Chuck C. Choi
745 Fort Street, Suite 1900
Honolulu, Hawaii  96813
Telephone:  808-566-1877
Facsimile:  808-566-6900

PACHULSKI STANG ZIEHL & JONES LLP
Samuel Maizel (CA Bar No. 189301)
Bruce Grohsgal (DE Bar No. 3583)
Malhar Pagay (CA Bar No. 189289)
10100 Santa Monica Blvd., 11th Floor
Los Angeles, CA  90067-4100
Phone:  (310) 277-6910
Facsimile:  (310) 201-0760

[Proposed] Attorneys for the Official Committee of
Unsecured Creditors