PACHULSKI STANG ZIEHL & JONES LLP
Samuel R. Maizel (CA Bar No. 189301)
Malhar S. Pagay (CA Bar No. 189289)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067-4100
Telephone: 310-277-6910
Facsimile: 310-201-0760
E-mail: smaizel@pszjlaw.com
mpagay@pszjlaw.com

WAGNER CHOI & VERBRUGGE
James A. Wagner
Chuck C. Choi
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: 808-533-1877
Facsimile: 808-566-6900
E-mail: jwagner@hibklaw.com
cchoi@hibklaw.com

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF HAWAII

| In re: | Case No.: 11-01746 RJF |
|---|---|
| Hawaii Medical Center, et al.,[1] | (Chapter 11 Case) (Jointly Administered) |
| Debtors. | |
| | HEARING: |
| This document relates to: All Cases | Date: December 16, 2011<br>Time: 10:00 a.m.<br>Judge: Honorable Robert J. Faris |
| | Relates to Document No. 443 |

---

[1] The Debtors are as follows: Hawaii Medical Center, a Hawaii nonprofit corporation (Tax No. 20-3409838); Hawaii Medical Center East, a Hawaii nonprofit corporation (Tax No. 51-0598670); and Hawaii Medical Center West, a Hawaii nonprofit corporation (Tax No. 51-0598672).

**REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE OBJECTION OF ST. FRANCIS TO THE DEBTORS' MOTION FOR ORDER: (1) APPROVING THE BIDDING PROCEDURES AND BID PROTECTIONS UTILIZED IN CONNECTION WITH THE PROPOSED SALE OF SUBSTANTIALLY ALL ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS; (2) SCHEDULING AN AUCTION FOR THE SALE AND A HEARING TO APPROVE THE SALE; AND (3) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of Hawaii Medical Center and its affiliated debtors (the "Debtors") appointed in the above-captioned cases (the "Cases") hereby files its reply (the "Reply") to the objection (the "Objection") of St. Francis Healthcare System of Hawaii, St. Francis Medical Center, and St. Francis Medical Center—West's (collectively, "St. Francis") to *Debtors' Motion for Order (1) Approving the Bidding Procedures and Bid Protections Utilized in Connection with the Proposed Sale of Substantially All Assets of the Estate Free and Clear of Liens; (2) Scheduling an Auction for the Sale and a Hearing to Approve the Sale; and (3) Granting Related Relief* (the "Bid Procedures Motion") [Docket No.443].[2] This Reply is supported by testimony and evidence as may be presented by the Committee prior to or at the hearing on the Bid Procedures Motion as well as the documents filed in the Cases to date. For the reasons discussed herein, the Objection should be overruled and any order approving the Bid Procedures Motion should contain a specific provision pursuant

---

[2] Capitalized terms not otherwise defined herein shall have the meaning given them in the Bid Procedures Motion.

1

to section 363(k) of chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") denying, for cause, St. Francis and any of its affiliated entities the right to exercise their right to credit bid at the Auction of the Assets. In support of the Reply, the Committee represents as follows:

**I.**

**<u>INTRODUCTION</u>**

The Committee and the Debtor, under enormous time pressure, have secured a $25 million bid[3] from Prime Healthcare Foundation-Hawaii, Inc. and Bio-Med Services-Hawaii, Inc. (collectively "<u>Prime</u>") for substantially all of the Debtors' assets. The Debtors have filed a motion to approve the sale of their Assets to Prime, which is serving as the stalking horse bidder, or to the party with the highest and best bid at the Auction. St. Francis objected to the Bid Procedures Motion on the grounds that it did not provide for St. Francis' right to credit bid. Although the Bid Procedures Motion does not specifically address the right of St. Francis to credit bid at the Auction, any order approving the Bid Procedures Motion should overrule the Objection and contain a specific provision denying St. Francis the right to credit bid.

---

[3] The bid is substantially in excess of the valuation of the Debtors' assets that St. Francis and the Debtors relied upon in proposing the 2011 Plan.

