MCDONALD HOPKINS LLC
SHAWN M. RILEY (0037235) (Admitted Pro Hac Vice)
PAUL W. LINEHAN (0070116) (Admitted Pro Hac Vice)
JOHN A. POLINKO (0073967) (Admitted Pro Hac Vice)
600 Superior Avenue, East, Suite 2100
Cleveland, OH  44114-2653
Telephone:  (216) 348-5400
Facsimile:  (216) 348-5474
Email:    sriley@mcdonaldhopkins.com
          plinehan@mcdonaldhopkins.com
          jpolinko@mcdonaldhopkins.com

TSUGAWA BIEHL LAU & MUZZI
A HAWAII LIMITED LIABILITY LAW COMPANY
CHRISTOPHER J. MUZZI (6939)
Bishop Place
1132 Bishop Street, Suite 2400
Honolulu, HI  96813
Telephone:  (808) 531-0490
Facsimile (808) 534-0202
Email:  cmuzzi@hilaw.us

Co-Counsel to the Debtors and
Debtors in Possession

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>Hawaii Medical Center, et al.,[1]<br><br>      Debtors. | Case No. 11-01746<br>(Chapter 11 Case)<br>(Jointly Administered)<br>(Honorable Judge Faris) |
| This document relates to:<br>All Cases | |

---

[1]  The Debtors are as follows:  Hawaii Medical Center, a Hawaii non-profit corporation (Tax No. 20-3409838); Hawaii Medical Center East, a Hawaii non-profit corporation (Tax No. 51-0598670); and Hawaii Medical Center West, a Hawaii non-profit corporation (Tax No. 51-0598672).

**DEBTORS' MOTION FOR ORDER, PURSUANT TO SECTIONS 105, 362, 363, AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 4001 AND 9019, (I) APPROVING SETTLEMENT AMONG DEBTORS, OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND ST. FRANCIS; (II) AUTHORIZING SALE OF ASSETS AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES FREE AND CLEAR; (III) ESTABLISHING DEADLINES AND RELATED RELIEF FOR ADMINISTRATION OF THE ESTATES; AND (IV) AUTHORIZING <u>REJECTION OF CERTAIN EXECUTORY CONTRACTS AND LEASES</u>**

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ............................................................1

II.   BACKGROUND ...................................................................4

    A.   The Prior Chapter 11 Cases .......................................4

    B.   The Present Chapter 11 Cases and Disputes. ........................10

    C.   The Settlement Agreement ........................................18

III.  JURISDICTION AND VENUE ..........................................21

IV.   ARGUMENT ...................................................................21

    A.   This Court Should Approve the Settlement Agreement ...............................................................21

        1.   Probability of Success Favors Settlement ....................23

        2.   Complexity of Issues Favors Approval of the Settlement Agreement ...................................27

        3.   Paramount Interest of Creditors ....................................27

        4.   Difficulties in Collection .................................................28

        5.   The Settlement Agreement Is the Result of Good Faith and Arms'-Length Negotiations ...................28

    B.   The Transfer of Assets to St. Francis Is Appropriate under Section 363 and Rule 9019...........................................29

        1.   The Sale Is Made in Good Faith ....................................32

        2.   The Sale of The Transferred Assets Should Be Free and Clear ..........................................................33

        3.   Assumption and Assignment of Executory Contracts Is Appropriate .................................................34

C.  The Court Should Implement Additional Procedures
for the Efficient Administration of These Cases........................37

    1.  Appointment of Scouler as Responsible
        Person ............................................................................37

    2.  Establishment of an Administrative Claims Bar
        Date ................................................................................38

    3.  The Court Should Establish a Schedule for
        Consideration of Fee Applications for
        Professionals Paid by the Estate ...................................43

    4.  Withdrawal of Motions to Dismiss and Entry of
        a Final Decree in the Prior Chapter 11 Cases................44

D.  The Court Should Approve the Rejection of the
Rejected Contracts and Leases. ............................................44

V.  CONCLUSION .................................................................................46

U.S. Bankruptcy Court - Hawaii   #11-01746   Dkt # 481   Filed 03/30/12   Page 4 of 54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AEG Acquisition Corp.*,
   127 B.R. 34 (Bankr. C.D. Cal. 1991).....................................................35

*In re Beker Indus. Corp.*,
   63 B.R. 474 (Bankr. S.D.N.Y. 1986) ...................................................34

*In re Blair*,
   538 F.2d 849 (9th Cir. 1976)................................................................22

*In re Bowman*,
   194 B.R. 227 (Bankr. D. Ariz. 1995).....................................................35

*In re Carla Leather*,
   44 B.R. 457 (Bankr. S.D.N.Y. 1984) ...................................................22

*In re Cochise College Park, Inc.*,
   703 F.2d 1339 (9th Cir. 1983)..............................................................35

*In re Continental Air Lines, Inc.*,
   780 F.2d 1223 (5th Cir. 1986).........................................................30, 31

*In re Federated Dep't Stores, Inc.*,
   131 B.R. 808 (S.D. Ohio 1991) ...........................................................45

*In re Gaslight Club, Inc.*,
   782 F.2d 767 (7th Cir. 1986).........................................................37, 38

*In re Lionel Corp.*,
   722 F.2d 1063 (2d Cir. 1983)...............................................................30

*In re Patterson*,
   119 B.R. 59 (E.D. Pa. 1990) ...............................................................45

*In re Terrace Gardens Park P'ship*,
   96 B.R. 707 (Bankr. W.D. Tex. 1989) .................................................34

U.S. Bankruptcy Court - Hawaii  #11-01746  Dkt # 481  Filed 03/30/12  Page 5 of 54

*In re W.T. Grant & Co.*,
   699 F.2d 599 (2d. Cir. 1983)...................................................................22

*In re Walsh Construction, Inc.*,
   669 F.2d 1325 (9th Cir. 1982)................................................................22

*In re Walter*,
   83 B.R. 14 (B.A.P. 9th Cir. 1988).....................................................30, 31

*In re Wilde Horse Enterprises, Inc.*,
   136 B.R. 830 (Bankr. C.D. Cal. 1991)............................................30, 32

*Kashani v. Imperial Bank*,
   1995 U.S. App. LEXIS 5897, *5-6 (9th Cir. 1995 ................................22

*Lambert v. Flight Transportation*,
   730 F.2d 1128 (8th Cir.1984)................................................................23

*Lubrizol Enter., Inc. v. Richmond Metal Finishers*,
   756 F.2d 1043 (4th Cir. 1985)..............................................................46

*Martin v. Kane (In re A&C Properties)*,
   784 F.2d 1377 (9th Cir. 1986)..............................................................22

*NLRB v. Bildisco & Bildisco*,
   682 F.2d 72 (3d Cir. 1982)...................................................................45

*Reavis & McGrath v. Antinore*,
   469 U.S. 1207 (1985) ...........................................................................23

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*,
   872 F.2d 36 (3d Cir. 1989)...................................................................45

*United States of America v. Alaska Nat'l Bank of the North*,
   669 F.2d 1325 (9th Cir. 1982)..............................................................22

*University Med. Ctr. v. Sullivan*,
   973 F.2d 1065 (3d Cir. 1992)...............................................................44

*Westbury Real Estate Ventures, Inc. v. Bradlees, Inc.*,
   194 B.R. 555 (Bankr. S.D.N.Y. 1996) .................................................45

**Statutes**

11 U.S.C. § 1126 ...................................................................6

11 U.S.C. § 1129 ...................................................................6

11 U.S.C. § 363 ............................................................ passim

11 U.S.C. § 365 .........................................................34, 35, 44

11 U.S.C. § 503 .........................................................13, 38, 41

28 U.S.C. § 1334 .................................................................21

28 U.S.C. §§1408 ................................................................21

28 U.S.C. § 1409 .................................................................21

28 U.S.C. § 157 ..................................................................21

28 U.S.C. § 157 ..................................................................21

**Rules**

Bankruptcy Rule 9019(a)..................................................21, 29

# I. PRELIMINARY STATEMENT

By this Motion, the Hawaii Medical Center ("HMC"), Hawaii Medical Center East ("HMCE"), and Hawaii Medical Center West ("HMCW"), as debtors and debtors-in-possession (collectively, the "Debtors") seek entry of an order, pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and Rules 4001 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), granting the following relief:

(a) Approval of a global settlement, attached hereto as Exhibit A (the "Settlement Agreement"), among the Debtors, the Official Committee of Unsecured Creditors (the "Committee"), and St. Francis Healthcare System of Hawaii, as Agent, St. Francis Medical Center, and St. Francis Medical Center – West (collectively, "St. Francis"), that includes the use of cash collateral for the benefit of the Debtors' estates, the release of claims of the Debtors' estates against St. Francis, and the transfer of assets to St. Francis.