Section 363(k) of the Bankruptcy Code provides that the Court, for cause, may deny a secured creditor the right to credit bid at the sale of a debtor's assets. Both before and after the filing of these Cases, St. Francis, which holds a lien on the Debtors' assets,[4] acted inequitably toward the Debtors and their creditors, and has abused the bankruptcy process. These inequitable actions have resulted in an increase in the amount of the claims against the Debtors and a decrease in the value of the Debtors' assets. If it is allowed to credit bid at the Auction, St. Francis, because of the size of its secured claim, will no doubt be the highest bidder and its bad acts will be rewarded with ownership of the Debtors' property while the Debtors' other creditors (administrative, priority and unsecured), many of whose claims have been substantially increased due to St. Francis' abusive actions, will receive nothing. This result cannot be the result intended under the Bankruptcy Code.

As is set forth in detail below, cause exists in these Cases for the Court to deny St. Francis the right to credit bid at the Auction. The Committee, therefore, requests that any order entered approving the Bid Procedures Motion contain a specific provision denying St. Francis the right to credit bid at the Auction.

---

[4] The Committee reserves its right to seek equitable subordination of the liens and debt held by St. Francis to the claims of the other creditors in these Cases.

## II.

## STATEMENT OF RELEVANT FACTS

Although it is not clear to the Committee when St. Francis began it abusive behavior toward the Debtors and their creditors in its headlong drive toward ownership of the Debtors assets,[5] evidence of its intent is apparent in the plan St. Francis filed in the 2008 chapter 11 cases (the "<u>SF Plan</u>").  Under the SF Plan, St. Francis provided that it would receive three notes in the total principal amount of $77 million and 100% of the equity of the 2008 Debtors' in their businesses.  The Debtors and other parties in interest in those cases filed extensive objections (the "<u>SF Plan Objection</u>") [Docket No. 1215 in case no. 08-01369] to the St. Francis Plan, including, but not limited to objections that it was not proposed in good faith and was not fair and equitable because, among other reasons, it provided for St. Francis to receive more than 100% of the amount of its claims, which the SF Plan Objection estimated at no more than $46.7 million (SF Plan Objection § VII.A.) in addition to the ownership of the Debtors and because it provided for distributions to St. Francis from the income of the not-for-profit reorganized 2008 Debtors in

---

[5] The two hospital complexes currently operated by the Debtors, commonly referred to as "HMC East" and "HMC West," were owned and operated by St. Francis Medical Center until early 2007 when Hawaii Medical Center, LLC, a predecessor of Hawaii Medical Center, purchased them.  To finance the purchase of the hospitals and to obtain adequate working capital, the Debtors' predecessors borrowed approximately $69 million from St. Francis and Siemens Financial Services, Inc.

4

contravention of the nondistribution constraint on nonprofit entities. SF Plan § V. B. The Debtors, the committee in the 2008 case and Hawaii Physicians Group, LLC had also filed a plan (the "2010 Plan") and were able to negotiate a resolution with St. Francis to gain confirmation of the 2010 Plan.

Upon the Debtors' emergence from under the 2010 Plan in August, 2010, St. Francis had the right to appoint three members to the Debtors' nine member Board and veto rights over the appointment of two more. St. Francis, therefore, was privy to all of the Debtors' confidential, inside information. It could not have come as a shock to St. Francis that, four months into the term of the 2010 Plan, the Debtors would not be able to make their 2010 Plan payments.

St. Francis did not utilize its inside information about the Debtors' insolvency to try to stem the tide of every increasing trade payables, which it knew the Debtors would not be able to pay. Instead, it used the inside information to attempt, yet again, to take over ownership of the Debtors' Assets.

In February 2011, two months after the Debtors' default under the 2010 Plan, St. Francis presented a scheme to the Debtors by which the bankruptcy process would be used to facilitate what it expected would be the easiest, fastest, cheapest way to gain ownership of the Debtors' Assets. The scheme called for the Debtors to file new chapter 11 cases and, through the mechanism of a prepackaged

5

DOCS_LA:248499.3 35097-001

plan drafted by St. Francis and supported by evidence supplied by St. Francis, transfer their assets back to St. Francis cleansed of liabilities, increase the rental payments to affiliates of St. Francis under the ground leases to help St. Francis meet its obligations to its own underfunded pension plan, and pay unsecured creditors nothing. After St. Francis rejected, out of hand, all other proposals for restructuring made by the Debtors, including the sale of HMC East, HMC West or both, proposed its scheme to take the Debtors' assets, and insisted on the replacement of HMC's CEO, the Debtors ceased all efforts to market their Assets to third parties and, at the prodding of St. Francis, filed these chapter 11 cases and the prepackaged plan that benefitted no party other than St. Francis.