(b) Approval of the transfer of assets (including the assumption and assignment of certain executory contracts and unexpired leases) to St. Francis free and clear of liens, claims, interests and encumbrances as a component of the Settlement Agreement.

(c) Appointment of Mr. Dan Scouler as the Debtors' responsible person to complete the administration of these chapter 11 cases.

(d) Establishment of certain deadlines for the future administration of these chapter 11 cases, such as deadlines to file administrative claims and for professionals paid by the estate to file fee applications; and

(e) Approval of the rejection of certain executory contracts and unexpired leases.

The Settlement Agreement is the unfortunate result of the failure of the Debtors' businesses. This Court is well aware of the Debtors' financial difficulties and stay in chapter 11, both during the two years of their first chapter 11 cases (the "Prior Chapter 11 Cases"), and the tumultuous six months of their second chapter 11 cases (the "Present Chapter 11 Cases") filed on June 21, 2011 (the "Petition Date"). Unfortunately, following confirmation of the 2010 Plan (defined below), the Debtors could not improve their financial condition despite the benefits of converting to nonprofit entities and emerging from the Prior Chapter 11 Cases.

Additionally, the Debtors encountered new challenges, including, among others, the previously reported Stark Law issues. Those challenges proved insurmountable, as evidenced by the Debtors' inability to confirm a second, standalone plan of reorganization failed and, thereafter, to find a buyer of the Debtors' business as a going concern on terms that were acceptable to the Debtors' secured creditors. As a result, the Debtors were

left with very limited options other than protracted litigation with their secured creditors, including St. Francis.

Rather than pursue uncertain litigation in the face of mounting administrative expenses, as announced before the Court on December 16, 2011, the Debtors, the Committee, and St. Francis reached an agreement in principle to resolve all disputes among them. A key component of the settlement was the Debtors' decision to cease operations immediately and commence an orderly wind down of their businesses that would ensure the safety and health of the Debtors' patients. The Debtors accomplished this feat in just a few weeks, all the while focusing on patient safety.

Another key component, and benefit for the Debtors' estates, of the settlement is St. Francis' consent to the Debtors' use of up to $16.7 million of St. Francis' cash collateral to fund the winding down of the Debtors' businesses and the payment of administrative expenses. While it was originally estimated that this amount would be sufficient to satisfy all allowed administrative expenses, the Debtors do not believe that this is correct. In addition to the Wind Down Fund provided by St. Francis, the Debtors are evaluating their remaining claims and causes of action, such as avoidance recoveries, that could result in additional funds being available for creditors holding allowed administrative claims.

In consideration for the significant funds provided by St. Francis, the Debtors and the Committee have agreed to waive all claims against St. Francis and to promptly transfer the Debtors' assets to St. Francis free and clear of liens, claims, interests and encumbrances. The prompt transfer of the assets to St. Francis will also benefit the Debtors' estates by reducing future administrative expenses.

Overall, the Settlement Agreement is the product of extensive negotiations among parties and provides the best opportunity for administrative creditors to be paid for their claims. Moreover, by returning the hospitals to St. Francis, hope still exists that someone may reinvest, renovate, repurpose and possibly reopen the hospitals to continue to serve the community's healthcare needs.

The Debtors believe that the Settlement Agreement and the transactions contemplated therein are in the best interests of the Debtors' estates and administrative creditors and should be approved.

## II.  BACKGROUND

**A.    The Prior Chapter 11 Cases**

In January, 2007, Hawaii Medical Center, LLC, a Hawaii limited liability company,[2] purchased the two hospital campuses, one in Liliha

---

[2]  Hawaii Medical Center, LLC is the predecessor to Debtor Hawaii Medical Center.

(Hawaii Medical Center East, commonly referred to as "HMC East") and the other in Ewa Beach (Hawaii Medical Center West, commonly referred to as "HMC West") from St. Francis.[3]

To fund the purchase of the hospitals and provide adequate working capital, HMC, HMC East and HMC West, as borrowers, entered into certain loan agreements with St. Francis and Siemens Financial Services, Inc. ("Siemens"). Initially, the aggregate amount due and owing under the loan agreements was in excess of $69 million.

Following the acquisition of the hospitals in January of 2007 through August of 2008, HMC and its affiliates suffered significant operating losses. Contributing to such losses were several factors, including, but not limited to, the cost of patient care exceeding actual reimbursement and overstaffing. HMC and its affiliates instituted several initiatives to reduce losses and increase revenues while, at the same time, working to address various defaults under the loan agreement with Siemens.

HMC, its affiliates, and Siemens expended significant time discussing and negotiating the various defaults under the loan agreement, entering into a forbearance agreement, thereafter amended and revised on several

---

[3] CHA Hawaii, LLC ("CHA Hawaii"), a subsidiary of Cardiovascular Hospitals of America, LLC ("CHA"), provided management services to the Debtors subsequent to the purchase from St. Francis.

occasions. Ultimately, HMC and its affiliates were left with little choice but to seek bankruptcy protection and, on August 29, 2008, HMC and its affiliates filed the Prior Chapter 11 Cases, seeking relief under chapter 11 of the Bankruptcy Code.[4]

On April 10, 2010, HMC, its affiliated debtors, and the Official Committee of Unsecured Creditors (appointed in the Prior Chapter 11 Cases) filed their *First Amended Disclosure Statement for First Amended Joint Plan of Reorganization for Hawaii Medical Center, LLC, Hawaii Medical Center East, LLC, and Hawaii Medical Center West, LLC Proposed by the Official Committee of Unsecured Creditors, Hawaii Medical Center, LLC, Hawaii Medical Center East, LLC, and Hawaii Medical Center West, LLC, and Hawaii Physicians Group, LLC*, and, on that same day, their *First Amended Joint Plan of Reorganization.*

On May 28, 2010, the Court entered its *Findings of Fact, Conclusions of Law, and Order Under 11 U.S.C. §§ 1126 and 1129(A) and (B) and Fed. R. Bankr. P. 3020 Confirming the First Amended Joint Plan of Reorganization for Hawaii Medical Center, LLC, Hawaii Medical Center*

---

[4] The debtors in the 2008 Chapter 11 Bankruptcy Filing included: CHA Hawaii, LLC, a Delaware limited liability company (Tax No. xx-xxx7186); Hawaii Medical Center LLC, a Hawaii limited liability company (Tax No. xx-xxx9838); Hawaii Medical Center East, LLC, a Hawaii limited liability company (Tax No. xx-xxx8670); and Hawaii Medical Center West, LLC, a Hawaii limited liability company (Tax No. xxx-xxx8672).