The inequitable conduct of St. Francis continued unabated after the filing of the Cases. The prepackaged plan, which St. Francis had conceived and drafted, provided for the general unsecured creditors to receive nothing—a highly unusual, if not unheard of, treatment of general unsecured creditors in a prepackaged plan. Even though St. Francis has sophisticated bankruptcy counsel who must have known that such an unusual and unfair use of a prepackaged plan and the bankruptcy process would be met with strenuous objections, it chose to ignore the obvious and pushed the Debtors forward. St. Francis rejected out-of-hand the reasonable Plan settlement offer made by the Committee shortly after its formation knowing full well that the Debtors and the Committee would incur substantial fees

6

and expenses litigating confirmation of the Plan and that, due to the delay in the confirmation hearing resulting from the litigation, the Debtors' cash situation would deteriorate. After causing the incurrence of these substantial administrative expenses, St. Francis agreed to settle with the Committee "on the court house steps" for approximately the same amount originally offered by the Committee. That settlement was approved by the Bankruptcy Court on September 15, 2011.

St. Francis and its counsel also were well aware of the $57million claim held by CMS because it was the result of self-reported violations of the Stark Act. Once again, however, rather than addressing the CMS claim and attempting to resolve it on a reasonable basis, St. Francis chose to stonewall CMS. CMS was forced to file an objection to the Plan and on the same date that the Committee settlement was approved, CMS offered to settle its $57 million claim for $1.5 million which could be paid over many years. St. Francis, ostensibly for the purpose of considering the CMS offer, sought and obtained a continuance of the confirmation hearing, further delaying consideration of the Plan and causing further decay of the Debtors' financial situation.

Approximately six weeks later and four months into the bankruptcy Cases of its making and that had been filed for its benefit, under the pretense of wanting to discuss the settlement of the CMS claim, St. Francis set-up a meeting among the

7

Debtors, MidCap, the Committee, CMS and St. Francis. All parties traveled to San Francisco for that meeting, incurring addition fees and expenses, only to learn that the real purpose of the meeting was for St. Francis to advise the parties that it would not be proceeding with the Plan and wanted the Cases dismissed so that it could exercise its state court foreclosure rights. St. Francis further advised the assembled group, after distributing its cash flow projections for the Debtors, that it did not have or generate sufficient cash to cover the future losses that would be generated from the continued operation of the hospitals. It must be assumed, therefore, that St. Francis' planned to close the Debtors' non-profit hospitals after its foreclosure.

During the four months the Cases had been pending before St. Francis changed its mind, the Debtors had not marketed the Assets, had continued to burn cash at an alarming rate, had incurred substantial administrative claims, and had lost their postpetition financing. By the time St. Francis got around to advising the other parties that it would not proceed with the Plan that it had conceived for its own benefit, the Debtors were on the brink of collapse. St. Francis was well aware of the Debtors continued rapid decline, but St. Francis waited—waited until CMS had initiated an administrative freeze on Medicaid payments and MidCap had issued a notice of default under the DIP Facility, waited until the Debtors were basically out of cash, waited until the situation was desperate for the Debtors,

waited until it believed it was too late for the parties to have an opportunity to look for another purchaser—to spring the news of its change of heart on the parties.

The other parties, however, refused to give up and immediately began negotiating an agreement that gave the Debtors and the Committee a few days to try to find a legitimate purchaser of the Debtors' Assets. The parties entered into a stipulation whereby CMS backed off its administrative freeze of Medicaid payments and MidCap agreed to continue funding the Debtors on a very limited basis. St. Francis did not oppose this solution but did nothing to help either.