*East, LLC, and Hawaii Medical Center West, LLC Proposed by the Official Committee of Unsecured Creditors, Hawaii Medical Center, LLC, Hawaii Medical Center East, LLC, and Hawaii Medical Center West, LLC, and Hawaii Physicians Group, LLC* (the "2010 Plan Confirmation Order"), which confirmed the revised *First Amended Joint Plan of Reorganization for Hawaii Medical Center, LLC, Hawaii Medical Center East, LLC, and Hawaii Medical Center West, LLC Proposed by the Official Committee of Unsecured Creditors, Hawaii Medical Center, LLC, Hawaii Medical Center East, LLC, and Hawaii Medical Center West, LLC, and Hawaii Physicians Group, LLC* attached to the 2010 Plan Confirmation Order (the "2010 Plan").

Pursuant to the terms of the 2010 Plan, HMC and its affiliated debtors, then each Hawaii limited liability companies, converted to new, Hawaii non-profit corporations. Furthermore, CHA Hawaii, one of HMC's affiliated debtors and a subsidiary of Cardiovascular Hospitals of America, LLC, was, upon emergence, to discontinue any involvement in the management of HMC, HMC East and HMC West. CHA Hawaii did, in fact, cease involvement in the management of HMC, HMC East and HMC West and its chapter 11 case has since been dismissed. The remaining chapter 11 cases remain open.

{3686253:}

U.S. Bankruptcy Court - Hawaii   #11-01746   Dkt # 481   Filed  03/30/12   Page 14 of 54

MidCap Financial LLC ("MidCap") served as the Debtors "exit lender" under the 2010 Plan. On August 17, 2010, the Debtors and MidCap executed that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Prepetition MidCap Revolving Loan Agreement"), along with all agreements, documents, notes and instruments in respect thereof, pursuant to which MidCap made loans and extended other financial accommodations to the Debtors prior to the Petition Date (the "Prepetition MidCap Revolving Loan"). As of the Petition Date, the principal balance of the Prepetition MidCap Revolving Loan was approximately $7,676,495.

The Debtors' obligations with respect to the Prepetition MidCap Revolving Loan were secured by MidCap's first priority lien on, among other things: (i) all Accounts (as defined in the Prepetition MidCap Revolving Loan Agreement, Annex I), and payment intangibles, instruments and other rights to receive payment of the Debtors related to the Accounts; (ii) all general intangibles (including, without limitation, contract rights and intellectual property), chattel paper, documents, letter-of-credit rights and commercial tort claims; (iii) all Lockbox Accounts (as defined in the Prepetition MidCap Revolving Loan Agreement), and all deposit accounts of the Debtors (other than the SFMC Collateral Account

(as defined in the Prepetition MidCap Revolving Loan Agreement)); and (iv) all books and records of the Debtors evidencing or relating to or associated with any of the foregoing (collectively, the "<u>First Lien Collateral</u>").

MidCap held a second priority lien on, among other things, all right, title and interest of the Debtors in and to all property (other than the First Lien Collateral), including, without limitation accounts (as defined in the UCC) other than Accounts subject to a prior security interest of SFMC (collectively, the "<u>Second Lien Collateral</u>").

On August 17, 2010, in connection with the effective date of the 2010 Plan, the Debtors and St. Francis Healthcare System of Hawaii, a Hawaii nonprofit corporation, as Lender and Agent for the Lenders, St. Francis Medical Center, as Lender, and St. Francis Medical Center – West, as Lender, entered into that certain Term Loan A Loan Agreement (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "<u>Prepetition SFMC Term Loan</u>"), along with all agreements, documents, notes and instruments in respect thereof, in which SFMC made loans and extended other financial accommodations to the Debtors prior to the Petition Date. As of the Petition Date, the principal

balance owed on the Prepetition SFMC Term Loan was approximately $39,175,277.

The Debtors' obligations with respect to the Prepetition SFMC Term Loan are secured by SFMC's first priority lien on, among other things, all real property in which the Debtors are fee simple owners, the SFMC Collateral Account, and all collateral described in the Collateral Documents made part of, and associated with, the Prepetition SFMC Term Loan other than the First Lien Collateral, on which SFMC holds a second priority lien subject to MidCap's prior lien.

## B. The Present Chapter 11 Cases and Disputes.

Following their emergence from the Prior Chapter 11 Cases, the Debtors suffered numerous setbacks that did not allow them to reach the projected goals set forth in the 2010 Plan, nor meet their financial obligations going forward. Although the Debtors were able to achieve some of the tax savings projected through their conversion to Hawaii non-profit corporations, and, further, although the Debtors made certain operational adjustments and took steps to reduce overhead, the Debtors could not generate sufficient revenues to service their debt obligations and meet other needs.

On or about December 31, 2010, the Debtors defaulted on their debt service obligations under the 2010 Plan, which caused additional defaults under the Prepetition MidCap Revolving Loan Agreement and the Prepetition St. Francis Term Loan. Faced with such defaults, and considering the continued decline in revenue, the Debtors approached St. Francis and MidCap to discuss a strategy to relieve the stresses on the hospitals, while also addressing the Debtors' liquidity issues, including their debt service obligations. Such strategies to avert financial crisis included, among others, extending payment terms.

After significant negotiations, however, the Debtors' determined that the best solution for the hospitals, all of their creditors, and the community was to work with St. Francis and MidCap to form a plan of reorganization. As part of the proposed reorganization mutually agreed upon at that time by the Debtors, St. Francis and MidCap, the Debtors believed it to be in the best interests of all parties involved to return the hospitals to the control of St. Francis through the filing of voluntary petitions for chapter 11 protection and the discharge of debts.

On June 20, 2011, the day prior to the Petition Date, the Debtors, St. Francis, and MidCap entered into that certain Restructuring Support Agreement in which they agreed to support confirmation of the plan of

reorganization described therein and filed by the Debtors on June 21, 2011 (the "2011 Plan"). The 2011 Plan contained several conditions to the occurrence of the effective date, including, among other things: (i) maximum estimated amounts for certain administrative claims, non-priority tax claims, and priority tax claims; (ii) limitations on claims asserted by the Centers for Medicare & Medicaid Services ("CMS"); (iii) the non-occurrence of an event of default under postpetition financing facility between the Debtors and MidCap; and (iv) the timely confirmation of the Plan. The Restructuring Support Agreement similarly contained numerous termination events, including, among others, the occurrence of an event of default under the DIP Facility, the occurrence of an outside date, and the absence of a material adverse change in the business of the Debtors. The Restructuring Support Agreement was never amended by the Debtors, St. Francis and MidCap.

On the Petition Date, the Debtors filed voluntary petitions for relief commencing cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Hawaii (Honolulu) (the "Bankruptcy Court"), designated Bankruptcy Case Numbers 11-01746, 11-01747, and 11-01748 (the "Present Chapter 11 Cases"). The Debtors are continuing in possession of their property, and, until fairly recently, were

operating and managing their business, as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed. The Committee was formed on June 29, 2011.

Shortly after the commencement of the Debtors' cases, the Court entered an interim order authorizing the Debtors to enter into the DIP Facility and use cash collateral. On July 25, 2011, the Court entered its *Agreed Final Order (I) Authorizing Post-Petition Secured Financing Pursuant to Sections 105, 3561, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 503(b) of the Bankruptcy Code; (II) Authorizing The Debtors To Use Cash Collateral Pursuant To Section 363 Of The Bankruptcy Code; (III) Providing Adequate Protection To The Prepetition Secured Parties Pursuant To Sections 361, 362, And 363 Of The Bankruptcy Code; (IV) Modifying The Automatic Stay Pursuant To Section 362(d) Of The Bankruptcy Code; (V) Authorizing Execution Of Postpetition Amendment To Prepetition Revolving Credit Agreement; And (VI) Providing Related Relief* (the "Final DIP Order"). Among other things, under the Final DIP Order, the Debtors stipulated that the Prepetition SFMC Term Loan was secured by valid and perfected liens against substantially all of the Debtors' property, as described in the Prepetition SFMC Term Loan Agreement and

related documents, and waived any and all claims against St. Francis. The Debtors' admissions and waivers in the Final DIP Order became binding on the Committee and parties in interest on August 17, 2011, the date upon which the challenge period provided under the Final DIP Order expired.