The Debtors and the Committee immediately began the search for a real purchaser and, despite assurances by St. Francis that there were no other interested buyers, found some that would at least look at information in a quickly established virtual data room which resulted in offers for the Assets. Prime's offer was the best, and it was selected as the stalking horse bidder. Prime, in order to have the time to perform its due diligence and determine what offer it would make for the Debtors' Assets, bought MidCap's position as the postpetition lender and then continued to finance the Debtors' on a limited basis. After completion of its due diligence, Prime made the $25 million offer for the Assets. In light of the fact that, at the beginning of these Cases when the Debtors were in a much more stable financial condition than they are now, St. Francis was supporting confirmation of

9

the Plan with a valuation of the Assets of approximately $15-25 million, the $25 million offer should have been one that St. Francis, which stands to receive the lion's share of the sale proceeds, would welcome. However, once again, much to the detriment of the Debtors and their creditors, St. Francis has refused to discuss resolution of these Cases and wants to take the Assets back through a credit bid.

In addition to the diminution of the value of the Debtors business and the increase in the amount of the claims of creditors caused by St. Francis' inequitable actions, there is no guarantee that if St. Francis ends up with the Assets that it will continue to operate the Debtors' business as a hospital for the benefit of the community. It has never committed to do so. To the contrary, when it announced to the parties in interest that it would not consummate the Plan, St. Francis did so on the basis of financial projections that showed substantial operating losses and based its refusal to proceed with the Plan on its alleged inability to deal with those losses. It must be assumed that St. Francis would, if it gets the ownership of the Debtors' hospitals, close them. The community needs the services of a non-profit hospital and Prime will continue to provide that service.

It is clear that St. Francis, at every turn, has taken steps that have devalued the Debtors' assets for the benefit of St. Francis in that such actions have severely limited the Debtors' options, and the actions have also increased the Debtors'

debts. These knowing and inequitable actions have caused substantial harm to the Debtors and their creditors.

## III.

## **ARGUMENT**

The Bankruptcy Code does not provide an inalienable right to credit bid. Pursuant to section 363(k) of the Bankruptcy Code, a secured creditor holding an "allowed claim" may be permitted to credit bid its liens on a debtor's assets in a section 363(k) sale, unless a court "for cause" orders otherwise. 11 U.S.C. § 363(k). Section 363(k) of the Bankruptcy Code, therefore, grants the Court the discretion to determine whether a secured creditor should have the right to credit bid. *In re NJ Affordable Homes Corp.*, 2006 WL 2128624 (Bankr. D. N.J.) *citations omitted*. "The term 'cause' is not defined in § 363 of the Bankruptcy Code, but it is intended to be a flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis." *Id.* at *16.

"Cause" may exist where a secured party's liens are subject to a "bona fide dispute," such as where the creditor's lien is subject to a claim of equitable subordination. *See, e.g., In re Daufuskie Island Props.*, LLC, 441 13.R. 60, 63-64 (Bankr. D.S.C. 2010) (finding where trustee and parties-in-interest filed adversary proceedings to invalidate or subordinate mortgage and claim, mortgage and claim

11

were disputed and secured creditor was not entitled to credit bid asserted mortgage); *Nat'l Bank of Commerce v. McMullan (In re McMullan)*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) ("At any such sale, [the secured creditor] shall not be entitled to offset bid any of its claimed liens or security interest under 11 U.S.C. § 363(k) (1994) because the validity of its liens and security interests are unresolved."), affirmed, 162 F.3d 1164 (8th Cir. 1998). This Court should deny St. Francis the right to credit bid because the Committee asserts that its lien should be equitably subordinated to the claims of all other creditors due to the inequitable actions of St. Francis as discussed above. [6]

Section 510(c) of the Bankruptcy Code empowers bankruptcy courts, in their discretion, to subordinate a claim under principles of equitable subordination where "subordination will promote just and equitable distribution of the bankruptcy estate." *Trone v. Smith (In re Westgate-California Corp.)*, 642 F. 2d 1174, 1177 (9th Cir. 1981) *citing Pepper v. Litton*, 308 U.S. 295, 60 S. Ct. 238, 84 L. Ed. 281 (1939). The Ninth Circuit has held that if a claimant has acted inequitably in its dealings with a debtor and that inequitable conduct has harmed the debtor or its creditors in some way, the claim of the bad actor should be