The Committee initially opposed confirmation of the 2011 Plan and engaged in extensive discovery. However, prior to the commencement of the confirmation hearing for the 2011 Plan, the Debtors, the Committee, and St. Francis reached an agreement in principle to resolve the Committee's objections to confirmation of the 2011 Plan. That settlement was conditioned upon future resolution of the Debtors' disputes with CMS.

On October 3, 2011, MidCap advised the Debtors that as a result of the issuance by CMS to the Hawaii Department of Human Services of a *Notice of Request for Administrative Freeze Related to Recovery of Medicare Overpayments from HMCE and HMCW* dated September 29, 2011, pursuant to which CMS notified Hawaii Medicaid to withhold the federal share of all Medicaid payments owed to HMCE and HMCW, a DIP Facility Termination Event occurred. MidCap asserted that it was not obligated to advance any further amounts under the DIP Facility and, as a result, only made protective advances thereafter.

14

Additionally, St. Francis asserted that, as the result of, among other things, the occurrence of the Outside Date (as defined in the Restructuring Support Agreement), the inability to satisfy the conditions to the occurrence of the effective date of the 2011 Plan, and the termination of the DIP Facility, the Restructuring Support Agreement also terminated. In light of St. Francis' determination that the Restructuring Support Agreement terminated, St. Francis advised the Debtors that it could not support the Debtors' efforts to confirm the 2011 Plan, including any amendments and waivers to the 2011 Plan that would be required to obtain confirmation.

Immediately thereafter, the Debtors and the Committee commenced efforts to find potential purchasers for substantially all of the Debtors' assets as a going concern. In a short period of time, the Debtors met with several interested parties and received several expressions of interest. As a result of the efforts of the Debtors and the Committee, CMS agreed to forbear, to some extent, on its request for an administrative freeze on the federal share of all Medicaid payments owed to HMCE and HMCW. MidCap, in light of the agreement by CMS, agreed to continue to make protective advances to the Debtors on a very limited basis.

As the Debtors and the Committee sought out potential purchasers, Prime Healthcare Los Angeles LLC, an affiliate of entities that expressed

interest in the Debtors' assets, purchased MidCap's claims against the Debtors' estates, including MidCap's claims under the DIP Facility. Thereafter, the Debtors were presented with an offer by Prime Healthcare Foundation, Prime A Investments, LLC and Bio-Med Services – Hawaii, Inc. (collectively, "Prime") to purchase the Debtors' assets for $25 million, subject to certain offsets and purchase price adjustments.

As the Debtors did not receive any other viable offers, the Debtors selected Prime as the stalking horse bidder and on December 7, 2011, filed a *Motion for Order (1) Approving the Bidding Procedures and Bid Protections Utilized in Connection with the Proposed Sale of Substantially All Assets of the Estates Free and Clear of Liens; (2) Scheduling an Auction for the Sale and a Hearing to Approve the Sale; and (3) Granting Related Relief* (the "Bid Procedures Motion"). Simultaneously, the Debtors filed a *Motion for Order Approving: (1) the Sale of Substantially All of the Assets of the Estate Free and Clear of Liens; (2) Assumption and Assignment of Leases and Executory Contracts in Connection with the Sale; (3) the Form of Asset Purchase Agreement in Connection with the Sale; (4) the Form and Manner of Notice; and (5) Other Related Relief* ("Sale Motion").

Collectively, the Bidding Procedures Motion and Sale Motion sought court approval of a proposed sale of assets to Prime. The Debtors estimated that, after certain sale price adjustments, payment of, among other claims, outstanding real estate taxes, cure costs, accrued employee payroll and paid time off, allowed administrative claims, the DIP Facility, an amount to settle the issues between the Debtors and CMS, and Court and United States Trustee-related fees, the estimated remaining sale proceeds available for St. Francis could have totaled approximately $11,285,000 or less.

The Debtors sought to sell their assets to Prime, free and clear of any and all liens, claims and interests and encumbrances (including St. Francis' liens), and also proposed to pay Prime a break-up fee of $625,000 in the event that another buyer was selected or the Debtors did not consummate the sale with Prime.

On December 13, 2011, St. Francis filed its Objection to the Bidding Procedures Motion (the "St. Francis Objection"). St. Francis, based on its status as a secured creditor, asserted a right to credit bid at the sale auction pursuant to section 363(k) of the Bankruptcy Code to preserve the value of its collateral. Additionally, it was St. Francis' contention that, without the right to credit bid, it would have been forced to accept the

U.S. Bankruptcy Court - Hawaii   #11-01746   Dkt # 481   Filed  03/30/12   Page 24 of 54

purchase price of the sale to Prime, subject to the Debtors' proposed distribution of the sale proceeds in violation of the priorities of the Bankruptcy Code. Furthermore, St. Francis disputed the potential break-up fee that could potentially have been awarded to Prime.

On December 15, 2011, the Committee filed a limited response to the St. Francis Objection (the "Committee Response"), alleging certain conduct by St. Francis during the pendency of the Bankruptcy Cases that it requested the Court consider and, as a consequence of the alleged conduct, requested that the Court use its equitable powers to preclude St. Francis from exercising any right to credit bid at the sale auction. Furthermore, the Committee and the Debtors' argued that other equitable grounds existed to support the Debtors' proposed distribution of the sale proceeds to other creditor constituencies before any distribution would be made to St. Francis.

## C.    The Settlement Agreement

Prior to the hearing on the Bidding Procedures Motion, the Debtors, the Committee, and St. Francis reached an agreement in principle to resolve the estate's claims against St. Francis, St. Francis' claims against the Debtors' assets, and the future administration of the cases. That settlement involved the Debtors immediately ceasing operations, St.

Francis consenting to the Debtors' use of up to $16.7 million of St. Francis' cash collateral, and the Debtors' agreement to transfer their assets to St. Francis on account of St. Francis' secured claims. After announcement of the principle terms of the settlement, the Debtors commenced winding down their operations, including the safe transition of patients to other health-care facilities.

During this time, the Debtors, the Committee, and St. Francis finalized the terms of the settlement as set forth in the Settlement Agreement attached as <u>Exhibit A</u>. The material terms of the Settlement Agreement are as follows:[2]

   (a)   <u>Settlement Effective Date</u>: Section 2.1 of the Settlement Agreement provides that the agreement will become effective and binding on the Parties on the first business day when the last of two events has occurred (the "<u>Settlement Effective Date</u>"): (1) the Parties shall have fully executed this Agreement, and (2) the Bankruptcy Court shall have entered an order approving this Agreement in form and substance acceptable to St. Francis (the "<u>Settlement Order</u>").

   (b)   <u>Use of Cash Collateral</u>: St. Francis will consent to the use of $16.7 million of Cash Collateral to fund all disbursements made on and after December 16, 2011, including disbursements for the winding down of the Debtors' business, the payment of allowed administrative claims and other claims as set forth in this Agreement on or after

---

[2] Terms not otherwise defined herein shall have the meanings set forth in the Settlement Agreement. In addition, to the extent of any inconsistency between the terms of the Settlement Agreement and the summary provided in this Motion, the terms of the Settlement Agreement shall control.

December 19, 2011 (the "Wind Down Fund").

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████.