---

[6] If for any reason the Court determines that St. Francis should be allowed to exercise its right to credit bid, the Committee requests that the Court require St. Francis to place cash in the amount of its bid in escrow, pending the outcome of the Committee's equitable subordination claims.

subordinated.  *Westgate*, 642 F. 2d at 1178 *citing In re Ashswede*, 516 F. 2d 784, 788 (9th Cir. 1975).  It has also held that because bankruptcy courts exercise broad equitable power in subordinating claims, the review of such decisions is for an abuse of discretion.  *Spacek v. Thomen (In re Universal Farming Industries)*, 873 F. 2d 1334, 1337 (9th Cir. 1989) *citing In re Christian Life*, 821 F. 2d 1370, 1376 (9th Cir. 1987).

In addition, if the claimant that is the bad actor is an insider, less egregious conduct may support equitable subordination.  *Summit Coffee Co. v. Herby's Foods, Inc. (In re Herby's Foods, Inc.)*, 2 F. 3d 128, 131 (5th Cir. 1993).  St. Francis is an insider of the Debtors.  It appoints three members of the Debtors' nine member board and has veto power over the appointment to two more.  St. Francis conceived of and drafted the Plan; the Debtors simply approved it.  St. Francis paid down the accrued unpaid fees of the Debtors' general bankruptcy counsel relating to the 2010 pln.  St. Francis controlled management of the Debtors' sufficiently that it was able to have the CEO replaced and have the Debtors blindly accept the cash flow projections for the prepackaged Plan prepared by St. Francis. St. Francis was also privy to the Debtors' confidential information and was allowed by the Debtor to participate in the Debtors' discussions and negotiations with other parties regarding the Debtors' financial options.  Thus, St. Francis became an insider with fiduciary duties to other creditors because it

13

"entered into a special confidential relationship in the conduct of the business of the [Debtors] and [was] given access to information solely for corporate purposes." *Dirks v. SEC*, 463 U.S. 646, 655 n. 14 (U.S. 1983); see also *In re Wash, Mut., Inc.*, No. 08-12229, 2011 Bankr. LEXIS 3361 at 159-60. However, it is not necessary for the injured Debtors and creditors to establish the insider status of St. Francis because the inequitable actions of St. Francis harmed the Debtors and the creditors whether or not subjected to strict scrutiny as the actions of an insider.

As set forth above, St. Francis' inequitable conduct has consistently reduced the value of the Debtors' assets and increased the Debtors' debts, damaging the Debtors and their creditors. St. Francis' refusal to allow the Debtors to close HMC East or to sell it for a higher and better use separate and apart from HMC West because such action did not fit within St. Francis' charitable plan, rendered the Debtors increasingly insolvent, as St. Francis certainly knew it would. St. Francis maneuvered the Debtors into ceasing all efforts to market the hospitals, insisting instead that the Debtors' file bankruptcy and seek confirmation of a highly unusual prepackaged plan. Because of the Debtors' financial condition, the Debtors could not even settle Plan disputes with the Committee or CMS, but had to defer to St. Francis' desires. In turn, St. Francis refused to address or settle any opposition to the Plan. These actions virtually insured that the Debtors and the Committee would incur substantial administrative expenses litigating the confirmation of the

Plan, thereby further harming the Debtors and their creditors. Further, St. Francis, which was intimately familiar with the Debtors' financial condition, delayed response to CMS's imminently reasonable settlement offer for approximately six weeks while the Debtors' cash position and the value of their assets continued to deteriorate almost to the point of collapse. When the Debtors were sufficiently weakened, St. Francis announced that it would not proceed with the Plan that it had conceived and drafted or the settlement with the unsecured creditors which was approved by the Court. The six week delay again virtually insured that, in their weakened position, the Debtors would have little or no option available to them but to allow St. Francis to foreclose, St. Francis' current takeover method of choice.

St. Francis in its Objection states that, pursuant to the terms of the DIP Order, the Debtors and the Committee have stipulated that St. Francis' prepetition loan was secured by a valid and perfected lien and that the Committee has waived any and all claims against St. Francis. Surely St. Francis cannot be taking the position that any such stipulation or waiver applies to the inequitable and abusive acts it committed after the entry of the DIP Order. Such a prospective release would allow St. Francis to take any action it desired, including criminal acts, with no concern that it would have to answer to the Debtors or its creditors for such actions. Further, nothing in the DIP Order indicates any intent on the part of the parties to waive prospective claims. St. Francis cannot hide behind the DIP Order.