(c)     Waiver and Release of Claims against St. Francis:
Sections 4.1 through 4.4 of the Settlement Agreement provide
for a complete general release on the Settlement Effective
Date, of all disputes and claims of the Debtors, their estates,
and the Committee against St. Francis, along with covenants
not to sue.

(d)     Transfer of Assets to St. Francis:   Section 5.1
provides that upon the Settlement Effective Date, the Debtors
will transfer to St. Francis, free and clear of all liens, claims,
encumbrances, all of the Debtors' right, title and interest in and
to the Transferred Assets, as described in the Settlement
Agreement and on Exhibit 1 to the Settlement Agreement.  The
Debtors will also assume and assign to St. Francis the
Transferred Contracts and Leases set forth on Exhibit 2 to the
Settlement Agreement.

(e)     Preservation of Assets: Section 7.1 provides that
from the Execution Date until the Settlement Effective Date, the
Debtors shall preserve the Transferred Assets.

(f)     Wind Down of the Estates: Section 8.1 of the
Settlement Agreement provides for the liquidation and wind
down of the Estates and requires the Settlement Order to
include the following relief:

i.     The appointment of Dan Scouler as the
responsible person for the Debtors with authority to
administer the Estates;

ii.     Within seven days of the entry of the
Settlement Order, the professionals entitled to be paid by
the Estates shall file applications for compensation and

be authorized to receive a distribution of up to 35% of the fees and expenses allowed by the Bankruptcy Court, which shall include the increased carveout under the Final DIP Order of $550,000, with further distributions to be made in his judgment.

        iii.    The Bankruptcy Court will establish an administrative claims bar date of 30 days after the entry of the Settlement Order.

        iv.    The Committee shall be dissolved on the Settlement Effective Date and professionals retained by the Committee may file applications for compensation with the Bankruptcy Court as set forth above.

## III.  JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The venue of the Bankruptcy Cases is proper pursuant to 28 U.S.C. §§1408 and 1409.

## IV.  ARGUMENT

### A.  This Court Should Approve the Settlement Agreement

The Debtors submit that the Settlement Agreement is in the best interest of their estates and should be approved as a settlement of the parties' disputes under Bankruptcy Rule 9019.  Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).

{3686253:}

The approval or rejection of a proposed compromise is within the discretion of the Court and is to be determined by the particular circumstances of each case. *See United States of America v. Alaska Nat'l Bank of the North (In re Walsh Constr., Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982). "A bankruptcy court has wide latitude in approving compromise agreements which it determines to be fair, reasonable and adequate." *Kashani v. Imperial Bank (In re Kashani)*, 1995 U.S. App. LEXIS 5897, *5-6 (9th Cir. 1995 (citing *In re Woodson*, 839 F.2d 610, 620 (9th Cir. 1988), and *Martin v. Kane (In re A&C Properties)*, 784 F.2d 1377, 1382 (9th Cir. 1986)). A court, however, should not substitute its own judgment for the judgment of a trustee. *See In re Carla Leather*, 44 B.R. 457, 465 (Bankr. S.D.N.Y. 1984). In reviewing a proposed settlement, a court is not "to decide the numerous questions of law and fact . . . but rather to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re W.T. Grant & Co.*, 699 F.2d 599, 608 (2d. Cir. 1983), *cert. denied*, 464 U.S. 822 (1983). A "mini-trial" on the merits of the underlying cause of action is not required and should not be undertaken by the Court. *See In re Blair*, 538 F.2d 849 (9th Cir. 1976); *see also In re Walsh Construction, Inc.*, 669 F.2d 1325 (9th Cir. 1982).

In determining the acceptability of a proposed compromise, the following four factors should be considered:

> (a) The probability of success in the litigation;
>
> (b) The difficulties, if any, to be encountered in the matters of collections;
>
> (c) The complexity of the litigation and the expense, inconvenience and delay necessarily attending it; and
>
> (d) The paramount interest of the creditors and the proper deference to their reasonable views.

*See, A&C Properties*, 784 F.2d at 1381; *see also, Lambert v. Flight Transportation (Flight Transportation Corporation Securities Litigation)*, 730 F.2d 1128, 1135 (8th Cir.1984); *cert. denied nom, Reavis & McGrath v. Antinore*, 469 U.S. 1207 (1985).

As shown below, the Settlement Agreement falls well above the low end of the range of reasonable outcomes and should be approved.

## 1. Probability of Success Favors Settlement

The Debtors and the Committee have alleged that claims may exist under section 510(c) of the Bankruptcy Code to equitably subordinate St. Francis' claims and liens to junior creditors. As set forth in the Bidding Procedures Motion and the Committee Response, it was the Debtors' and the Committee's positions that these claims required the Bankruptcy Court to find and determine that St. Francis engaged in inequitable conduct.

The Committee alleged that St. Francis' conduct during the Bankruptcy Cases supported the imposition of equitable subordination. The Committee has contended that St. Francis was an insider of the Debtors by virtue of St. Francis' right to appoint members to the Debtors' board of directors, in addition to St. Francis' support of a plan of reorganization that failed and caused the increase of claims of the Debtors' estates. The Committee further asserted that St. Francis effectively reduced the value of the Debtors' assets by refusing to settle objections raised by the Committee to the Plan, delaying a response to CMS, and hindering the Debtors' efforts to sell their businesses to a third party for no less than $25 million. In summary, the Committee alleged that St. Francis' conduct deprived creditors from recovering value in the Present Chapter 11 Cases.

St. Francis, however, asserted that the claims raised by the Debtors and the Committee had no merit. First, St. Francis disputed that it engaged in any inequitable conduct; arguing instead that its conduct both prior to the commencement of the Present Chapter 11 Cases and thereafter was consistent and within its rights as a secured creditor holding a senior position in the Present Chapter 11 Cases by virtue of its liens in all of the Debtors' assets. St. Francis' position was that until the Debtors' assets

could be shown to be worth more than St. Francis' claims, St. Francis had the right to protect and preserve its senior claims and rights in its collateral.

Second, St. Francis asserted that the Debtors, the Committee, and all parties in interest, by failing to challenge any of the Debtors' admissions under the Final DIP Order, including that nonexistence of claims against St. Francis, waived any and all claims against St. Francis arising prior to the expiration of the challenge period under the Final DIP Order in August 2011 – including any claims for equitable subordination. It was St. Francis' position that the overwhelming majority of the allegations raised by the Committee occurred prior to the expiration of the challenge period under the Final DIP Order and that the Court would give no consideration to those claims.

Lastly, based on St. Francis' position that the Restructuring Support Agreement had terminated, St. Francis asserted that it had no further contractual or other obligation to support the 2011 Plan (or any amended plan that may have included additional obligations) or the Debtors' sale efforts. In addition, St. Francis believed that it was well within its rights, as a secured creditor, to assert the right to credit bid at any sale. Moreover, it was St. Francis' contention that it did not preclude the Debtors' efforts to find a third party buyer for the assets. Instead, St. Francis asserted that it

cooperated with the Debtors throughout the sale process, only asserting credit bid rights to protect against the sale of its collateral for less than that what was owed to St. Francis, as is a secured creditor's right.

The Settlement Agreement reaches a compromise of these issues that the Debtors' believe benefits all parties. On the one hand, St. Francis has agreed to provide value to the Debtors' estates in the form of up to $16.7 million in cash to fund the final administration of the Debtors' estates. A portion of these funds have already been used to complete the safe and orderly winding down of operations, including the transfer of all of the Debtors' patients, and to repay the outstanding obligations under the DIP Facility. In addition, the Settlement Agreement relieves the Debtors of the continued operation of the Debtors' assets, which have proven to be a cash draining operation.