In addition, even if St. Francis' liens are not subject to equitable subordination, "[a] court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment." *See, e.g.*, 3 Collier on Bankruptcy 363.09[1] ("The Court might [deny credit bidding] if permitting the lienholder to bid would chill the bidding process.")." *Philadelphia Newspapers,* 599 F.3d at 316 n.14. Because St. Francis' secured claim is well in excess of the stalking horse bid, its credit bid will chill bidding, which constitutes grounds in and of itself to deny credit bidding.

Courts have also denied credit bidding where there have been bad acts. The Court in *In re Theroux*, 169 B.R. 498, 499 and n.3 (Bankr. D.R.I. 1994) noted that "there is no absolute entitlement to credit bid" even though creditor was oversecured because entire process was designed to benefit only the secured creditor. Additionally, the Court in *In re Aloha Airlines*, 2009 WL 1371950, at *8 (Bankr. D. Hawaii May 14, 2009) determined that "cause exists to deny the credit bid" under § 363(k) where the secured creditor has agreed to sell the purchased assets to a party that has been a bad actor and taken actions that have harmed the debtors. Similarly here, the Plan was designed strictly for the benefit of St. Francis to the detriment of the Debtor and its other creditors. Further, St. Francis actions

16

directly, not the actions of a third party, have caused the Debtors and their creditors harm.

St. Francis in its Objection also alleges that the Debtor and the Committee have previously agreed that St. Francis has the right to credit bid pursuant to paragraph 31 of the Final DIP Order, which provides in pertinent part that "subject to the indefeasible payment in full in cash of the DIP Obligations and the Intercreditor Agreement, each of the Prepetition Secured Parties shall have the right to credit bid with respect to any bulk or piecemeal sale of all or any portion of the Prepetition Collateral". Final DIP Order at ¶31.[7] This does nothing more than recognize the general right of a secured lender to credit bid. It in no way limits the Committee's ability to challenge St. Francis' right to exercise its right to credit bid. Also, like the stipulation and the waiver discussed above, even if this generic language somehow affirmed St. Francis' ability to exercise its credit bid right, it only did so as of the date the Final DIP Order was entered. It simply would be

---

[7] This quoted language raises another issue that St. Francis does not address in its Objection. This language forbids St. Francis from credit bidding unless the DIP Obligations, DIP Liens and DIP Superpriority Claims now owed to Prime are indefeasibly paid in full. St. Francis has never stated, much less established, that it has the ability to pay all amounts owed Prime under the DIP Facility. In its Objection it states that is should be deemed a qualified bidder and that it should not be required to submit an Over Bidder's Deposit. If the Court does allow St. Francis to credit bid, it should not be relieved of those requirement and, in fact, it should be required to prove that it has the ability to pay the DIP Lender, Prime, in full.

17

nonsensical to interpret this language as insulating St. Francis from being denied the right to credit bid "for cause" as provided in section 363(k) of the Bankruptcy Code no matter what it might do to harm the Debtors and the creditors after the entry of the DIP Order.

Through the actions of St. Francis, the Debtors ability to continue their operations and, thereby, to preserve the value of its assets was put into serious jeopardy and the claims against the Debtors have been substantially increased. St. Francis should not be rewarded with the right to exercise it right to credit bid under such circumstances, especially when the a credit bid by St. Francis will eliminate any possibility that other creditors will receive any distribution on their claims, many of which were caused by St. Francis' inequitable conduct.

Dated: December 15, 2011    WAGNER CHOI & VERBRUGGE

/s/ Chuck C. Choi
Chuck C. Choi
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: 808-566-1877
Facsimile: 808-566-6900

PACHULSKI STANG ZIEHL & JONES LLP
Samuel R. Maizel (CA Bar No. 189301)
Scotta E. McFarland (CA Bar No. 165391)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067-4100
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

Attorneys for the Official Committee of Unsecured Creditors