On the other hand, St. Francis will receive releases of claims from the Debtors' estates to avoid further litigation and will receive title to the collateral securing its interests. If the Debtors and the Committee did not succeed on their equitable subordination claims, it is likely that St. Francis would foreclose on its collateral and the Debtors' estates would have no funds to pay any administrative creditors.

Accordingly, the recoveries under the Settlement Agreement fall above the lowest end of the range of reasonable outcomes.

## 2. Complexity of Issues Favors Approval of the Settlement Agreement

The disputes among the Debtors, the Committee, and St. Francis have already proven to be both lengthy and costly. The Debtors, the Committee, and St. Francis already engaged in extensive discovery concerning disputes over confirmation of the 2011 Plan. Moreover, allegations of equitable subordination are necessarily fact intensive and would likely lead to even broader discovery efforts than those involved in the confirmation process. Indeed, the allegations raised by the Committee reach back to the Prior Chapter 11 Cases.

The Settlement Agreement avoids these disputes and the cost and delay associated with prosecuting them and, thus, provides significant value to the Debtors' estates.

## 3. Paramount Interest of Creditors

The Settlement Agreement serves the paramount interest of the Debtors' creditors. The Settlement Agreement has the support of the Committee, who has been an advocate for the creditors in these cases. Moreover, the Settlement Agreement provides the Debtors' estates with funds for administrative purposes. Although a significant amount of these

U.S. Bankruptcy Court - Hawaii  #11-01746  Dkt # 481  Filed  03/30/12  Page 34 of 54

funds have already been used to wind down operations, funds still remain for administrative creditors.  Furthermore, the Settlement Agreement also reduces the possibility that the Debtors' will continue to incur substantial additional administrative expenses that, as a result, would further dilute recoveries for administrative creditors.

Accordingly, the Settlement Agreement serves the paramount interest of creditors.

### 4. Difficulties in Collection

It is not clear that the remaining *A&C Properties* factor is implicated. The claims asserted by the Debtors and the Committee largely pertain to avoiding St. Francis' liens and claims.  Accordingly, recoveries would be dependent upon a subsequent disposition of assets, which is far from certain.  Thus, this factor is neutral with respect to approving the Settlement Agreement.

### 5. The Settlement Agreement Is the Result of Good Faith and Arms'-Length Negotiations

The Settlement Agreement is the product of extensive negotiations among the Debtors, the Committee, and St. Francis – three parties that rarely reached agreement in these cases.  Recognizing the economic realities of the case, the Debtors, the Committee, and St. Francis reached an agreement in principle on the eve of the hearing on the Bidding

Procedures Motion. Thereafter, the parties, both through counsel and directly through principals, negotiated the final Settlement Agreement. These negotiations were sometimes contentious and involved compromises by all parties. While there were several iterations of the Settlement Agreement, its material terms remained consistent with the terms described to the Court on December 16, 2011 at the hearing on the Bidding Procedures Motion.

In summary, the Settlement Agreement is in the best interests of the Debtors' estates, was negotiated at arms-length, and represents the Debtors' sound business judgment. As a result, the Settlement Agreement should be approved in all respects by the Court pursuant to Bankruptcy Rule 9019(a) and as otherwise requested herein.

## B. The Transfer of Assets to St. Francis Is Appropriate under Section 363 and Rule 9019

A key component of the Settlement Agreement is the transfer of the Transferred Assets (as defined in the Settlement Agreement) to St. Francis. Section 363(b) of the Bankruptcy Code authorizes the Debtors, after notice and hearing, to sell property of the estates. 11 U.S.C. § 363(b). The standards to authorize a sale under this section are that there is a sound business purpose for the sale, that the sale is in the best interests of the estate (*i.e*., the sale is for a fair and reasonable price), that there is

U.S. Bankruptcy Court - Hawaii   #11-01746   Dkt # 481   Filed  03/30/12   Page 36 of 54

accurate and reasonable notice to creditors and that the sale is made in good faith. *See In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991); *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir. 1983).

The Ninth Circuit in *In re Walter*, 83 B.R. 14 (B.A.P. 9th Cir. 1988) has adopted a flexible, case by case test to determine whether the business purpose for a proposed sale justifies disposition of property of the estate under section 363(b) of the Bankruptcy Code. In *Walter*, the Ninth Circuit, adopting the reasoning of the Fifth Circuit in *In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th Cir. 1986), and the Second Circuit in *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983), set forth the following standard to be applied under section 363(b) of the Bankruptcy Code:

> Whether the proffered business justification is sufficient depends on the case. As the Second Circuit held in Lionel, the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the assets to the estate as a whole, the amount of lapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition *vis-a-vis* any appraisals of the property, which of the alternatives of use, sale or lease the proposal

> envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

*Walter*, 83 B.R., at 19-20 (*quoting In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986)).

The Debtors have been unable to find a buyer suitable to all parties in interest for their businesses as a going concern. Due to the continued negative cash flow resulting from operations and the mounting administrative expenses, the Debtors determined in their sound business judgment, that it was necessary to cease operations and wind down their affairs. This business judgment was supported by the Committee (as evidenced by its agreement to enter into the Settlement Agreement). In order to accomplish this, the Debtors, along with the Committee, negotiated the Settlement Agreement with St. Francis that provides for the transfer of the Debtors' assets in exchange for the consent to use up to $16.7 million of St. Francis' cash collateral to fund expenses. Given the lack of alternatives, and despite the Present Chapter 11 Cases, the Debtors believe that the sale of the Transferred Assets to St. Francis on the terms and conditions set forth in the Settlement Agreement presents the best outcome for the Debtors and their estates.

Based on sound business reasons, including the current market for the Debtors' particular assets and the economics of these estates, it is in the best interest of the Debtors and their creditors that this Motion and the sale of the Transferred Assets be approved. Therefore, the Debtors respectfully submit that, if this Court applies the sound business reason standard suggested by the Second Circuit in *Lionel*, the sale should be approved in these Bankruptcy Cases.

**1. The Sale Is Made in Good Faith**

As discussed above, the proposed sale is a key component of the Settlement Agreement that was negotiated in good faith and on an "arms-length" basis. The court, in *Wilde Horse Enterprises*, set forth the factors in considering whether a transaction is in good faith. The court stated:

> 'Good faith' encompasses fair value, and further speaks to the integrity of the transaction. Typical 'bad faith' or misconduct, would include collusion between the seller and buyer, or any attempt to take unfair advantage of other potential purchasers. . . . And, with respect to making such determinations, the court and creditors must be provided with sufficient information to allow them to take a position on the proposed sale.

*Id.* at 842 (citations omitted).

In the present case, the negotiation of the proposed sale was an arms-length transaction. The negotiations of the sale occurred with the

U.S. Bankruptcy Court - Hawaii   #11-01746   Dkt # 481   Filed  03/30/12   Page 39 of 54

Debtors, St. Francis, and the Committee. Creditors will have been provided with sufficient notice of the sale. Accordingly, the sale is in good faith and should be approved.

### 2. The Sale of the Transferred Assets Should Be Free and Clear

Bankruptcy Code Section 363(f) allows a trustee to sell property of the bankruptcy estate "free and clear of any interest in such property of an entity," if any one of the following five conditions is met:

> (1) applicable non-bankruptcy law permits a sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept money satisfaction of such interest.

11 U.S.C. § 363(f). Section 363(f) of the Bankruptcy Code is written in the disjunctive and thus only one of the enumerated conditions needs to be satisfied for Court approval to be appropriate.

The Debtors believe that they will satisfy several of these conditions. First, the Debtors' believe it is likely that creditors will consent to the sale of assets proposed herein, as the sale will provide certainty that some

recovery will result. Second, under section 363(f)(5) of the Bankruptcy Code, the Debtors could demonstrate that certain creditors may be compelled to accept money in satisfaction of their interests. Third, courts have approved sales under section 363(f) of the Bankruptcy Code even where the sale price did not exceed the aggregate face value of the liens asserted on the property so long as the sale is for fair market value. *See In re Terrace Gardens Park P'ship*, 96 B.R. 707 (Bankr. W.D. Tex. 1989); *In re Beker Indus. Corp.*, 63 B.R. 474, 477 (Bankr. S.D.N.Y. 1986). In this case, the proposed purchase price is for fair market value. As such, the sale of the Transferred Assets is proper pursuant to section 363(f)(3) of the Bankruptcy Code.

Thus, approval for the sale of the Transferred Assets free and clear of liens and encumbrances pursuant to Bankruptcy Code Section 363(f) in the manner provided herein is appropriate.

### 3. Assumption and Assignment of Executory Contracts Is Appropriate

In connection with the Settlement Agreement, the Debtors also seek Court authority to assume and assign a small number of executory contracts and unexpired leases listed in Exhibit 2 to the Sale Agreement (the "Transferred Contracts and Leases"), and attached hereto as Exhibit B. Pursuant to section 365(a) of the Bankruptcy Code, a debtor

may assume unexpired leases provided the debtor complies with the provisions of section 365(b)(1) of the Bankruptcy Code and provides adequate assurance of future performance of the executory contract or lease. 11 U.S.C. §365(a). Specifically, section 365(a) of the Bankruptcy Code provides that, "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

Assumption of executory contracts and unexpired leases requires a debtor to: (a) cure any existing defaults under such agreements; (b) compensate all non-debtor parties to such agreements for any actual pecuniary loss resulting from the defaults; and (c) provide adequate assurance of future performance under the contract or lease. 11 U.S.C. § 365(b)(1); *see also In re Bowman*, 194 B.R. 227, 230 (Bankr. D. Ariz. 1995); *In re AEG Acquisition Corp.*, 127 B.R. 34, 44 (Bankr. C.D. Cal. 1991), *aff'd*, 161 B.R. 50 (9th Cir. B.A.P. 1993).

The trustee or debtor in possession may assume an executory contract if the value of consideration still owed to the estate exceeds the cost of the remaining obligations under the contract. *See In re Cochise College Park, Inc.*, 703 F.2d 1339, 1355 (9th Cir. 1983). "The theory is that advantageous contracts should be affirmed by the trustee, [or debtors in possession] as a means of enhancing the likelihood of successful

reorganization, or, if the estate is in liquidation, as a means of increasing creditor dividends." *Id.*

The Debtors are subtenants with respect to the majority of the Transferred Contracts and Leases. Because the Debtors will no longer own or lease the real property that is the subject of the Transferred Contracts and Leases, these agreements have no remaining value for the estates. The Debtors believe that there are no amounts required to cure any defaults under the Transferred Contracts and Leases. Exhibit B lists the Transferred Contracts and Leases and the individual cure amounts for each Transferred Contract and Lease. To the extent that the Court determines that defaults do exist, St. Francis has agreed in the Settlement Agreement to pay such amounts, subject to St. Francis' right to decide not to take assignment of such agreement. To be clear, the Debtors are not proposing to assume and assign their Medicare provider agreements to St. Francis.

Accordingly, the Court should approve the assumption and assignment of the Transferred Contracts and Leases to St. Francis.

**C. The Court Should Implement Additional Procedures for the Efficient Administration of These Cases**

In connection with the Settlement Agreement, the Debtors have determined that it is beneficial to obtain authorization from the Court to assist in the further winding down and completion of these cases.

**1. Appointment of Scouler as Responsible Person**

Given the wind down of the Debtors' business operations, the Debtors have considered several alternatives to the continued administration of the cases. The Debtors believe, and the Committee concurs, that the most efficient method for administering the estates is to appoint Mr. Daniel Scouler as the Debtors' responsible person with full authority to act on the Debtors' and their estates behalf (the "Responsible Person"). Mr. Scouler is already familiar with various remaining estate causes of action, including the remaining causes of action that the estate may pursue to add to recoveries for creditors. In addition, Mr. Scouler is familiar with the administrative claims being asserted against the estate that will need to be resolved to make distributions.

Courts have authorized the appointment of a responsible person under sections 105 and 1107 of the Bankruptcy Code. In *In re Gaslight Club, Inc.*, 782 F.2d 767 (7th Cir. 1986), the Seventh Circuit upheld the

appointment of a responsible person that supplanted the debtor's management and board of directors. The Seventh Circuit held:

> Sections 105(a) and 1107(a) of the Bankruptcy Code provide adequate authority for the bankruptcy court to approve the replacement of the person designated to perform the duties and exercise the rights of the debtor in possession if the creditors' committee, the person presently in control and the majority and controlling shareholder of the debtor agree to this course of action.

*Gaslight Club*, 782 F.2d at 771. Here, the Debtors' Chief Executive Officer and Board of Directors and the Committee all believe that it is more efficient for the estate to empower Mr. Scouler to act on behalf of the Debtors and their estates going forward than it is to appoint a chapter 11 trustee or convert the cases to chapter 7.

Accordingly, the Debtors request that the Court approve the appointment of Mr. Scouler as the Debtors' Responsible Person.

## 2. Establishment of an Administrative Claims Bar Date

Except as otherwise provided herein, the Debtors propose that each person or entity (including, without limitation, individuals, partnerships, corporations, joint ventures, trusts, and governmental units) that holds or wishes to assert an administrative expense claim arising under sections 503(b) or 507(a)(2) of the Bankruptcy Code, other than a Section 503(b)(9) Claim that is the subject of a prior bar date order, against the Debtors'

estates that may have arisen on or before the hearing date on the Motion (an "<u>Administrative Expense Claim</u>"), must file a request for allowance of such Administrative Expense Claim (a "<u>Request for Payment of Administrative Expense Claim</u>"), substantially in the form prescribed by Local Bankruptcy Rule 3001-2, no later than 30 days after entry of an order on this Motion  (the "<u>Administrative Expense Bar Date</u>").

The Debtors also propose that each person or entity (including, without limitation, individuals, partnerships, corporations, joint ventures, trusts, and governmental units) asserting an Administrative Expense Claim against more than one Debtor be required to file a separate Request for Payment of Administrative Expense Claim with respect to each such Debtor.  If more than one Debtor is listed on the Request for Payment of Administrative Expense Claim, the Debtors propose to treat such claim as filed only against the first listed Debtor.  If the Request for Payment of Administrative Expense Claim is filed under the lead jointly administered case – *In re Hawaii Medical Center LLC*, Case No. 11-01746 – or no specific Debtor is indicated, the Request for Payment of Administrative Expense Claim will be deemed filed only against HMC.

The following claims are excepted from the relief requested pursuant to this Motion and are not required to be filed on or before the Administrative Expense Bar Date:

  (a)  Administrative Expense Claims previously filed with the Bankruptcy Court;

  (b)  claims of professionals employed in the Present Chapter 11 Cases and to be paid by the estates;

  (c)  all claims for fees payable to the Clerk of the Bankruptcy Court;

  (d)  all U.S. Trustee fees; and

  (e)  all Administrative Expense Claims that arise on or after the hearing date on this Motion.

In the event that a party purportedly holding an Administrative Expense Claim against the Debtors who is required, but fails, to properly or timely file a Request for Payment of Administrative Expense Claim in accordance with the Order, the Debtors request that such party be forever barred, estopped, and enjoined from asserting such claim against any of the Debtors, and the Debtors and their properties be forever discharged from any and all liability with respect to such claim.

The Debtors further seek approval of the Debtors' proposed notice of the Administrative Expense Bar Date, which is attached hereto as Exhibit C (the "Administrative Expense Bar Date Notice").

To ensure that holders of Administrative Expense Claims are timely informed of the Administrative Expense Bar Date, the Debtors intend to serve a copy of the Administrative Expense Bar Date Notice within five (5) business days after entry of the Order (the "Service Date") by first-class mail, postage prepaid, on the following parties:

(a)     the Office of the U.S. Trustee;

(b)     counsel to the Committee;

(c)     all known holders of claims listed on the Schedules at the addresses stated therein (as amended or supplemented from time to time);

(d)     all parties listed on the Debtors' mailing matrix;

(e)     all parties who have requested notice pursuant to Bankruptcy Rule 2002;

(f)     the Internal Revenue Service;

(g)     all applicable state and local tax authorities; and

(h)     the Debtors' current and former officers, directors, and employees to the extent that contact information for such former officers, directors, and employees is available in the Debtors' records.

Section 503(a) of the Bankruptcy Code provides that "an entity may timely file a request for payment of an administrative expense." 11 U.S.C. § 503(a). Bankruptcy Rule 3003(c)(3) further provides that "[t]he court shall fix . . . the time within which proofs of claim or interest may be filed." Fed. R. Bank. P. 3003(c)(3).

Local Bankruptcy Rule 3001-2 provides the procedure for parties to file a request for payment of administrative expense. Local Bankruptcy Rule 3001-2(c) contemplates that the Court may schedule a deadline for the filing of Administrative Expense Claims other than what is set forth in the Local Bankruptcy Rules. LBR 3001-2(c) ("Unless the court otherwise sets a deadline . . .").

Accordingly, the Debtors hereby request that the Court establish the Administrative Expense Bar Date. The Debtors submit that the Administrative Expense Bar Date will give parties in interest ample time after receiving the Administrative Expense Bar Date Notice to file any Requests for Payment Of Administrative Expense Claims against the Debtors' estates. Fixing the Administrative Expense Bar Date will enable the Debtors to receive, process, and begin their analysis of Administrative Expense Claims in a timely and efficient manner.

Accordingly, pursuant to the procedures described above, the Debtors anticipate that creditors and parties in interest will have at least twenty-five (25) days' notice of the Administrative Expense Bar Date. Thus, any affected party should have sufficient notice of the Administrative Expense Bar Date and ample opportunity to prepare and file a Request For

Payment Of Administrative Expense Claim under Bankruptcy Rule 2002(a)(7).

Accordingly, for the reasons set forth above, the Debtors submit that establishing the Administrative Expense Bar Date and authorizing the Debtors to provide notice thereof, as provided for herein, along with the other proposed procedures, are in the best interests of the Debtors' estates, creditors and other parties in interest.

### 3. The Court Should Establish a Schedule for Consideration of Fee Applications for Professionals Paid by the Estate

To date, none of the non-ordinary course professionals retained by the Debtors, the Committee, or otherwise employed by an order of this Court have filed applications for compensation and reimbursement of expenses or received any compensation or reimbursement. The Debtors hereby request that the Court establish a schedule for all professionals that are entitled to payment from the estates to file such fee applications. The Debtors propose that professionals be required to file applications for allowance of compensation and reimbursement of expenses within seven days following the entry of the Order to be heard at the first available hearing date on regular notice. The Debtors further request that the Court authorize the payment of up to 35% of the allowed fees and expenses, which amount takes into consideration the increased carve-out under the

U.S. Bankruptcy Court - Hawaii   #11-01746   Dkt # 481   Filed  03/30/12   Page 50 of 54

Final DIP Order of $550,000. The Debtors further propose that future distributions to professionals be made in the judgment of the Responsible Person administering the estate.

### 4. Withdrawal of Motions to Dismiss and Entry of a Final Decree in the Prior Chapter 11 Cases

The Settlement Agreement also addresses certain other pending procedural matters. First, under Section 9.1 of the Settlement Agreement, the Committee has agreed to withdraw with prejudice its Motion to Dismiss these chapter 11 cases. Second, the Committee has also agreed to withdraw with prejudice both its Motion to Dismiss the Prior Cases as well as its objection to the Debtors' Motion for a Final Decree in the Prior Cases. The Debtors anticipate that these withdrawals will be filed prior to the hearing on the Motion and that they will present an order entering a Final Decree in the Prior Cases at the hearing on this Motion.

### D. The Court Should Approve the Rejection of the Rejected Contracts and Leases.

Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject an executory contract or an expired lease." 11 U.S.C. § 365(a); *see also University Med. Ctr. v. Sullivan* (*In re University Med. Ctr.*), 973 F.2d 1065, 1075 (3d Cir. 1992). The Court may approve a debtor's rejection of an executory

contract or unexpired lease if such rejection is made in the exercise of such debtor's sound business judgment, and if such rejection benefits the estate. *See, e.g.*, *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989); *NLRB v. Bildisco & Bildisco* (*In re Bildisco & Bildisco*), 682 F.2d 72, 79 (3d Cir. 1982), *aff'd* 465 U.S. 513 (1984); *In re Patterson*, 119 B.R. 59 (E.D. Pa. 1990); *see also In re Federated Dep't Stores, Inc.*, 131 B.R. 808, 811 (S.D. Ohio 1991) ("Courts traditionally have applied the business judgment standard in determining whether to authorize the rejection of executory contracts and unexpired leases"); *Westbury Real Estate Ventures, Inc. v. Bradlees, Inc.* (*In re Bradlees, Inc.*), 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996) ("[u]nder the business judgment test . . . [a court should approve a debtor's proposed rejection] if the debtor can demonstrate that rejection will benefit the estate").

It is sufficient if a debtor determines in its business judgment that a benefit will be realized. *Sharon Steel Corp.*, 872 F.2d at 39 (*citing Wheeling-Pittsburgh Steel Corp., v. West Penn Power Co.* (*In re Wheeling-Pittsburgh Steel Corp.*), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987)). The business judgment standard requires that the Court approve the debtor's business decision unless that judgment is the product of bad faith, whim or

caprice.  *Lubrizol Enter., Inc. v. Richmond Metal Finishers*, 756 F.2d 1043, 1047 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986).

The Debtors have determined that the executory contracts and unexpired leases listed on Exhibit D to this Motion no longer have any economic benefit to the estates (collectively, the "Rejected Contracts and Leases").  Among other things, since the Debtors are no longer operating their businesses and will have transferred substantially all of their assets, they no longer require the services or benefits offered by the Rejected Contracts and Leases.  Moreover, it is imperative to the Debtors to minimize future administrative expenses, which requires the rejection of the Rejected Contracts and Leases.  Accordingly, the Debtors have offered a sound business reason for the rejection of the Rejected Contracts and Leases.  Under the prior bar date established by the Court, parties to the Rejected Contracts and Leases will have 30 days from the date of the entry of the Order to file any claims arising as a result of the rejection of the Rejected Contracts and Leases.

## V.  CONCLUSION

Based upon the foregoing, the Debtors respectfully submit that good cause exists for granting the Motion and the Debtors request that the Court enter an order granting such relief, including the waiver of the fourteen-day

stay under Bankruptcy Rule 6004(h), in addition to any such further relief the Court deems proper.

Dated:  March 30, 2012      _/s/    Christopher J. Muzzi_
                            CHRISTOPHER J. MUZZI
                            TSUGAWA BIEHL LAU & MUZZI
                            A HAWAII LIMITED LIABILITY PARTNERSHIP

                            and

                            SHAWN M. RILEY
                            PAUL W. LINEHAN
                            JOHN A. POLINKO

                            MCDONALD HOPKINS LLC

                            CO-COUNSEL FOR THE DEBTORS AND
                            DEBTORS IN POSSESSION